UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | |
|---|---|
| SELMA STONE, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>    v.<br><br>LIFE PARTNERS HOLDINGS, INC., BRIAN D. PARDO, R. SCOTT PEDEN, and DAVID M. MARTIN,<br><br>          Defendants. | Cause No. DR-11-CV-016-AM<br><br><br>FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |

Lead Plaintiff Stewart Scothorn and additional named plaintiffs David G. Santacroce and Jeremy Goad file this amended complaint on behalf of themselves and all others similarly situated against Defendants Life Partners Holdings, Inc., Brian D. Pardo, R. Scott Peden and David M. Martin (collectively, the "Defendants").  Plaintiffs bring these allegations based upon their own knowledge as to all allegations regarding their own conduct, and based upon the investigation of counsel and experts as to all other allegations, including counsel's review of press releases, conference call transcripts, analyst reports, Defendants' filings with the United States Securities and Exchange Commission ("SEC"), relevant accounting standards and the complaint filed by the SEC against these same defendants on January 3, 2012, in the United States District Court for the Western District of Texas.  *SEC v. Life Partners Holdings, Inc., Brian D. Pardo, R. Scott Peden and David M. Martin*, No. 1:12-cv-00033-JRN (W.D. Tex.).[1]

---

[1] The complaint in that action is sometimes hereinafter referred to as the "SEC Complaint."

- 1 -

## I.     NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the common stock of LPHI between May 26, 2006, and June 17, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Life Partners Holding, Inc. ("LPHI") is the publicly traded holding company for Life Partners, Inc. ("LPI").  LPHI's main business is as a "life settlement broker," buying life insurance policies in the secondary market, and reselling fractional pieces of those policies to "accredited investors" through a multi-level marketing style network of licensees.  LPHI makes money by being the buyers' agent in these transactions and has strong incentives to make the life insurance policies appear more attractive to potential investors to encourage them to purchase such policies and allow LPHI to earn a commission.

3.     Because LPHI made its money in selling commissions, its income was dependent upon the volume of purchases it arranged – not the level of returns achieved by investors in the policies.

4.     When purchasing an insurance policy in the secondary market, an investor looks at several factors to assess his probable return on investment.  The investor calculates his internal rate of return (or "IRR") based upon the money he is currently investing and the timing of money he expects to receive when the policy "matures" (when the insured dies).  Thus, the most important factor in the equation is the life expectancy ("LE") of the insured.  If the LE is calculated correctly, the policy will mature when expected, and the investor will achieve his targeted returns.  If the LE is too short, the investor will receive less than his targeted returns.

5.     The life settlements market is highly competitive.  According to a WALL STREET JOURNAL article, "life settlement brokers often pocket the lesser of 6% of a policy's face or 30% of the gross sales price."  LPHI's fees, however, were more than 14% of policy face values.

6.      LPHI was only able to charge these egregious fees because they:  failed to adequately disclose their fees to investors; prevented the transactions from being priced competitively; and failed to disclose the true LE of the insured – instead using the false projections authored by LPHI's in-house actuarial consultant to make investors think that they would achieve returns between 9% and 13% (although LPHI has promised returns as high as 16%).  Because LPHI's fees were so much higher than its competitors, the IRR achieved by its clients should have been correspondingly lower.  However, because of the competitive nature of the life settlements business, the clients would go to another broker that would enable them to achieve their targeted IRRs.

7.      In order to induce its clients to purchase life insurance policies from them, LPHI devised a scheme to deliberately overstate the value of such insurance policies by providing the potential purchasers with false and artificially low LEs.  With an artificially low LE, the IRR of the investments would be overstated, making them appear as good an investment as those sold by life settlement companies with dramatically lower fee structures.  It is important to recognize that LPHI clients were not told of the higher fee structure, or even the fact that LEs prepared by the seller's brokers had dramatically higher LEs.  The only information LPHI clients had to calculate their IRRs were given to them by LPHI and consisted primarily of LEs.

8.      In order to implement its scheme to understate LEs, LPHI retained Dr. Donald Cassidy ("Cassidy" or "Dr. Cassidy"), a Reno-based Oncologist with no actuarial background, to perform all of its LE analyses.

9.      Because investors were not aware that the LEs were bogus until some date in the future (when insureds had outlived Dr. Cassidy's LEs), the scheme was undetectable in the short-term.  These excessive fees went directly to the "bottom line" of LPHI, allowing the company to

report "record" revenues and earnings quarter after quarter and sending the Company's stock price soaring from $2.19 per share (split-adjusted) prior to the start of the Class Period to more than $22.50 per share in early 2009.

10.     Although the scheme was not detectable for years until Dr. Cassidy's LEs would be proven false, reporters and regulators eventually began to unravel the scheme and quantify the extent of Dr. Cassidy's understatements of LEs.  When CITRON RESEARCH first raised questions about LPHI's business model on February 11, 2009, LPHI's share price fell dramatically over the next week from $16.60 per share to close as low as $10.17 per share on February 18, 2009. Because this report was somewhat speculative and the extent of the falseness of Dr. Cassidy's LEs could not yet be demonstrated, LPHI's share price rebounded somewhat, and stayed in the $12.00 to $15.00 per share range until late 2010.

11.     Defendant Brian D. Pardo, the CEO of LPHI, concocted to two-part scheme to profit from the artificial inflation of the Company's shares during the Class Period.  First, Defendant Pardo sold approximately $11.2 million in LPHI stock during the Class Period while the shares were artificially inflated at prices between $10.00 per share and $43.50 per share (non-split adjusted), rather than their current trading price of $4.19 per share (split adjusted). Defendant Peden also sold approximately $300,000 in LPHI stock at $30.13 per share (not split-adjusted) on June 18, 2007.

12.     Secondly, in order to further "cash out" from this illicit scheme, Defendant Pardo looted the Company through the payment of huge an unsustainable "dividends" that were paid to his off-shore partnership.  Defendant Pardo owns approximately 50.3% of the Company's shares through an offshore trust he set up on the island of Gibraltar.  Because the Company's business model was a shell game that was ultimately unsustainable, he was aware that the long-term

- 4 -

prospects for his stock ownership in the Company were not good (a fact that was never disclosed to investors).  Accordingly, he needed to come up with a scheme to "cash out" of the Company without selling shares and having his holdings drop below the 50% "control" threshold. Accordingly, the Company began paying large and unsustainable dividends, and because of his large ownership interest, 50.3% of this money went directly to Defendant Pardo's trust in Gibraltar.  This scheme to deplete the cash of the Company provided a strong incentive to operate the Company under a business strategy that management was well aware was unsustainable and would ultimately come crashing down.  To keep the Company's shares artificially high during the Class Period, LPHI also falsely recognized "material" amounts of revenue in violation of Generally Accepted Accounting Principles ("GAAP") and SEC regulations.  By reporting "record" earnings quarter after quarter from 2007 through 2010, the Company was able to continue this ruse long enough to pay more than $20 million dollars in dividends to Defendant Pardo's trust in Gibraltar.  Additionally, LPHI shares traded as high as closing at $21.36 per share on January 13, 2009.  By late 2010, however, market analysts, newspaper reporters, the Texas Department of insurance and the U.S. Securities and Exchange Commission had begun to unravel this elaborate scheme.

13.    During the Class Period, although the Defendants were aware that Dr. Cassidy's LEs were materially flawed by at least February of 2006, Defendants continued to misrepresent LPHI's business model and its sustainability.  Specifically, as of February 28, 2006, the Defendants were aware that in 88% of the relevant life settlements brokered by LPHI, the insureds had exceeded their Cassidy-rendered LEs.  Notwithstanding this knowledge, in each and every quarterly and annual financial report filed with the SEC during the Class Period, the Defendants misrepresented both the reported financial results of the Company and the viability

of its business model.  In the same public filings, the Defendants failed to disclose that the deliberately underestimated LEs constituted a material trend impacting the Company's revenues, although such disclosure is required by federal securities laws.

14.     The lengths to which Defendants Pardo, Peden and Martin went to conceal the fraud is strong evidence of their knowledge and intent to deceive shareholders.  For example, despite his knowledge that such returns were impossible even under ideal circumstances, and even less possible when LEs were being consistently understated by Dr. Cassidy, Defendant Pardo disclosed in quarterly conference calls with investors during the Class Period, and directly told BLOOMBERG TELEVISION in 2009, that LPHI had a track record of delivering "double-digit" returns to investors in life settlements brokered by the Company.  Likewise, Defendant Peden misrepresented to investors that Dr. Cassidy used a Valuation Basic Table ("VBT") in arriving at his LEs, when, in fact, he used a census table instead (which served to materially understate LEs in contrast to the VBT's, which were considered industry standard).

15.     In order to continue to misrepresent the quarterly and audited annual financial results of the Company, the Defendants deliberately misled LPHI's auditors by providing false representation letters to the auditors, deliberately backdating key documents that were relied upon by the auditors in making their audit opinions and providing other false information to the auditors.  For example, Defendants Peden and Martin provided LPHI's auditor with a spreadsheet that they represented were of the 300 "most recent" maturities.  According to the chart, which covered a ten-year period, the ratio of policies that matured before, versus after, the date projected by Cassidy's LEs was roughly 50%/50%.  Knowing that the auditors would rely on this spreadsheet, Defendants Pardo and Martin deliberately excluded 1,230 policies for which

the insureds had already outlived their LEs calculated by Dr. Cassidy.[2]  Unaware of the falsity of these representation and key documents, the Company's auditors provided unqualified or "clean" audit opinions for the Company's financial reports.

16.     By late 2010, many of Dr. Cassidy's LEs had been performed long enough ago that they could be analyzed quantitatively with publicly available data.  In late 2010, the WALL STREET JOURNAL performed an analysis of numerous of these LEs based upon records it received from the Texas Department of Insurance pursuant to a public records request and concluded that "in policies old enough to provide a measure, the insured people usually hadn't died within the life expectancy Life Partners gave its clients, and often were living beyond double or triple their projected span."

17.     Shortly thereafter, on January 20, 2011, LPHI admitted that the SEC was investigating LPHI, and specifically the methods it used to calculate LEs for its clients.  Seeing this as confirmation of the misconduct alleged in the WALL STREET JOURNAL article, investors sent LPHI shares down 17.2% in one day to close at $11.28 per share.

18.     On May 13, 2011, LPHI was forced to admit on June 3, 2011, that it had received a "Wells Notice" from the SEC – a letter stating that the staff of the SEC would recommend that civil charges be brought against the company and certain of its officers for violations of the federal securities laws.  This news sent LPHI shares down more than 20% in one day, with the stock closing at just $5.34 per share on May 13, 2011.

19.     Things got even worse for LPHI's investors when the Company announced that it would be unable to file its annual report for the year ended February 28, 2011, because of certain undefined accounting issues.  Days later, on June 9, 2011, Ernst & Young ("E&Y"), its

---

[2] SEC Complaint ¶¶ 13, 127

independent auditor, resigned and took the highly unusual step of disassociating itself from the previously audited February 28, 2010 financial statements, maintaining that these statements "should no longer be relied upon."  Further, E&Y publicly stated that LPHI's revenue recognition policies did not comply with Generally Accepted Accounting Principles or SEC regulations and that both annual and quarterly previously filed financial statements would need to be restated for "material" amounts.  This controversy caused LPHI shares to close trading as low as $3.09 per share on June 10, 2011.

20.     The Class Period ends on June 17, 2011, when Eide Bailly (the Company's auditors prior to E&Y), announced that its audit report covering the February 28, 2009 financial statements should likewise "no longer be relied upon."

21.     On November 22, 2011, LPHI restated its financial results for the years 2009 and 2010 to lower revenues and net income to correct errors related to revenue recognition and the impairment of policies that the Company itself owned, and admitted that its financial statements had been "overstated" by $3.8 million prior to March 1, 2008.

22.     On January 3, 2012, the SEC concluded its year-long investigation into the accounting and disclosure practices of the Company by filing a securities fraud complaint against the Company, as well as Defendants Pardo, Peden and Martin in federal court.  An SEC official commented that "Life Partners duped its shareholders by employing an unqualified medical doctor to assign baseless life expectancy estimates to the underlying insurance policies."  A second SEC official added that "[t]he senior-most executives at Life Partners concealed significant risks to the business, manipulated financial statements with improper accounting, and knowingly profited from their misconduct by executing insider trades based on information that was not available to the public."

- 8 -

23.     Although Defendants Pardo, Peden and Martin profited handsomely from the scheme to artificially inflate LPHI shares, having sold millions of dollars in artificially inflated stock, diverting tens of millions of dollars of Company cash in "dividends to Pardo's offshore trust and receiving millions of dollars of salary and other compensation from the Company, Plaintiffs and the other Class members did not fare so well, losing many millions of dollars when LPHI's share price collapsed to less than $4.00 per share.

## II.     JURISDICTION AND VENUE

24.     The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

26.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

27.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.     PARTIES

28.     Lead Plaintiff Stewart Scothorn ("Scothorn"), as set forth in his previously filed certification which is incorporated by reference herein, purchased the common stock of LPHI during the Class Period and has been damaged thereby.  Additional Named Plaintiffs, David G. Santacroce ("Santacroce") and Jeremy Goad ("Goad"), as set forth in their previously filed

certifications which are incorporated by reference herein, purchased the common stock of LPHI during the Class Period and have been damaged thereby.

29.     Defendant Life Partners Holdings, Inc. ("LPHI") is a Texas corporation with its principal place of business at 204 Woodhew Drive, Waco, Texas 76712.  It is a financial services company specializing in buying and selling "life settlements."  The Company operates as a licensed insurance company in the state of Texas through its wholly-owned subsidiary, Life Partners, Inc.  LPHI's stock trades on the NASDAQ under the ticker symbol "LPHI."  The Company's fiscal year (for accounting purposes) ends on the last day of February.

30.     The following officers and directors of LPHI (the "Individual Defendants") are also defendants in this action:

(a)     Defendant Brian D. Pardo ("Pardo") is the President and Chief Executive Officer of LPHI and has been the Chief Executive Officer of LPHI since 1991.  Defendant Pardo, according to LPHI's website, "is one of the pioneers of the life settlement industry having been instrumental in establishing life settlements as a viable financial investment alternative."  Defendant Pardo owns 9,377,605 shares of LPHI (approximately 50.3% of the outstanding shares of the Company), primarily through a trust (Pardo Family Holdings, Ltd.) that he established on the island of Gibraltar.  In July 1989, the SEC filed a complaint against Pardo and his company, ASK Corp. of Waco, Texas, alleging that they materially overstated the company's revenues and profits in public filings.  Pardo resolved the enforcement action by consenting to the entry of a permanent injunction enjoining him from future violations of Exchange Act antifraud provisions and from aiding and abetting Exchange Act reporting violations;

(b)     Defendant R. Scott Peden ("Peden") serves as General Counsel for LPHI and President of LPHI.  He served as Vice President and General Counsel for LPHI since its

incorporation in 1991.  According to LPHI's website, Defendant Peden "designed the legal structure of the life settlement transaction that is widely used throughout the industry." Defendant Peden is a licensed attorney in the State of Texas; and

        (c)    Defendant David M. Martin ("Martin") has served as the Chief Financial Officer of LPHI since February 2008.  Martin is licensed as a Certified Public Accountant in Texas.

      31.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of LPHI, were privy to confidential and proprietary information concerning LPHI, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning LPHI, as discussed in detail below.  Because of their positions with LPHI, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

      32.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in

the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of LPHI's business.

33.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

34.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to LPHI's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of LPHI's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

35.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of LPHI's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme:  (i) deceived the investing public regarding LPHI's business, operations and

management and the intrinsic value of LPHI's securities; (ii) allowed the Individual Defendants

to siphon millions of dollars of "dividend" payments from the Company; and (iii) caused

Plaintiffs and members of the Class to purchase LPHI common stock at artificially inflated

prices.

## IV.   CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the

common stock of LPHI between May 26, 2006, and June 17, 2011, inclusive, and who were

damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and

directors of LPHI, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants have or had a

controlling interest.

37.     The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, LPHI common stock was actively traded on the

NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and

can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds

or thousands of members in the proposed Class.  Record Owners and other members of the Class

may be identified from records maintained by LPHI or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions.

38.     Plaintiffs' claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law complained of herein.

39.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of LPHI;

        (c)     whether the price of LPHI common stock was artificially inflated during the Class Period; and

        (d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.     BACKGROUND ALLEGATIONS REGARDING LPHI'S SCHEME

42.     The "life settlements" business is a secondary financial marketplace for the purchase and sale of the death benefits from existing life insurance policies.  In this marketplace,

- 14 -

purchasers do not buy life insurance on their own lives, but rather buy all or part of the death benefits of other peoples life insurance policies for an upfront payment.

43.     LPHI, through its wholly owned subsidiary Life Partners, Inc., brokers the sale of the life insurance policies by policy owners (typically the insureds under the policies) to investors willing to purchase these policies.  Typically, the insureds under these policies are either ill or older people looking to obtain an up-front payment of some portion of the death benefit that will ultimately be paid by the insurance company upon their death.  This transaction is commonly referred to as a "life settlement" by the Company.  Investors are willing to buy these policies from insureds at enough of a discount that they can make a reasonable return on their investment.

44.     LPHI sometimes facilitates sales of fractionalized interests in a single policy to multiple investors, a structure the Company refers to as "direct fractional ownership."  At the date investors purchase an interest in a policy, they also contribute funds to escrow for future premium payments on the policy for the term of the life expectancy estimate provided by LPHI. When an insured dies, investors in that policy collect their pro rata share of the policy's death benefit.

45.     LPHI's business model is to make a profit in the life settlement transactions that it brokers by selling the policies to the investors at a higher price than it pays to the insureds.  This difference is referred to by the Company as the "commission."

46.     The life settlements business is highly competitive, with buyers brokers typically receiving commissions of approximately 6%.  LPHI, however, received commissions of approximately 14%.  In order to make these excess commissions in a highly competitive marketplace, LPHI would have to convince investors in the life settlements that they were

achieving market or above-market returns on their investment.  A common measure of one's

return in such an investment is the Internal Rate of Return ("IRR"), which is the annual interest

rate achieved by an investor based upon the timing and amounts of cash inflows relative to the

purchase price of this investment.

47.     In purchasing a life insurance policy, there are several factors that can impact

IRR.  The first is the purchase price, which is readily apparent to the purchaser.  The second is

the amount of premiums that will need to be paid, and the third, and most important factor, is the

life expectancy of the insured, because it is at the death of the insured that the policy matures,

and the investor will be paid.  The biggest risk factor, and the only real uncertainty in this

equation, is the life expectancy ("LE") of the insured.  By manipulating this factor, the IRR of

the investment can be easily manipulated as well.

**A.     LPHI's Unsustainable Business Model Reaps Extraordinary Short-Term Profits**

**1.     LPHI Purchased Policies from Sellers at a Substantial Discount below the
Face Amount**

48.     LPHI locates policy owners willing to become Sellers through a network of life

settlement brokers; insurance, financial, and estate planning professionals; personal referrals; and

through Internet and print media advertising.  Brokers are typically compensated based on a

percentage of the face value of the policy sold, an amount negotiated directly between the

policyholder and the broker.  This compensation, advanced by LPHI, is paid immediately upon

acceptance of the policy by LPHI.

**2.     LPHI Purchasers/Investors were Recruited through a Network of Licensees**

49.     LPHI categorizes purchasers of life settlements as either institutional or

retail.  Institutional Purchasers are typically investment funds designed to acquire and hold life

settlements.  Purchasers are not informed of the actual amount Defendants pay the Seller, which

- 16 -

would be an appropriate estimate of the policy's true value.  Instead, Purchasers are only informed of the marked-up "acquisition price" which LPHI – in its sole discretion – sets based upon its false life expectancy estimates.

### 3.    LPHI is a Small Company

50.    LPHI is a small company, having only from 37 to 62 "direct employees" throughout the Class Period, as described in the Company's various annual reports filed with the SEC:

- As of February 28, 2006, we had 37 direct employees, none of whom are represented by a labor union (2006 Form 10-KSB);

- As of February 28, 2007, we had 37 direct employees, none of whom are represented by a labor union (2007 Form 10-KSB);

- As of February 29, 2008, we had 40 direct employees, none of whom are represented by a labor union (2008 Form 10-K);

- As of February 28, 2009, we had 56 direct employees, none of whom are represented by a labor union (2009 Form 10-K);

- As of February 28, 2010, we had 62 direct employees, none of whom are represented by a labor union (2010 Form 10-K); and

- As of February 28, 2011, we had 59 direct employees, none of whom is represented by a labor union (2011 Form 10-K)

### 4.    LPHI's Transaction Cycle With its Clients[3]

51.    In a typical life settlement transaction brokered by the Company, LPHI first identifies policy owners interested in selling their policies and negotiates a potential purchase of the policies through "Seller Agreements" between the policy owners and the Company.  Upon

---

[3] SEC Complaint, ¶¶ 69-73

reaching an agreement for a potential sale by the policy owners, LPHI forwards them assignment documents covering the policies, to be returned to the Company along with executed copies of the Seller Agreement.  Peden was one of three executives who reviewed and signed Seller Agreements on behalf of the Company.

52.     Prior to the "Closing Date," Seller Agreements are non-binding and unenforceable against the policy owner.  The Seller Agreements define "Closing Date" as "the date upon which the consideration for the transaction described herein is transferred from the Escrow Agent to the Seller."  Prior to the Closing Date, neither the policy owner nor LPHI are contractually obligated to proceed with the sale, as each may rescind the agreement at any time and for any reason without incurring a penalty.  In fact, for a 15-day period following the Closing Date (the "Rescission Period"), the policy owner has the option to rescind his or her agreement to sell the policy for any reason.  Moreover, death of the insured covered by the policy prior to or during the Rescission Period triggers an automatic rescission under the Seller Agreement.

53.     While it processes the Seller Agreement, LPHI sends the medical file for the insured underlying the policy to Cassidy for his review and analysis.  Once Cassidy completes his analysis, LPHI prepares a confidential case history for each insured, which contains Cassidy's LE.  Licensees submit reservations on behalf of interested investors to purchase specified interests in a particular policy or policies.  To secure their reservation, investors mail or wire money to the escrow agent to be used to purchase life settlements at closing, and they deliver signed, but undated, "Policy Funding Agreements" to the Company. The Policy Funding Agreement specifies the policy or policies to be purchased, the acquisition price, and the escrow arrangements for receipt and disbursement of funds.

- 18 -

54.     After receipt of the Policy Funding Agreement, the Seller Agreement, and the accompanying assignment documents, LPHI forwards to the escrow agent the documents necessary for closing. A LPHI employee responsible for coordinating funding sends the escrow agent a closing letter that provides instructions regarding the payment of funds at closing, including the amount to be paid to the seller, the amount to be placed into escrow for future premiums, and the residual amount to be sent to the Company.  The closing of a life settlement transaction occurs when the seller gets paid – i.e., on the Closing Date, as defined in the Seller Agreement.

55.     At all times during the Class Period, Pardo, Peden, and Martin participated in and/or monitored the process by which the Company processed and recorded revenue from life settlement transactions.  Martin, as CFO and head of the Accounting Department, was responsible for reviewing and approving the quarter-end accrual journal entry reflecting revenues, including the journal entries necessary to reflect policies that were only partially funded – *i.e.,* polices as which the Company had secured commitments from investors sufficient to purchase some, but not all, fractional interests in the policy.  Pardo and Peden monitored daily, monthly, quarterly, and annual contract activity, including contract funding status, through an internal, electronic database that holds all information related to a particular policy.

**5.     Defendants Used Fraudulent Life Expectancy Estimates to Sell Policies to LPHI Clients**

56.     The most important factor in policy pricing – both in acquiring the policy from the Seller and in then placing it with the Purchaser – is the life expectancy determination.  Sellers and Brokers for Sellers regularly obtain life expectancy estimates in order to know the proper price at which to sell their policies.  LPHI evaluates the life expectancy of each Seller when it determines whether or not it will purchase any given policy.  However, this is not the same life

expectancy that LPHI passes on to Purchasers in order for Purchasers to decide what the likely payout will be on the policy and whether to invest. Instead, when *placing policies with Purchasers*, LPHI uses a so-called "independent medical doctor" to provide a new – and apparently always shorter – life expectancy.

> a.   **LPHI Hires Dr. Cassidy Without Performing Due Diligence on His Qualifications[4]**

57.   Prior to 1999, LPHI obtained the LEs that it used to broker life settlements from Dr. Jack Kelly ("Kelly") – a Reno, Nevada-based doctor that, as a founder and part owner of the Company, had a financial interest in Life Partners, Inc. Following Kelly's unexpected death in 1999 – Pardo immediately hired Kelly's officemate, Dr. Donald Cassidy ("Cassidy"), to render LPHI's LEs. Defendant Pardo had met Cassidy at Dr. Kelly's funeral and essentially hired him on the spot to fill Dr. Kelly's shoes in the scheme.

58.   Prior to hiring Cassidy, LPHI and Pardo did not conduct any meaningful due diligence on Cassidy's qualifications to act as a life expectancy underwriter. In fact, during their only conversation (at Kelly's funeral), Pardo instructed Cassidy to review Kelly's life expectancy assessments to determine "how they were doing it." Within a few days of Kelly's funeral, LPHI began sending all of its retail life expectancy work to Cassidy, paying him $500 for each policy LPHI successfully brokered using the LEs that Cassidy provided. In February 2008, LPHI began paying Cassidy an additional $15,000 per month.

59.   Doctor Cassidy served as LPHI's one and only so-called "independent medical doctor" who provided LPHI with life expectancies that it, in turn, provided to Purchasers. Cassidy was deposed on November 21, 2008, in connection with a suit by Colorado regulators against LPHI for selling unregistered securities. Cassidy testified that for each insurance policy

---

[4] SEC Complaint, ¶¶ 5-8.

that LPHI purchased, he was paid $500.  Cassidy further testified that at the beginning of his

relationship with LPHI, he did work for his own practice four days per week and for LPHI three

days per week.  In each three-day LPHI work week, Cassidy would provide 50-80 life

expectancy estimates.  As of the time of his deposition, he estimated preparing between 100 and

200 life expectancies per week, working three days a week.  Assuming an 8-hour work day and

one 30-minute break, at the beginning of his relationship with LPHI, Cassidy was taking 17-27

minutes to perform each life expectancy estimate.  At the time of his deposition, under the same

assumptions, Cassidy was taking just 7-14 minutes to perform each estimate.

60.     Prior to being hired by LPHI, Cassidy had no experience rendering LEs.  He had

no actuarial training, and had never taken any courses or received any professional training on

life expectancy analysis.  Likewise, Cassidy had never attended any relevant professional

conferences or even researched the methodology used by life settlement underwriters.  At the

time he was hired, Cassidy had absolutely no experience in rendering LEs.

### b.     Cassidy's Flawed Methodology Results in Understated LEs[5]

61.     Cassidy described his methodology in letters to the Company dated March 2002

("2002 Letter") and May 2009 ("2009 Letter") (collectively, the "Letters").  The purpose of the

Letters was to provide information to LPHI's auditor about Cassidy's methodology.

62.     According to the 2009 letter, Cassidy was rendering LEs using a census table

published by the U.S. Department of Health and Human Services ("HHS").  The HHS table is a

census table that addresses life expectancies for the entire U.S. population.  In contrast, mortality

tables used by actuaries in the life settlement industry address mortality rates for a select portion

of the population who have been underwritten for insurance.  LE estimates based on data

---

[5] SEC Complaint, ¶¶ 7, 12, 34-40, 42.

- 21 -

provided in the HHS table are typically shorter than LE estimates based on data in tables tailored to insured populations. Cassidy's practice of using a census table to assess life expectancy deviates from the standard practice in the life settlement industry.

63.     Cassidy also deviated from standard practices in the life settlement industry by rendering LEs based on outdated mortality data instead of the most recent data, e.g., using 1999 data when 2005 data was available.

64.     Cassidy has purportedly reviewed tens of thousands of policies during his decade-plus tenure underwriting LEs for LPHI, but neither Cassidy nor the Company ever assessed the accuracy of his LE track record prior to being contacted by the SEC in 2010.  Nor did they otherwise attempt to inform future LE estimates based on other historical experiences, such as changes in medical treatments or mortality tables.  Cassidy's failure to factor in historical experience in his LE underwriting methodology deviates from standard practice in the life settlement industry.

65.     The Letters also indicate that Cassidy's methodology for generating LEs on viaticals and senior life settlements is substantially the same.  According to LPHI, it brokered primarily viatical policies until fiscal year 2008.

66.     As a result of these deficiencies in Cassidy's methodology, his LEs are materially short, and the number of policies brokered by LPHI for which the insured has exceeded Cassidy's LE has increased over time.  The actual number of maturities on policies underwritten by LPHI is significantly lower than the expected number of maturities (based on Cassidy's LEs) for those same policies, for both viaticals and life settlements.

67.     For example, the average LE generated by Cassidy for all policies from 2000¬2005 was 3.8 years, and his average LE for life settlements from 2000-2010 was 4.6 years.

- 22 -

Had the LEs been appropriately developed based on sound actuarial practices, including factoring in historical experience, Cassidy's average LE for all policies (including viaticals) funded from 2000 through 2005 should have been at least 8 years longer.  Cassidy's average LE for life settlements funded from 2000 through 2010 should have been at least 9 years longer than estimated.

68.     In an effort to conceal LPHI's practice of using Cassidy's flawed methodology to systematically underestimate LEs, and the accompanying risk that Life Partner's reliance on underestimated LEs posed to the Company's business, Peden misrepresented that Cassidy's methodology was consistent with industry practices.  Specifically, in October and November 2008, Peden misrepresented to an investor, as well as a member of the network of independent buyers' agents that LPHI uses to identify investors that Cassidy's LEs were based on the 2008 VBT, a table published by the Society of Actuaries that is widely used in the life settlement industry.

         c.      **In the ten-plus years he has worked for LPHI, Cassidy never modified his methodology or evaluated his track record on LEs.  Defendants Were Aware That Dr. Cassidy's LEs Were False Prior to the Beginning of the Class Period[6]**

69.     Cassidy's success rate in accurately estimating LEs was abysmal.  The following chart shows, for the universe of policies from which his success rate is measurable, the percentage of policies that have exceeded Cassidy's LEs since LPHI started brokering policies based on those LEs:

| Fiscal Year | Policies Exceeding LE |
|:-----------:|:---------------------:|
| 2006 | 88% |
| 2007 | 88% |
| 2008 | 89% |
| 2009 | 90% |

---

[6] SEC Complaint, ¶¶ 41-44,  49-55.

| 2010 | 91% |
|------|-----|

70.     Beginning at least as early as 2003, it was apparent to LPHI's Audit Committee and Board of Directors that the LEs used by the Company to broker life settlement transactions were materially short.  In February 2003, LPHI's auditor and Audit Committee expressed concern that the number of maturities on the policies that the Company brokered was less than expected based on the LEs that LPHI assigned to those policies.  In pertinent part, the Audit Committee's February 2003 quarterly report to LPHI's Board of Directors stated:

> [D]iscussion was held regarding the small number of policies paying off during the nine months ended November 30, 2002. Based on these discussions, the Committee recommended discussions with management about obtaining an independent review of this issue to determine whether adjustments are necessary to the Company's underwriting criteria.

71.     Both Defendant Pardo and Defendant Peden were members of LPHI's Board of Directors in February 2003, and received this report from the Audit Committee.  Despite the Audit Committee's concerns, Pardo and Peden did not attempt to review or adjust the Company's underwriting criteria or determine why LPHI was not seeing the expected number of maturities based on Cassidy's LEs.  Indeed, neither Pardo nor Peden followed the audit committee's recommendation to conduct an independent review of LPHI's underwriting criteria even though, according to them, they had not spoken to LPHI's sole underwriter – Cassidy – for almost four years.

72.     In 2003, LPHI began including data in its annual filings with the Texas Department of Insurance ("TDI") reflecting, for matured policies, the difference between Cassidy's LEs and when insureds actually died.  The reports filed by LPHI for 2003 through 2009 reveal that insureds underlying approximately 80% of matured policies that the Company brokered had outlived Cassidy's LEs.  The annual reports filed with TDI were prepared by the Company's legal department, which Peden oversaw.

- 24 -

73.     LPHI disclosed in its periodic filings with the SEC that it advanced money to make premium payments on brokered policies when the amounts escrowed for premiums was depleted – i.e., when insureds outlived their LEs, and additional premium payments came due. The amount of premiums advanced by LPHI increased steadily from $827,583 in fiscal year 2005 to $2,518,316 in fiscal year 2010.  During this period, LPHI paid a total of $8,881,035 in premium advances.  Defendants knew that Cassidy's flawed methodology for estimating LEs would result in an increasing rate of escrow depletion over time, as more escrow advances became necessary to address the rising incidence of insureds outliving Cassidy's LEs.

74.     In early 2006, questions and concerns about the reliability of LPHI's LEs were raised again, when an investment firm considered a potential investment in a pool of life settlements brokered by LPHI.  The Company authorized the investment firm to conduct due diligence on LPHI's operations.  The firm retained a due diligence consultant who concluded, in February 2006, that LPHI had failed to analyze the accuracy of Cassidy's LEs, and that LPHI provided no feedback to Cassidy on his track record or methodology.  The consultant's report included a recommendation to Pardo and Peden that LPHI "track, analyze, and validate" Cassidy's LEs.  Again, Pardo and Peden did not follow the recommendation to analyze Cassidy's LEs.

75.     Prior to the start of the Class Period, it was or should have been obvious to LPHI, Pardo, and Peden from the Company's own statistical data the extent to which Cassidy, utilizing the Kelly methodology, had delivered to LPHI systematically and materially underestimated LEs.  Specifically, as shown in the chart above, as of February 28, 2006, data available to Defendants from the Company's internal policy tracking system showed that the LEs that LPHI used to broker life settlement interests were systematically and materially underestimated. Accordingly, Pardo and Peden knew or were reckless in not knowing that 88% of the relevant

policies brokered by LPHI had exceeded their Cassidy–rendered LE.  By February 28, 2009,

LPHI, Pardo, Peden and Martin knew or were reckless in not knowing that 90% of the relevant

policies brokered by the Company had exceeded their Cassidy-rendered LE.

76.     In fact, in 2007, the Colorado Securities Commission sued LPHI, Pardo, and

Peden for, among other things, failing to disclose to investors the "high frequency rate" at which

insureds outlive the LEs that LPHI assigns to the policies underlying its life settlement

transactions.  LPHI paid $12.8 million to settle the Colorado action.  The settlement required the

Company, at the option of investors, to acquire the interests the Company had brokered to them

and refund the purchase price.

77.     In October 2008, Peden misrepresented to an investor that "the average LE is

based on how old the insured is right now and what the 2008 VBT tables say your LE [is]."

When he made this statement, Peden knew that Cassidy used a census table that included all

persons, not a table, like the VBT, that includes data only for persons underwritten for life

insurance.  In fact, contrary to these statements, LPHI made no use of the 2008 VBT table in its

LE estimates.

78.     Similarly, in November 2008, Peden told a member of the network of independent

buyers' agents that LPHI uses to identify investors ("Licensees") that Cassidy "uses the same

mortality table that 21st Services uses."  At the time that Peden made this representation, he

knew that 21st Services, a well-known life expectancy provider, was using the 2008 VBT Table,

and that Cassidy was using the HHS table.

79.     According to the December 21, 2010 WALL STREET JOURNAL article, Dr. Cassidy,

LPHI's "independent medical doctor," "often significantly" underestimated life expectancies.

The article continued:

- 26 -

> Life expectancies are a key factor in the business of investing in strangers' life insurance.  If estimates are too low, investors face a double whammy: Their policy payout is delayed, and they must keep paying premiums as the person lives on.  At Life Partners, according to the Journal investigation, the result is that 10% to 15% yearly returns promoted to investors may prove elusive for many.

80.     An investigation of Texas insurance records, according to the WALL STREET JOURNAL article, showed that insureds "often" lived beyond double or triple the projected life span.  Defendant Pardo is quoted in the article as admitting that LPHI's life expectancy estimates "are probably wrong."  In a review of 1,197 LPHI policies, the article noted that only 6.8% of insureds passed away at or before LPHI's projected life expectancy.  Thus, over 9 in 10 of the insureds for Defendants' life settlements lived longer than the life expectancy provided by Dr. Cassidy.

### d.     Manipulating LEs Allowed Defendants to Artificially Manipulate its Reported Financial Results[7]

81.     By manipulating the LE, and failing to disclose the outrageous and above-market profits being made by LPHI on the transactions, LPHI was able to disguise the true value of the policies, and cause investors to pay too much for the policies.  This ruse was not sustainable, but in the short-term, the Company would be able to earn huge excess profits.  Of course, when the scheme was ultimately discovered, the Company's shares would plummet.  In order to cash out, the Individual Defendants needed to either sell their shares in the Company before the fraud was discovered, or otherwise divert Company proceeds to their own accounts.

## B.     Defendants' Scheme to Loot the Company Before the Unsustainable Business Model is Exposed

82.     The Defendants were aware that LPHI's business model of charging excess commissions and using false LEs to get investments from clients was unsustainable, and would

---

[7] SEC Complaint, ¶¶ 45-48.

ultimately fail.  Defendant Pardo devised a scheme to monetize his interest in the company without selling the majority of shares and thus giving up his "control" block of slightly more than 50% of the shares.

83.     Defendant Pardo set up a trust on the island of Gibraltar named "Pardo Family Holdings, Ltd." that holds his 50.3% interest in LPHI.  Gibraltar is a well-known "asset protection" haven where it is extremely difficult, if not impossible, for creditors to attach assets. Having established his ownership interest in this "asset protection haven," Defendant Pardo now needed a way to transfer the assets of the Company to this safe haven.

84.     Pardo did not want to incur the scrutiny of large insider sales of stock, nor did he want his ownership interest to drop below the magic 50% threshold for control of the Company. Instead, Defendant Pardo decided to loot the company by:  1) engaging in insider sales of approximately $11.5 million dollars (the most he could sell without dropping his ownership below the magic 50% threshold); and 2) causing LPHI to pay abnormally large and unsustainable dividends – more than half of which would go to his Gibraltar trust and be unavailable for recovery by any potential creditors or judgment creditors.  By keeping his slim majority stake rather than selling shares of stock, he kept control of the Company and could unilaterally set its dividend policies.

### 1.     The Insider Selling Prong of the Scheme

85.     As set forth above, by at least fiscal year end 2006, Pardo and Peden knew, but failed to disclose to shareholders, that LPHI systematically underestimated LEs in pricing the life settlements interests it brokered.  This was material, non-public information because, as Pardo and Peden knew, the revenues and profit margins that LPHI reported depended on underestimated LEs.  LPHI could not sustain revenues and profit margins at the levels it reported without the continued use of underestimated LEs.  And LPHI could not continue to use

- 28 -

underestimated LEs to prop up its business had it disclosed its practice of doing so, as investor

demand for the life settlement interests that the Company brokers would have greatly diminished

if not vanished entirely had this information been public.

86.     Based on this material, non-public information, Pardo (through an entity under his

control) and Peden sold approximately $11.2 million and $300,000 of LPHI common stock,

respectively.  Pardo Family Holdings, Ltd., a wholly-owned subsidiary of the Pardo Family Trust

("Pardo Trust"), sold LPHI stock for Pardo, the beneficial owner of the Pardo Trust, as follows:

a)  On June 18, 2007, Peden sold approximately $300,000 of LPHI stock held in his

name;

b)  Defendant Pardo sold approximately 450,000 shares for gross proceeds of

approximately $11.2 million, as shown in the following chart of his sales:

| Date | Price | # Shares Sold | Stock Sale Proceeds |
|---|---|---|---|
| 2/12/2007 | $10.00 | 96,155 | $   961,550.00 |
| 5/18/2007 | 17.90 | 150,000 | 2,685,000.00 |
| 6/25/2007 | 34.10 | 100,358 | 3,422,207.80 |
| 10/17/2007 | 39.00 | 5,800 | 226,200.00 |
| 10/18/2007 | 39.00 | 11,200 | 436,800.00 |
| 7/25/2008 | 26.24 | 5,723 | 150,171.52 |
| 8/11/2008 | 27.64 | 6.661 | 184,110.04 |
| 8/12/2008 | 28.31 | 3,339 | 94,527.09 |
| 9/22/2008 | 35.32 | 15,000 | 529,800.00 |
| 10/14/2008 | 35.15 | 15,000 | 527,250.00 |
| 10/30/2008 | 40.71 | 15,135 | 616,145.85 |
| 10/31/2008 | 40.01 | 9,865 | 394,698.65 |
| 11/03/2008 | 36.67 | 2,866 | 105,096.22 |
| 01/07/2009 | 42.95 | 10,000 | 429,500.00 |
| 01/08/2009 | 43.50 | 10,000 | 435,000.00 |
| | | | |
| **Totals** | | 457,102 | $  11,198,057.17 |

87.     LPHI's systematic use of materially underestimated LEs to price the life settlement interests it brokered inflated the Company's financial condition, and, consequently, its stock price.  Defendants Pardo and Peden took advantage of this material non-public information to sell LPHI stock at inflated prices.

### 2.     The Dividend Prong of the Scheme

88.     In the beginning of the Class Period, as shown in the following chart, the dividends were a relatively modest $0.06 per share.  After the reporters and analysts started asking questions, and it became clear that the end was near for LPHI's scheme to understate LEs, Pardo and the Company ramped up the dividends to $0.25 per quarter, even declaring an additional "special" dividend of $0.25 per share in October of 2010.  In all, during the Class Period, Defendant Pardo was able to divert more than $20 million to his offshore trust:

| Date | Dividend | Type | Pardo Shares | |
|---|---|---|---|---|
| 5/29/2007 | 0.0625 | Regular | 3,841,067 | $    240,066.69 |
| 8/29/2007 | 0.0600 | Regular | 4,801,334 | 288,080.03 |
| 11/28/2007 | 0.0600 | Regular | 6,001,667 | 360,100.03 |
| 11/28/2007 | 0.0100 | Special | 6,001,667 | 60,016.67 |
| 2/27/2008 | 0.0600 | Regular | 6,001,667 | 360,100.03 |
| 5/28/2008 | 0.0700 | Regular | 6,001,667 | 420,116.70 |
| 8/27/2008 | 0.0700 | Regular | 6,001,667 | 420,116.70 |
| 11/25/2008 | 0.0700 | Regular | 6,001,667 | 420,116.70 |
| 11/25/2008 | 0.0100 | Special | 6,001,667 | 60,016.67 |
| 3/4/2009 | 0.0700 | Regular | 7,502,084 | 525,145.88 |
| 5/18/2009 | 0.0700 | Regular | 7,502,084 | 525,145.88 |
| 8/5/2009 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 11/4/2009 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 2/3/2010 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 5/5/2010 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 8/4/2010 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 10/13/2010 | 0.2500 | Special | 7,502,084 | 1,875,521.00 |
| 11/3/2010 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 1/27/2011 | 0.0400 | Special | 9,377,605 | 375,104.20 |
| 2/2/2011 | 0.2000 | Regular | 9,377,605 | 1,875,521.00 |
| 5/12/2011 | 0.2000 | Regular | 9,377,605 | 1,875,521.00 |
| | | | | |
| | | | | $ 20,933,815.19 |

## VI.    DISCLOSURES MADE DURING THE CLASS PERIOD

89.     Prior to the start of the Class Period, LPHI shares closed trading at $2.19 per share on May 25, 2006.[8]

90.     On May 26, 2006, LPHI filed its annual report for fiscal 2006, which ended on February 28, 2006, on Form 10-KSB with the SEC (the "2006 Form 10-KSB").  The 2006 Form 10-KSB was signed by Defendants Pardo and Peden in their capacities as President and Secretary, respectively.  The 2006 Form 10-KSB reported revenues of $20.1 million, net income of $1.1 million and earnings per share of $0.12.  The 2006 Form 10-KSB also specifically provided that "our discussion and analysis of financial condition and results of operations are based on our consolidated financial statements that were prepared in accordance with accounting principles generally accepted in the United States of America."  The 2006 Form 10-KSB further disclosed that LPHI recognized revenues "at the time a settlement has been closed":

> Revenue Recognition - We recognize income at the time a settlement has been closed and the purchaser has obligated itself to make the purchase. We defer $100 per viatical settlement and $200 per life settlement to cover minor monitoring services provided subsequent to the settlement date and to amortize this deferred cost over the anticipated life expectancy of the insureds.

The Company's financial statements were audited by Murrell, Hall, Mcintosh & Co., PLLP, which authored an audit opinion maintaining that "In our opinion, the consolidated financial statements referred to in the first paragraph above present fairly, in all material respects, the consolidated financial position of Life Partners Holdings, Inc. and subsidiaries as of February 28, 2006, and the consolidated results of its operations and cash flows for the years ended February 28, 2006 and 2005, in conformity with accounting principles generally accepted in the United States of America."

---

[8] For consistency, all share prices cited throughout this complaint are split-adjusted.

These disclosures were materially false and misleading because, as discussed in more detail below, LPHI's financial statements were not prepared in compliance with GAAP and SEC regulations.  Further, LPHI had begun ignoring this stated revenue recognition policy prior to fiscal 2003, and was instead recognizing revenues on a basis inconsistent with this stated revenue recognition policy and in violation of GAAP.

91.     Further, the financial information disclosed in the 2006 Form 10-KSB was materially false and misleading when made because it failed to disclose that that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  The unsustainability of this business model built upon false LEs constituted a known trend to the Company which that would result in, or that were reasonably likely to result in, a material favorable or unfavorable impact on the Company's net revenue from continuing operations and was therefore required to be disclosed in the MD&A Section of the 2008 Form 10-K pursuant to Item 303 of Regulation S-K.

92.     The 2006 Form 10-KSB also provided the following description of the need for accurate life expectancy estimates:

> **Our Purchasers Depend on Our Ability to Predict Life Expectancies and Set Appropriate Price; If Our Investment Returns Are Not Competitive We May Lose Purchasers; We Must Purchase In Large Numbers**
>
> A purchaser's investment return from a viatical or life settlement depends primarily on the demise of the insured. We price settlements based on the anticipated life expectancy of an insured. For viatical settlements, life expectancies are estimated based on a medical analysis of the insured. For life settlements, life expectancies are estimated from medical and actuarial data based on the historical experiences of similarly situated persons. The data is necessarily based on averages involving mortality and morbidity statistics. The outcome of a single settlement may vary significantly from the statistical average. It is impossible to predict any one insured's life expectancy exactly. To mitigate the risk that an insured will outlive his or her predicted life expectancy, viatical

and life settlement purchasers must be able to bear a non-liquid investment for an indeterminate period of time.

If we underestimate the average life expectancies, our purchasers will not realize the returns they seek, demand will fall, and purchasers will invest their funds elsewhere. In addition, amounts escrowed for premiums may be insufficient to keep the policy in force. If we overestimate the average life expectancies, the settlement prices we offer viators and life settlors will fall below market levels, supply will decrease, and viators and life settlers will opt for other alternatives. Our ability to accurately predict life expectancies is affected by a number of factors, including:

- the accuracy of our life expectancy estimations, which must sufficiently account for factors including an insured's age, medical condition, life habits (such as smoking), and geographic location;

- our ability to anticipate and adjust for trends, such as advances in medical treatments, that affect life expectancy data; and

- our ability to balance competing interests when pricing settlements, such as the amounts paid to viators or life settlors, the acquisition costs paid by purchasers, and the compensation paid to ourselves and our referral networks.

To foster the integrity of our pricing systems, we use both in-house and outside experts, including medical doctors and published actuarial data. We cannot assure you that, despite our experience in settlement pricing, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums. If we do so, we could lose purchasers or viators and life settlors, and those losses could have a material adverse effect on our business, financial condition, and results of operations.

This disclosure was materially false and misleading because it failed to disclose that LPHI knowingly employed the services of Dr. Cassidy to perform virtually all life expectancy calculations, and was aware that Dr. Cassidy's life expectancies were materially flawed and systematically understated the life expectancies of policy sellers.

- 33 -

93.     The 2006 Form 10-KSB also included certifications pursuant to the Sarbanes-

Oxley Act of 2002 ("SOX"), which was signed by Defendant Pardo as follows:

> 1. I have reviewed this annual report on Form 10-KSB of Life
> Partners Holdings, Inc.;
>
> 2. Based on my knowledge, this annual report does not contain any
> untrue statement of a material fact or omit to state a material fact
> necessary to make the statements made, in light of the
> circumstances under which such statements were made, not
> misleading with respect to the period covered by this annual report;
> and
>
> 3. Based on my knowledge, the financial statements, and other
> financial information included in this annual report, fairly present
> in all material respects the financial condition, results of operations
> and cash flows of the registrant as of, and for, the periods
> presented in this annual report; and
>
> 4. The registrant's other certifying officers and I are responsible
> for establishing and maintaining disclosure controls and
> procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-
> 15(e) for the registrant and have:
>
> (a) designed such disclosure controls and procedures, or caused
> such disclosure controls and procedures to be designed under our
> supervision, to ensure that material information relating to the
> registrant, including its consolidated subsidiaries, is made known
> to us by others within those entities, particularly during the period
> in which this annual report is being prepared;
>
> (b) evaluated the effectiveness of the registrant's disclosure
> controls and procedures and presented in this report our
> conclusions about the effectiveness of the disclosure controls and
> procedures, as of the end of the period covered by this report based
> on such evaluation; and
>
> (c) disclosed in this report any change in the registrant's internal
> control over financial reporting that occurred during the
> registrant's most recent fiscal quarter (the registrant's fourth fiscal
> quarter in the case of an annual report) that has materially affected,
> or is reasonably likely to materially affect, the registrant's internal
> control over financial reporting; and
>
> 5. The registrant's other certifying officers and I have disclosed,
> based on our most recent evaluation of internal control over

financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a) all significant deficiencies in the design or operation of internal control over financial reporting which are reasonably likely to affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

This certification was materially false and misleading when made because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."

94.     On July 17, 2006, LPHI filed its quarterly report for Q1 2007 (which ended May 31, 2006) with the SEC on Form 10-QSB.  This Form 10-QSB was signed by Defendant Pardo in his capacity as President and Chief Executive Officer.  Defendant Pardo also signed sworn certifications pursuant to Section 13a-14 of the Securities Exchange Act of 1934 and 18 U.S.C. 1350 (the Sarbanes-Oxley Act) attesting that this Form 10-QSB "fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods covered in the Report," and certifying that the Company's internal controls were effective.  This Q1 2007 Form 10-QSB reported quarterly revenues of approximately $6.2 million and net income of $470,992 ($.02 per share).

The Q1 2007 Form 10-QSB was materially false and misleading when filed because the financial information contained therein did not comply with GAAP or SEC regulations.  Further,

the Company's actual revenue recognition policies differed materially from those disclosed in the footnotes to the financial statements of its 2006 Form 10-K.

95.     Also on July 17, 2006, LPHI issued a press release over the BUSINESS WIRE announcing its financial results for Q1 2007.  This press release contained the same false and misleading financial information as the Q1 2007 Form 10-QSB, and was materially false and misleading when issued for the same reasons.

96.     On October 16, 2006, LPHI filed its quarterly report for Q2 2007 (which ended August 31, 2006) with the SEC on Form 10-QSB.  This Form 10-QSB was signed by Defendant Pardo in his capacity as President and Chief Executive Officer.  Defendant Pardo also signed sworn certifications pursuant to Section 13a-14 of the Securities Exchange Act of 1934 and 18 U.S.C. 1350 (the Sarbanes-Oxley Act) attesting that this Form 10-QSB "fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods covered in the Report," and certifying that the Company's internal controls were effective.  This Q2 2007 Form 10-QSB reported quarterly revenues of approximately $6.6 million and net income of $223,743 ($.02 per share).

The Q2 2007 Form 10-QSB was materially false and misleading when filed because the financial information contained therein did not comply with GAAP or SEC regulations.  Further, the Company's actual revenue recognition policies differed materially from those disclosed in the footnotes to the financial statements of its 2006 Form 10-K.

97.     Also on October 16, 2006, LPHI issued a press release over the BUSINESS WIRE announcing its financial results for Q2 2007.  This press release contained the same false and misleading financial information as the Q2 2007 Form 10-QSB, and was materially false and misleading when issued for the same reasons.

- 36 -

98.     On January 16, 2007, LPHI filed its quarterly report for Q3 2007 (which ended November 30, 2006) with the SEC on Form 10-QSB.  This Form 10-QSB was signed by Defendant Pardo in his capacity as President and Chief Executive Officer.  Defendant Pardo also signed sworn certifications pursuant to Section 13a-14 of the Securities Exchange Act of 1934 and 18 U.S.C. 1350 (the Sarbanes-Oxley Act) attesting that this Form 10-QSB "fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods covered in the Report," and certifying that the Company's internal controls were effective.  This Q2 2007 Form 10-QSB reported quarterly revenues of approximately $7.3 million and net income of $847,606 ($0.10 per share).

The Q3 2007 Form 10-QSB was materially false and misleading when filed because the financial information contained therein did not comply with GAAP or SEC regulations.  Further, the Company's actual revenue recognition policies differed materially from those disclosed in the footnotes to the financial statements of its 2006 Form 10-K.

99.     On January 16, 2007, MARKETWATCH reported that the excellent reported Q3 2007 earnings had caused LPHI shares to rise 10%:

> HEADLINE: Life Partners quarterly profit surges; shares rise
>
> BYLINE: Gabriel Madway
>
> BODY:
>
> SAN FRANCISCO (MarketWatch) -- Life Partners Holdings Inc. (lphi) on Tuesday reported second-quarter net earnings of $847,606, or 9 cents a share, up from $323,470, or 3 cents a share, in the year-ago period. Revenue rose to $7.32 million from $6.97 million. "We expect the current trend of increasing revenues and total business volume throughout the remainder of our fiscal year," said Chief Executive Brian Pardo in a statement. Shares of Waco, Texas-based Life Partners, an insurance company, rose 10% to $11.16 in Tuesday morning trade.

LPHI shares closed trading at $4.23 (adjusted for splits), an increase of more than 4.7% over the previous day's closing price of $4.04.

100.   On March 8, 2007, LPHI issued a press release over the Business Wire announcing that the Company had qualified to begin trading on the NASDAQ Global Market on March 12, 2007.  This press release quoted Defendant Pardo as maintaining that the listing was the result of "continued growth and performance":

> Life Partners Chief Executive, Brian Pardo, stated, "Qualifying for listing on the NASDAQ Global Market represents yet another milestone in our company's long and successful history. It is indicative of our continued growth and performance through the years as well as our commitment to sustainable growth in the future."

This statement was materially false and misleading when made in that the Company's alleged growth and performance was the result of improper accounting manipulations in violation of GAAP and SEC regulations, as described below, as well as the result of an inherently flawed and unsustainable business model.

101.   On April 17, 2007, LPHI reported its preliminary financial results for fiscal 2007, which ended February 28, 2007, in a press release over the BUSINESS WIRE.  This press release announced outstanding financial results, including a 215% increase in net income:

> Life Partners Holdings, Inc. (NASDAQ GM:LPHI),parent company of Life Partners, Inc., today announced it expects to report an increase of 215% in net income for its 2007 fiscal year ended February 28, 2007. The Company expects to report net income of approximately $3.6 million or $0.38 per share compared to $1.14 million or $0.12 per share reported for its 2006 fiscal year. Life Partners also expects to report a 49% increase in revenues for the 2007 fiscal year while total business volume, as measured in policy face values transacted, increased by 73% over last year to $151 million.
>
> Earnings for the year were driven by an exceptional increase in net income beginning in the third quarter and continuing into the fourth quarter. For the fourth quarter, Life Partners expects to

report a 192% increase in net income of approximately $2.1 million or $0.22 per share on $9.7 million in revenues compared to $104 thousand or $0.01 per share on $5.5 million in revenues for the fourth quarter last year.

This press release was materially false and misleading when issued because the financial results disclosed therein were inaccurate in that they did not comport with GAAP and SEC regulations, as discussed below.  Further, this release was materially false and misleading in that it omitted to disclose that these reported financial results were only attained through the use of a flawed and unsustainable business model.

102.    On May 26, 2006, the Company filed with the SEC its annual report on Form 10-KSB for fiscal year 2007.  The 2007 Form 10-KSB was signed by Defendants Pardo and Peden in their capacities as President and Secretary, respectively.  The 2007 Form 10-KSB disclosed that the Company's consolidated financial statements "were prepared in accordance with accounting principles generally accepted in the United States of America."  The Form 10-KSB also disclosed LPHI's revenue recognition policies:

> Revenue Recognition - We recognize income at the time a settlement has been closed and the purchaser has obligated itself to make the purchase. We defer $100 per viatical settlement and $200 per life settlement to cover minor monitoring services provided subsequent to the settlement date and to amortize this deferred cost over the anticipated life expectancy of the insureds.

The Company's financial statements were audited by Murrell, Hall, Mcintosh & Co., PLLP, which stated in its unqualified audit opinion that "in our opinion, the consolidated financial statements referred to in the first paragraph above present fairly, in all material respects, the consolidated financial position of Life Partners Holdings, Inc. and subsidiaries as of February 28, 2007, and the consolidated results of its operations and cash flows for the years ended February 28, 2007 and 2006, in conformity with accounting principles generally accepted in the United States of America."

- 39 -

These disclosures regarding the Company's revenue recognition policies and compliance with GAAP were materially false and misleading when made because, inter alia, the Company's financial statements were not prepared in compliance with GAAP, as discussed more fully below.  Further, the disclosure of the Company's revenue recognition policy was false and misleading because the Company had abandoned this reported policy by 2003, and was no longer recognizing revenues at the closing of a sale, but at an earlier date, as described below.

103.    The 2007 Form 10-KSB reported revenue of $29.8 million, net income of $3.6 million and Earnings Per Share of $0.36.  The financial information was further misleading because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

104.    The 2007 Form 10-KSB was further materially false and misleading because it failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  The unsustainability of this business model built upon false LEs constituted a known trend to the Company which that would result in, or that were reasonably likely to result in, a material favorable or unfavorable impact on the Company's net revenue from continuing operations and was therefore required to be disclosed in the MD&A Section of the 2007 Form 10-KSB pursuant to Item 303 of Regulation S-K.

105.    The 2007 Form 10-KSB provided the following description of the need for accurate life expectancy estimates:

> **Our Purchasers Depend on Our Ability to Predict Life Expectancies and Set Appropriate Price; If Our Investment Returns Are Not Competitive We May Lose Purchasers; We Must Purchase In Large Numbers**
>
> A purchaser's investment return from a life settlement depends on three factors:  the policy face amount, the settlement purchase price and the demise of the insured. We price settlements based on

the policy face amount and the anticipated life expectancy of an insured.

\* \* \*

If we underestimate the average life expectancies and price our transactions too high, our purchasers will not realize the returns they seek, demand may fall, and purchasers may invest their funds elsewhere. In addition, amounts escrowed for premiums may be insufficient to keep the policy in force and it is the responsibility of the purchasers to pay these additional premiums. If we overestimate the average life expectancies, the settlement prices we offer will fall below market levels, supply will decrease, and sellers may engage in business with our competitors or pursue other alternatives. Our ability to accurately predict life expectancies and price accordingly is affected by a number of factors, including:

- the accuracy of our life expectancy estimations, which must sufficiently account for factors including an insured's age, medical condition, life habits (such as smoking), and geographic location;

- our ability to anticipate and adjust for trends, such as advances in medical treatments, that affect life expectancy data; and

- our ability to balance competing interests when pricing settlements, such as the amounts paid to life settlors, the acquisition costs paid by purchasers, and the compensation paid to ourselves and our referral networks.

To foster the integrity of our pricing systems, we use both in-house and outside experts, including medical doctors and published actuarial data. We cannot assure you that, despite our experience in settlement pricing, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums. If we do so, we could lose purchasers or policy sellers, and those losses could have a material adverse effect on our business, financial condition, and results of operations.

This disclosure was materially false and misleading because it failed to disclose that

LPHI knowingly employed the services of Dr. Cassidy to perform virtually all life expectancy

calculations, and was aware that Dr. Cassidy's life expectancies were materially flawed and

systematically understated the life expectancies of policy sellers.

106.    The 2007 Form 10-KSB also included certifications pursuant to the Sarbanes-

Oxley Act of 2002 ("SOX"), which was signed by Defendant Pardo as follows:

> 1. I have reviewed this annual report on Form 10-KSB of Life
> Partners Holdings, Inc.;
>
> 2. Based on my knowledge, this annual report does not contain any
> untrue statement of a material fact or omit to state a material fact
> necessary to make the statements made, in light of the
> circumstances under which such statements were made, not
> misleading with respect to the period covered by this annual report;
> and
>
> 3. Based on my knowledge, the financial statements, and other
> financial information included in this annual report, fairly present
> in all material respects the financial condition, results of operations
> and cash flows of the registrant as of, and for, the periods
> presented in this annual report; and
>
> 4. The registrant's other certifying officers and I are responsible
> for establishing and maintaining disclosure controls and
> procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-
> 15(e) for the registrant and have:
>
> (a) designed such disclosure controls and procedures, or caused
> such disclosure controls and procedures to be designed under our
> supervision, to ensure that material information relating to the
> registrant, including its consolidated subsidiaries, is made known
> to us by others within those entities, particularly during the period
> in which this annual report is being prepared;
>
> (b) evaluated the effectiveness of the registrant's disclosure
> controls and procedures and presented in this report our
> conclusions about the effectiveness of the disclosure controls and
> procedures, as of the end of the period covered by this report based
> on such evaluation; and
>
> (c) disclosed in this report any change in the registrant's internal
> control over financial reporting that occurred during the
> registrant's most recent fiscal quarter (the registrant's fourth fiscal
> quarter in the case of an annual report) that has materially affected,

or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a) all significant deficiencies in the design or operation of internal control over financial reporting which are reasonably likely to affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\* \* \*

For the Annual Report of Life Partners Holdings, Inc. (the "Company") on Form 10-KSB for the period ending February 28, 2007 (the "Report"), the undersigned Chief Executive Officer and Chief Financial Officer of the Company hereby certify that:

(i) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and

(ii) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods covered in the Report.

These certifications were materially false and misleading when made because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."

107. By May 29, 2007, LPHI shares had risen to close trading at $7.23 per share.

108.    On June 4, 2007, LPHI issued a press release over the BUSINESS WIRE announcing that the Company expected a "substantial increase in first quarter earnings and revenue":

> Life Partners Holdings, Inc. (NASDAQ GM: LPHI), parent company of Life Partners, Inc., today issued exceptionally positive earnings guidance for its first quarter ended May 31, 2007. The company expects to report earnings which are approximately nine times greater than the first quarter of last fiscal year. Earnings for the first quarter ended May 31, 2007 are expected to be approximately $0.49 per share compared with earnings of $0.05 per share for the same period last year. Life Partners also expects to report an almost 200% increase in revenues for the quarter. Revenues are expected to be approximately $17.5 million for the first quarter ended May 31, 2007 compared with revenues of approximately $6 million last year.
>
> Brian Pardo, Chief Executive Officer, said, "We believe our outstanding performance this quarter is a direct result of the substantial and continuing growth in the life settlement market. Each day, more and more wealthy seniors are realizing they can turn their unwanted life insurance into cash. This increasing market awareness has made the life settlement market one of the fastest growing segments of the financial services sector. We're very proud to be known as 'The Architect of Life Settlements.'"
>
> The Company plans to officially report its earnings in its Form 10-Q to be filed with the Securities and Exchange Commission on or about July 15, 2007.

This press release was materially false and misleading when issued because, among other things, the reported financial earnings were misleading in that they were generated through the use of a flawed and unsustainable business model that was only possible in the short term through the use of false LE estimates.  Further, the financial information contained in this release was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

109.    The stock market, unaware of the falsity of this information contained in the June

4, 2007 press release, sent LPHI shares up 29.6% – closing at $9.64 per share on June 4, 2007,

compared to its closing price of $7.44 on the previous day.

110.    On June 14, 2007, LPHI issued a press release over the BUSINESS WIRE reporting

excellent financial results for the quarter ended May 31, 2007 ("Q1 2008"):

> Life Partners Holdings, Inc. (NASDAQ GM: LPHI),parent
> company of Life Partners, Inc., today announced net income of
> $4.7 million, or $0.49 per share for its first quarter ended May 31,
> 2007, compared to $0.5 million, or $0.05 per share, for first quarter
> of 2006. Life Partners also announced first quarter revenues of
> approximately $17.6 million compared to revenues of $6.2 million
> during the first quarter of last year. Total business volume for the
> first quarter, as measured in policy face values transacted increased
> by 180% from $28.7 million last year to $80.3 million this year.
>
> Earnings for the first quarter continued an exceptionally strong
> trend for the third quarter in a row. Life Partners attributed
> increased revenues generally to increasing interest in the life
> settlement market. The substantial increase in net income resulted
> from the steady trend toward closing fewer policies with higher
> face values and from much higher operating income over a
> relatively fixed cost, operating structure.

Defendant Pardo was quoted in this June 14, 2007 press release as falsely attributing the

excellent reported financial results to the Company's "excellent service" within a growing

industry, rather than being achieved only through the use of accounting trickery:

> Brian Pardo, Chief Executive Officer, said, "As these results
> clearly demonstrate, we believe our outstanding performance this
> quarter is a direct result of the continuing growth in the life
> settlement market coupled with our unique ability to provide
> excellent service within a very reasonable cost structure. Our
> proprietary software and processes benefit not only our clients and
> shareholders, but the thousands of wealthy seniors that are
> realizing the financial option we provide by turning their unwanted
> life insurance into cash. This increasing market awareness has
> made the life settlement market one of the fastest growing
> segments of the financial services sector and our expertise and
> operational efficiency has made Life Partners one of the fastest
> growing companies within that sector."

- 45 -

This press release was materially false and misleading when issued because, among other things, the reported financial earnings were misleading in that they were generated through the use of a flawed and unsustainable business model that was only possible in the short term through the use of false LE estimates.  Further, the financial information contained in this release was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.  Unaware of the falsity of the representations contained in this June 14, 2007 press release, the stock market accepted this good news, sending LPHI shares up from $10.54 on the previous day to close trading on June 14, 2007, at $11.52 per share – a gain of more than 9.3% for the day.

111.    On July 16, 2007, the Company filed with the SEC its Form 10-QSB for the quarterly period ended May 31, 2007.  The July 16, 2007 Form 10-QSB reported net income of $4,723,946 and revenues of $17,578,976 for Q1 2008.  The financial information contained in this press release was materially false and misleading in that the reported financial results were not prepared in compliance with GAAP and SEC regulations, as set forth in more detail below.  The Q1 2008 Form 10-QSB contained SOX certifications that were substantially similar to those contained in the 2007 Form 10-KSB, which were materially false and misleading for the same reasons as those contained in the 2007 Form 10-KSB.  These excellent reported financial results caused LPHI shares to rise from $15.72 per share on July 13, 2007, to close trading at $16.84 on July 16, 2007, and at $17.90 per share on July 17, 2007 – a two trading day gain of 13.9%.

112.    On August 13, 2007, LPHI issued a press release over the BUSINESS WIRE announcing that it would pay a quarterly cash dividend of $0.06 per share to shareholders of record as of August 31, 2007.

- 46 -

113.    On September 26, 2007, LPHI issued a press release over the BUSINESS WIRE

announcing a "large earnings increase" for the second quarter of fiscal 2008:

> Life Partners Holdings, Inc. (NASDAQ GM:LPHI), parent
> company of Life Partners, Inc., today announced net income of
> $4.3 million, or $0.46 per share for its second fiscal quarter
> compared to $0.22 million, or $0.02 per share, for its second
> quarter last year. Net income for the first half of the current fiscal
> year was $9.1 million, or $0.95 per share compared with net
> income of $0.7 million or $.07 per share for the first six months of
> last year.
>
> The Company also announced revenues of $17.6 million for the
> second quarter ended August 31, 2007 and $35.2 million for the
> six months ended August 31, 2007 compared to revenues of $6.6
> million during the second quarter of the prior year and $13 million
> for the first six months of the prior year.
>
> Life Partners attributed its increased revenues to the Company's
> steady trend toward closing policies with higher face values and
> the increase in both demand for and supply of qualified life
> settlement policies, which tracks the continued growth in the life
> settlement market generally.

Defendant Pardo was quoted in this press release as attributing these excellent reported

results to "incredible growth in the life settlement market," rather than accounting manipulations:

> Brian Pardo, Chief Executive Officer, said, "Looking at our year-
> on-year performance to date, our financial results clearly show
> incredible growth in the life settlement market as well as our
> unique ability to provide excellent service within this market at a
> very reasonable cost structure."
>
> As the only publicly traded life settlement provider, our
> transparency is very attractive to institutional clients, including our
> recently announced relationship with West LB, one of Germany's
> leading financial service providers with over $300 Billion in assets,
> as well as to our individual accredited investor clients. The
> investment we have made in proprietary software and process
> development enables us to meet the growing demand in both our
> retail (accredited investor) market and our developing institutional
> market.
>
> "With continuing growth in revenues and earnings from both our
> retail market and our rapidly rising institutional market, we expect

<u>a substantial increase in both revenues and earnings during the
second half and for our current fiscal year in general.</u>" [Emphasis
added.]

This press release was false and misleading because, among other things, the reported financial earnings were misleading in that they were generated through the use of a flawed and unsustainable business model that was only possible in the short term through the use of false LE estimates. Further, the financial information contained in this release was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations. Additionally, the excellent reported financial results were due to accounting manipulations rather than the "incredible growth in the life settlement market as well as our unique ability to provide excellent service within this market" as maintained by Defendant Pardo. Unaware of the falsity of these representations, LPHI shares closed trading at $15.41 per share on September 26, 2007 – an increase of 8.1% from the previous day's closing price of $14.26 per share.

114. On October 15, 2007, the Company filed with the SEC its Form 10-QSB for the quarterly period ended August 31, 2007 ("Q2 2008"). This quarterly report disclosed revenues of $11,059,500 and net income of $4,341,111 for the quarter ended August 31, 2007. The Q2 2008 Form 10-QSB contained SOX certifications that were substantially similar to those contained in the 2007 Form 10-KSB, as well as statements regarding the Company's controls and procedures that were substantially similar as those contained in the Company's Form 10-QSB for the quarterly period ended May 31, 2007. This financial information was materially false and misleading when made because, among other things, the reported financial earnings were misleading in that they were generated through the use of a flawed and unsustainable business model that was only possible in the short term through the use of false LE estimates. Further, the financial information contained in this release was materially false and misleading

when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations. Likewise, the SOX certifications were materially false and misleading because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner." Unaware of the falsity of these representations, the market reacted to these impressive reported financial results by driving up the price of LPHI shares from $18.88 on October 12, 2007, to close at $19.47 on October 15, 2007, and $19.89 on October 16, 2007 – a two-day increase of more than 5.3%.

115. On November 13, 2007, LPHI announced in a press release over the Business Wire that it would pay a quarterly dividend of $0.07 per share, which consisted of a regular dividend of $0.06 and a special "Christmas Holiday Bonus" dividend of $0.01 per share.

116. On January 14, 2008, LPHI issued a press release over the BUSINESS WIRE announcing its financial results for the quarter ended November 30, 2007 ("Q3 2008"):

> Life Partners Holdings, Inc. (Nasdaq: LPHI) today announced a 515% increase in net income of $5,215,695 or $0.44 per share for the three months ended November 30, 2007, compared to $847,606 or $0.07 per share reported for the same period last year. Revenues increased by 164% over the same period last year while total business volume, as measured in policy face values transacted, increased by 257% over last year to almost $126 million. For the nine months ended November 30, 2007, the company reported an 826% increase in net income of $14,280,752 or $1.19 per share compared to $1,542,341 or $0.13 per share during the period last year.
>
> Brian Pardo, Chief Executive Officer, said, "This has been our strongest quarter ever and we are very pleased with the continuing and substantial growth in revenues and net income. Because we serve investors in the alternative investment market and our business plan does not rely on debt, we expect Life Partners to

- 49 -

> remain insulated from the current credit trouble of other financial service companies and we believe that investors will find our company to be one of the few bright spots within the financial sector."

This financial information was materially false and misleading when made because among other things, the reported financial earnings were misleading in that they were generated through the use of a flawed and unsustainable business model that was only possible in the short term through the use of false LE estimates.  Further, the financial information contained in this release was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

117.    On January 14, 2008, the Company filed with the SEC its Form 10-QSB for Q3 2008.  This quarterly report disclosed revenues of $19,298,726 and net income of $5,215,695 for the three months ended November 30, 2007.  The Q3 2008 Form 10-QSB contained SOX certifications that were substantially similar to those contained in the 2007 Form 10-KSB.  This financial information was materially false and misleading when made because, among other things, the reported financial earnings were misleading in that they were generated through the use of a flawed and unsustainable business model that was only possible in the short term through the use of false LE estimates.  Further, the financial information contained in this release was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.  Likewise, the SOX certifications were materially false and misleading because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that "there is a more than remote

likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."

118.    On February 7, 2008, LPHI announced in a press release over the BUSINESS WIRE that Defendant Martin had been appointed Chief Financial Officer of the Company.

119.    On March 26, 2008, the Company issued a press release stating, among other disclosures, that it expected to report revenues of $72.5 million for fiscal year 2008, which ended February 28, 2008, compared to $29.8 million for its 2007 fiscal year.  Net income for the current fiscal year was $19.1 million, or $1.59 per share compared with net income of $3.6 million or $0.31 per split adjusted share during the previous year.  The Company filed a Current Report on Form 8-K with the SEC on March 26, 2010, which included this press release as an exhibit.  This Form 8-K was signed by Defendant Martin.

120.    On March 26, 2008, in response to these reported financial results, the Company's stock price rose 8.3% from $7.72 to close at $8.36 on March 26, 2008, and rose another 13.0% or $1.09 the very next day, to close at $9.45 per share.

121.    On May 15, 2008, LPHI filed its Form 10-K with the SEC for the fiscal year ended February 29, 2008 (the "2008 Form 10-K").  The 2008 Form 10-K was signed by Defendants Pardo, Martin and Peden, in their respective capacities as President, Chief Financial Officer and Secretary.  The 2008 Form 10-K also contained SOX certifications signed by Defendants Pardo and Martin that were substantially similar to those contained in the 2007 Form 10-KSB and were materially false and misleading for the same reasons.

122.    The 2008 Form 10-K also specifically disclosed that the financial statements contained therein "were prepared in accordance with accounting principles generally accepted in

the United States of America."  In this filing, LPHI further disclosed that its revenue recognition policy was to recognize revenues at the closing of the sale of a life settlement:

> Revenue Recognition – We recognize income at the time a settlement has been closed and the purchaser has obligated itself to make the purchase. We defer $50 per viatical settlement and $100 per life settlement to cover minor monitoring services provided subsequent to the settlement date and to amortize this deferred cost over the anticipated life expectancy of the insureds.

These disclosures regarding the Company's revenue recognition policies and compliance with GAAP were materially false and misleading when made because, inter alia, the Company's financial statements were not prepared in compliance with GAAP, as discussed more fully below.  Further, the disclosure of the Company's revenue recognition policy was false and misleading because the Company had abandoned this reported policy by 2003 and was no longer recognizing revenues at the closing of a sale, but at an earlier date, as described below.

123.    The 2008 Form 10-K reported net revenues of $36.8 million and net income of $18.7 million.  This financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition was flawed and did not comply with GAAP or SEC regulations.

124.    The 2008 Form 10-K further provided the following description of the need for accurate life expectancy estimates:

> **Our Purchasers Depend on Our Ability to Predict Life Expectancies and Set Appropriate Prices; If Our Investment Returns Are Not Competitive, We May Lose Purchasers**
>
> A purchaser's investment return from a life settlement depends on three factors: the difference between the policy face amount and purchaser's cost basis (consisting of the acquisition cost and premiums paid to maintain the policy), the length of the holding period, and the demise of the insured. We price settlements based on the policy face amount, the anticipated life expectancy of an insured and policy maintenance costs. Life expectancies are generally estimated from standard medical and actuarial data based

- 52 -

on the historical experiences of similarly situated persons. The data is necessarily based on averages involving mortality and morbidity statistics. The outcome of a single settlement may vary significantly from the statistical average. It is impossible to predict any one insured's life expectancy exactly. To mitigate the risk that an insured will outlive his or her predicted life expectancy, we price life settlements to yield competitive returns even if this life expectancy prediction is exceeded. In addition, life settlement purchasers must be able to bear a non-liquid investment for an indeterminate period.

 If we underestimate the average life expectancies and price our transactions too high, our purchasers will not realize the returns they seek, demand may fall, and purchasers may invest their funds elsewhere. In addition, amounts escrowed for premiums may be insufficient to keep the policy in force and it is the responsibility of the purchasers to pay these additional premiums. If we overestimate the average life expectancies, the settlement prices we offer will fall below market levels, supply will decrease, and sellers may engage in business with our competitors or pursue other alternatives. Our ability to accurately predict life expectancies and price accordingly is affected by a number of factors, including:

- The accuracy of our life expectancy estimations, which must sufficiently account for factors including an insured's age, medical condition, life habits (such as smoking), and geographic location;

- Our ability to anticipate and adjust for trends, such as advances in medical treatments, that affect life expectancy data; and

- Our ability to balance competing interests when pricing settlements, such as the amounts paid to life settlors, the acquisition costs paid by purchasers, and the compensation paid to ourselves and our referral networks.

To foster the integrity of our pricing systems, we use both in-house and outside experts, including medical doctors and published actuarial data. We cannot assure you that, despite our experience in settlement pricing, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums. If we do so, we could lose purchasers or policy sellers, and those losses could have a material adverse effect on our business, financial condition, and results of operations.

- 53 -

This disclosure was materially false and misleading because it failed to disclose that LPHI knowingly employed the services of Dr. Cassidy to perform virtually all life expectancy calculations and was aware that Dr. Cassidy's life expectancies were materially flawed and systematically understated the life expectancies of policy sellers.

125.    The 2008 Form 10-K was further materially false and misleading because it failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  The unsustainability of this business model built upon false LEs constituted a known trend to the Company which that would result in, or that were reasonably likely to result in, a material favorable or unfavorable impact on the Company's net revenue from continuing operations and was therefore required to be disclosed in the MD&A Section of the 2008 Form 10-K pursuant to Item 303 of Regulation S-K.

126.    On May 21, 2008, the Company issued a press release announcing that it would pay a $0.07 per share quarterly dividend to shareholders on or about June 15, 2008.  In discussing these events, the press release quoted Defendant Pardo as saying:

> We are delighted to announce this increase in our quarterly dividend, which we feel is reflective of the growth in our company's earnings.  During a year when many financial sector companies have cut their dividends, we are exceptionally proud to be able to increase our dividend and continue to build the wealth of our shareholders.  [Emphasis added.]

127.    The Company also filed a Form 8-K with the SEC on May 21, 2008, confirming the issuance of the quarterly dividend. The Form 8-K was signed by Defendant Martin.

128.    This press release and Form 8-K were materially false and misleading when made because they portrayed the dividend as "reflective of the growth of [LPHI's] earnings."  In reality, however, the "growth" of LPHI's earnings were only achieved through accounting trickery and misconduct, as described in more detail below.

129.    On June 16, 2008, the Company issued a press release announcing that it

"predicted record earnings" for its first fiscal quarter ended May 31, 2008 ("Q1 2009").  The

press release stated, in relevant part:

### LIFE PARTNERS PREDICTS RECORD EARNINGS

WACO, TX — June 16, 2008 — Life Partners Holdings, Inc.
(NASDAQ GM: LPHI), parent company of Life Partners, Inc.,
today predicted record earnings as it issued guidance for its first
fiscal quarter ended May 31, 2008. Life Partners expects to report
first quarter earnings of approximately $0.52 per share compared
with earnings of $0.40 per share last year. Results for the quarter
are expected to show a 33% increase in earnings over the same
period last year and a 40% increase over the immediately
preceding quarter. All earnings per share calculations are adjusted
to account for the 5-for-4 stock split in September 2007.

**For its first quarter ended May 31, 2008, Life Partners expects
to report over $24 million in revenues, a 39% increase over the
$17.6 million it reported for the first quarter of last year**.
[Emphasis added.]

This press release quoted Defendant Pardo as stating:

Because of our continued growth within the growing life
settlement industry, this has been the best quarter in the history of
our company. Our business model deals exclusively with real
assets with inherent value and does not rely on credit to provide
diversification from the financial markets. That formula has
become extremely attractive to investors and we expect that
interest to continue. We expect our strong financial performance to
underscore the substantial value of our company when compared
to other stocks in the financial services sector.

Both these financial predictions and Defendant Prado's comments in response to them

were materially false and misleading when made because LPHI's revenue recognition policies

were materially flawed and did not comply with GAAP or SEC regulations, as set forth in more

detail below.

- 55 -

130.    The Company also filed a Current Report on Form 8-K with the SEC on June 16, 2008, confirming the financial results for Q1 2009.  The Form 8-K was signed by Defendant Martin, and was materially false and misleading for the same reasons set forth above.

131.    On July 9, 2008, LPHI filed a Form 10-Q with the SEC, announcing financial results for the quarter ended May 31, 2008 ("Q2 2009").  This Form 10-Q was signed by Defendants Pardo and Martin, contained SOX certifications that were substantially similar to those contained in the 2007 Form 10-KSB, and stated the following financial results:  (i) net revenues totaled $12,260,274, (ii) brokerage fees of $12,177,872, and (iii) net income of $6,248,574.  This financial information was materially false and misleading when made because, among other things, the reported financial earnings were misleading in that they were generated through the use of a flawed and unsustainable business model that was only possible in the short term through the use of false LE estimates.  Further, the financial information contained in this release was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.  Likewise, the SOX certifications were materially false and misleading because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."

132.    On August 7, 2008, LPHI announced in a press release over the BUSINESS WIRE that the Company would pay a cash dividend of $0.07 per share to its shareholders.

133.   On September 18, 2008, LPHI issued a press release over the BUSINESS WIRE

announcing its anticipated financial results for the fiscal quarter ended August 31, 2008 ("Q2

2009").  This press release stated, in pertinent part:

### LIFE PARTNERS TO POST RECORD EARNINGS

WACO, TX — September 18, 2008 — Life Partners Holdings,
Inc. (NASDAQ GM: LPHI), parent company of Life Partners, Inc.,
today announced another quarter of record earnings as it issued
guidance for its second fiscal quarter and first half ended August
31, 2008. For the quarter, Life Partners expects to report a 56%
increase in net earnings, which were $6.6 million or $0.56 per
share compared with earnings of $4.3 million or $0.36 per share
for the same period of last year. For the six months ended August
31, 2008, the company expects to report earnings of $12.9 million
or $1.08 per share compared with $9.1 million or $0.76 per share
for the same period last year.

For the quarter ended August 31, 2008, Life Partners expects to
report $25.9 million in revenues, a 47% increase over the $17.6
million it reported for the same period last year. For the first half of
the year ended August 31, 2008, the company expects to report
revenues of $50.4 million, which is a 43% increase compared to
$35.2 million for the same period last year.

134.   The Company also filed a Form 8-K with the SEC on September 18, 2008, which

confirmed the announcements in the press release issued that same day.  The Form 8-K was

signed by Defendant Martin.  Both this press release and the Form 8-K were materially false and

misleading among other things, the reported financial earnings were misleading in that they were

generated through the use of a flawed and unsustainable business model that was only possible in

the short term through the use of false LE estimates.  Further, the financial information contained

in this release was materially false and misleading when made because, as set forth in more

detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP

or SEC regulations.  Unaware of the falsity of the representations in the press release and the

Form 8-K filed on September 18, 2008, the market caused LPHI shares to rise from a close of

$15.73 on September 17, 2008, to close at $16.62 on September 18, 2008 – a gain of 5.7%.

135.    On the very next day, September 19, 2008, LPHI announced in a press release

over the BUSINESS WIRE that it "sees dramatic interest" in the life settlement policies:

> HEADLINE: Life Partner Holdings Sees Dramatic Interest in
> Alternative Investment Due to Current Financial Shakeup;
>
> LPHI Announces Another Quarter of Record Earnings, Expecting
> to Report 56% Increase in Net Earnings
>
> DATELINE: WACO, Texas
>
> BODY:
>
> Life Partner Holdings, Inc. (Nasdaq: LPHI ), recently issued
> guidance for its second fiscal quarter and expects to report a 56%
> increase in net earnings, representing another record quarter. The
> announcement demonstrates the popularity of alternative
> investments as market uncertainties continue to worry investors.
> While many are advised to pull money out of equities in favor of
> low-risk/low-yield vehicles such as CDs, treasury bills and money
> market funds, an increased number of investors are turning to
> alternative asset-based vehicles such as life settlements, which are
> not correlated to the financial markets and offer far superior
> returns.
>
> Life settlements companies purchase life insurance policies from
> wealthy citizens who used the policies as part of their estate
> planning and for a number of reasons no longer need their policies.
>
> LPHI is the oldest and only publicly traded life settlements
> company.  For the past two quarters, the company has experienced
> record earnings and its stock continues to be agreen in a sea of red.
> [Emphasis added.]

This press release was materially false and misleading when issued in that its "record"

earnings causing it to appear to be "agreen" were materially false and misleading when made

because, among other things, the reported financial earnings were misleading in that they were

generated through the use of a flawed and unsustainable business model that was only possible in

the short term through the use of false LE estimates.  Further, the financial information contained in this release was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.  Unaware of the falsity of these representations, this trumpeting of "record" earnings caused LPHI's shares to rise to close at $17.83 per share on September 19, 2008 – an increase of 7.4% over the previous day's closing price.

136.    On October 10, 2008, the Company filed a Form 10-Q with the SEC containing the Company's financial results for Q2 2009.  The Form 10Q, which was signed by Defendants Pardo and Martin and contained SOX certifications that were substantially similar to those contained in the 2007 Form 10-KSB, reported:  (i) net revenues of $13,411,954, (ii) brokerage fees of $11,376,771, and (iii) net income of $6,603,491.  This financial information was materially false and misleading when made because, among other things, the reported financial earnings were misleading in that they were generated through the use of a flawed and unsustainable business model that was only possible in the short term through the use of false LE estimates.  Further, the financial information contained in this release was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.  Likewise, the SOX certifications were materially false and misleading because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."  Unaware of the falsity of these

- 59 -

disclosures, the stock market LPHI shares up $2.58 per share to close at $17.38 per share on

October 13, 2008 (the next trading day).  This was an increase of 17.4%.

      137.    LPHI hosted a conference call on October 17, 2008 to discuss the financial results

for Q2 2009.  Participating in the call were Defendants Pardo, Peden and Martin.  During the

call, Defendants Peden and Pardo used the recent stock market troubles to make LPHI appear to

be a safe alternative to other financial sector companies:

> SCOTT PEDEN:  Now I want to talk about one thing that, you
> know, because Wall Street looks very different than the last time
> we had our call the last quarter. And a lot of that seems to be
> concerned with debt and leverage, and leverage seems to have
> been the death knell for many of the hedge funds over the past few
> weeks.
>
> You know, at one time we could have easily expanded our
> business with easy credit. You prefer to build the business
> organically and without operating debt. Why?
>
> BRIAN PARDO:  Well, I guess the one answer is I'm a builder --
> and I'm 66, in case anybody is interested. I was around in the '87
> market disruption -- it certainly wasn't as severe as this one, but it
> was nevertheless painful for a lot of people, the 2001 disruption,
> which was also very painful for a lot of people, and then, of course,
> this one.
>
> And it seems to me that at the basis of or at the foundation for most
> of the problems that people have, investors have in the market is
> that they are leveraged. And as we've seen in the sub-prime
> markets that sometimes the leverage is just ridiculously high. And
> I, on the other hand, am very adverse to debt.
>
> And I'm not saying that a company shouldn't use debt, but it
> shouldn't use debt if it doesn't have to use debt. And it shouldn't
> use debt to expand growth in the company that is already growing
> at the rate that we are.
>
> A feature of Life Partners which is -- allows us to be in this
> fortunate position is that we are kind of like the old-time country
> grocery store. The more we sell, the more we make. It's a cash in,
> cash out transaction.

> We do not use credit, and we do not issue credit. And we get paid
> when we accomplish the transaction, and the money goes to the
> bank. So I think it's just mainly a result of the fact that we have not
> tried to use debt, and that we've not tried to diversify into other
> areas, but rather stuck to markets that we know best. The same
> markets we know best.

Defendants Peden and Pardo also downplayed the level of risk of LPHI, maintaining that

they had "put a level of armor" around the company to protect shareholders and that the reported

financial results were the result of "conservative management" producing some "very solid

numbers" that were "some pretty outstanding results":

> And because of the nature of Life Partners product and the lack of
> debt as Life Partners is a company, we had, innately, put a level of
> armor around the Company to protect ourselves and our
> shareholders.

> SCOTT PEDEN:  Let's go ahead and take a look and see at some
> of the numbers in detail and see what conservative management
> has actually yielded. Some pretty outstanding results, wouldn't you
> say?

> BRIAN PARDO:  I'm happy with it and I think that these are very
> solid numbers. You know, our revenues for the quarter ended in
> 8/31/2008 was $24.8 million. That was versus $17.6 million last
> year. So that was up 40%. Our earnings per share was $0.56 versus
> $0.36.

> I keep in mind we have a 5 to 4 split in that, and that accounts for -
> - in these numbers, but again, about a 56% increase over the
> previous period.

> Our actual revenues were $49 million.

These disclosures were materially false and misleading in that they portrayed LPHI as

significantly less risky than other financial sector companies, and further materially false and

misleading because the "solid" and "pretty outstanding" financial results were only attained

through the employment of accounting manipulations that served to overstate these reported

financial results, as described in more detail below.

- 61 -

138.    Also on this October 17, 2008 conference call, Defendant Pardo disclosed that investors in policies brokered by the Company could look forward to "double-digit returns":

> BRIAN PARDO: We like to tell our clients to be looking for a low double-digit return.
>
> DAVID FORSTER: Okay. 11, 12%? That kind of return?
>
> BRIAN PARDO: Yes. And I think if they are expecting that, they will not be disappointed.

This statement was materially false and misleading when made in that Defendant Pardo knew that such returns were impossible even under ideal circumstances, and particularly when LEs were being consistently understated by Dr. Cassidy.

139.    All of the above-referenced false and misleading disclosures on the October 17, 2008 conference call caused LPHI shares to climb from $17.80 per share on October 17, 2008, to close at $20.17 per share on the next trading day, October 20, 2008 – a gain of $2.37 per share, or 13.3%.

140.    On November 20, 2008, LPHI issued a press release announcing that it would pay a quarterly cash dividend of $0.08 per share, which included the Company's ordinary quarterly dividend of $0.07 per share, plus a "Christmas Bonus" of $0.01 per share.  In discussing these events, Defendant Pardo stated:

> We are proud that LPHI has demonstrated its sustainable growth ability, even in these turbulent financial times. We continue to bring value to our clients who are seeking asset-based investments that are not correlated to the financial markets. Our dividend policy reflects our growth trend and our commitment to bringing value to our shareholders.

141.    The Company also filed a Form 8-K with the SEC on November 20, 2008, incorporating the press release concerning the quarterly dividend of $0.08 as an exhibit.  The 8-K was signed by Defendant Martin.

142.    On December 5, 2008, LPHI took the unusual step of issuing a press release over the BUSINESS WIRE to announce that a market analyst had initiated coverage of LPHI with a "BUY" rating:

> Life Partners Holdings, Inc. (NASDAQ: LPHI ) announces that Singular Research, an independent research firm for small-to-micro cap companies has initiated coverage on LPHI with a BUY rating. The leading life settlement company provides immediate payouts to holders of unneeded life insurance policies and uncorrelated growth to investors.
>
> Life Partners Holdings, Inc. (LPHI) engages in the secondary market for life insurance known as life settlements, which involves the purchase of previously issued life insurance policies at a discount to their face amount. LPHI acts as an agent for buyers and engages in the purchase of life settlements for its own investment purposes.
>
> RESEARCH REPORT HIGHLIGHTS
>
> - The life settlement industry is expected to grow more than 15% annually over the next five years and LPHI may continue to gain market share.
>
> - LPHI's business model does not require leverage to grow and is expected to generate strong cash flow.
>
> - Life settlements generate high returns that are neither economically sensitive nor correlated to other financial markets or commodity markets.
>
> - Given strong market growth, increasing market share and exceptional financial performance, we believe LPHI to be meaningfully undervalued and expect it to outperform the market averages over the next 12 -18 months.

This press release was materially false and misleading because LPHI was aware that the returns cited by this analyst were based upon a flawed and unsustainable business model that misleadingly skewed the financial results of LPHI.  Further, the reported financial results upon which this analyst relied were not prepared in compliance with GAAP and SEC regulations.  The market reacted favorably to this press release, causing LPHI shares to jump from $18.90 per

- 63 -

share on December 4, 2008, to close at $19.88 per share on December 5, 2008 – an increase of

$0.98 per share, or 5.2%.

143.    On December 15, 2008, LPHI issued a press release over the BUSINESS WIRE

announcing its preliminary financial results and earnings guidance for the third fiscal quarter

ended November 30, 2008 ("Q3 2009").   The press release stated, in pertinent part:

### LIFE PARTNERS TO POST RECORD EARNINGS

WACO, TX — December 15, 2008 — Life Partners Holdings, Inc.
(NASDAQ GM: LPHI), parent company of Life Partners, Inc.,
today announced another quarter of record earnings as it issued
guidance for its third fiscal quarter and nine months ended
November 30, 2008.  For the quarter, Life Partners expects to
report a 38% increase in net earnings which were $7.3 million or
$0.61 per share compared with earnings of $5.2 million or $0.44
per share for the same period of last year. For the nine months
ended November 30, 2008, the company expects to report earnings
of $20.1 million or $1.69 per share compared with $14.3 million or
$1.19 per share for the same period last year.

For the quarter ended November 30, 2008, Life Partners expects to
report $28.1 million in revenues, a 46% increase over the $19.3
million it reported for the same period last year. For the nine
months ended November 30, 2008, the company expects to report
revenues of $77.3 million, which is a 42% increase compared to
$54.5 million for the same period last year.

This press release was materially false and misleading when issued because, among other

things, the reported financial earnings were misleading in that they were generated through the

use of a flawed and unsustainable business model that was only possible in the short term

through the use of false LE estimates.  Further, the financial information contained in this release

was materially false and misleading when made because, as set forth in more detail below,

LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC

regulations.  Because the market was unaware of the misleading nature of these disclosures, this

facially apparent good news caused LPHI shares to rise from $16.09 per share to close at $17.84

- 64 -

per share on December 15, 2008 – an increase of $1.75 per share, or 10.9%.  LPHI shares continued to rise to close at $19.10 per share on the next day, December 16, 2008 – for a two-day gain of $3.01 per share, or 18.7%.

144.    On December 17, 2008, the Company issued a press release over the BUSINESS WIRE announcing that it would begin trading on the NASDAQ Global Select Market on January 2, 2009.  The press release was also incorporated as an exhibit in a Form 8-K that the Company filed with the SEC on December 19, 2008.  The Form 8-K was signed by Defendant Martin.

145.    On January 9, 2009, the Company filed a Form 10-Q with the SEC, disclosing its financial results for the Q3 2009.  The Form 10-Q was signed by Defendants Pardo and Martin, contained SOX certifications that were substantially similar to those contained in the 2007 Form 10-KSB, and stated that:  (i) net revenues totaled $14,246,343, and (ii) brokerage fees totaled $13,857,587, and (iii) net income was $7,282,878.  This financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.  Likewise, the SOX certifications were materially false and misleading because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."

146.    On January 13, 2009, LPHI hosted a conference call to discuss the Q3 2009 reported financial results.  On this conference call, Defendant Pardo fielded softball questions from his employee Defendant Peden, and again touted the "terrific" financial results for Q3 2009:

> SCOTT PEDEN:  Thank you, Justin. Well, Brian, we have concluded another record quarter of revenues and earnings. But before we get into the numbers in depth can you give us an overview of what did you think about the quarter?
>
> BRIAN PARDO:  Obviously, Scott, I am very pleased.
>
> SCOTT PEDEN:  I thought you would be.
>
> BRIAN PARDO:  Yes. I think it's fair to say that obviously we had a terrific third quarter and it was another record quarter. As you all, I am sure, have been able to see by now that we had a 46% increase in revenues over the same period last year. So we went from $19 million to $28 million in revenues.
>
> We had a 41% increase in income from operations, a 40% increase in pretax income, and a 40% increase in net income, and a 39% increase in earnings per share. It went from $0.44 to $0.61.

These "terrific" financial results were materially false and misleading because they were generated through the use of a flawed and unsustainable business model that was only possible in the short term through the use of false LE estimates.  Further, the financial information contained in this release was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

147.    On this January 13, 2009 conference call, Defendants Peden and Pardo further disclosed that investors in life settlements brokered by LPHI could look forward to "double-digit" returns, and that investors could enjoy outsized returns by either investing in life settlements brokered by the Company, or by buying LPHI stock:

> SCOTT PEDEN: Of course, LPHI is the only publicly traded life settlement provider, so it seems that investors could benefit from the enormous interest that you can talk about in life settlements by becoming one of our clients or by buying our stock. They could do it either way.
>
> BRIAN PARDO: Yes, and actually I think we are seeing that. We are seeing a lot of people who are selling us their policies and then

- 66 -

once they actually see that transaction go full cycle I think they are good candidates. We have noticed where -- their named accounts at least, anyway we are being told -- but they are also turning around and becoming shareholders as well. So it's nice to see them have that kind of confidence in the Company.

But of course firsthand they are seeing what we are doing and the good that it's doing. So it's a great opportunity for us and for our marketing people to be able to be out there, particularly in this climate, this economic climate and being something that is genuinely good for the people that we are helping by buying their policies. Also, the elevated level of returns that we are delivering to our investor clients.

SCOTT PEDEN: Now let's turn a little bit to recent events. The Bernie Madoff scheme has had a lot of people scared. It's talked about almost every day. Can you explain a little bit how the safeguards in our life settlement transactions prevent the same kind of thing happening with Life Partners? Because I know a lot of people are worried.

*    *    *

[BRIAN PARDO]:  And so our job is to find policies, source policies that are qualified, underwrite them, make sure that they meet the underwriting and the investment criteria that the clients are looking for and that we know they are looking for to produce the kinds of returns that we are wanting, double-digit returns, and in a reasonable timeframe -- four, five, six years.

These disclosures were materially false and misleading when made in that Defendants Peden and Pardo knew that such returns were impossible even under ideal circumstances, and particularly when LEs were being consistently understated by Dr. Cassidy.  Further, these Defendants knew that shareholders would not "benefit" from investing in either life settlements brokered by LPHI or the Company's own stock because the Company was operating under a materially flawed and unsustainable business model.

148.    These reported financial results and misleading conference call commentary caused LPHI shares to climb to a closing price of $21.36 per share on January 13, 2009 – a gain of $0.88 per share (4.3%) from the previous day's close of $20.48 per share.

149.    The time period surrounding the Q3 2009 reported financial results represented the "high-water mark" for LPHI, and the closing price achieved on January 13, 2009, would prove to be the highest closing price for the Class Period.  Thereafter, starting on February 11, 2009, research analysts began questioning the financial results and reported revenue figures that LPHI announced quarter after quarter and the truth about LPHI's scheme began to be revealed, one piece at a time.

150.    For instance, CITRON RESEARCH published a report on February 11, 2009,[9] which questioned the sustainability of the Company's business model by highlighting various "red flags" in the Company's operations.   The "red flags" identified by CITRON included, but were not limited to:  (1) egregious fees and the sustainability of such fees; (2) management's "track record" and previous investigations of Defendant Pardo's business dealings by the SEC; (3) the relatively small size of LPHI's auditor given the large size of the Company; (4) that only one analyst, Taglich Brothers, even covers LPHI, and is paid by the Company to do so; and (5) the troubling comparison of the full-disclosure models of LPHI's competitors in the life-settlements industry, as opposed to LPHI's relatively obscure disclosures.  The CITRON report reached the following overall conclusion regarding the Company:

> Just two years ago, LPHI was an OTCBB stock that had never traded over $10. With its colorful CEO, lack of management oversight, tiny 30-employee operational footprint and string of regulatory troubles, it falls far short of the standard of accountability and transparency required of mid-cap Nasdaq companies. From an actuarial perspective, we'd say the odds are this one is terminal.

This report represented the first cracks in the wall of deceit that had been employed by the Company regarding its business model.  The issues raised by this research report caused

---

[9] A copy of CITRON'S Report published on February 11, 2009, can be found at the following website link: http://www.citronresearch.com/index.php/2009/02/.

LPHI shares to sink from a closing price of $16.60 per share on February 10, 2009, to close

trading at $14.33 per share on February 11, 2009 – a loss of $2.27 per share, or 13.7%.

151.    In an attempt to counteract the decline in share price started by the CITRON

RESEARCH analysis, the Company issued an "open letter" to shareholders from Defendant which

was set forth in a press release over the BUSINESS WIRE on February 11, 2009, as well as

incorporated as an exhibit in a Form 8-K that was signed by Defendant Martin and filed with the

SEC on February 12, 2009.  The open letter stated the following:

> Dear Shareholder:
>
> Earlier today, a negative report was issued about Life Partners
> which contained inaccurate assumptions, misinformation and
> erroneous facts about our company. As a result of the information
> in this report, our stock experienced unusual volatility and trading
> volume.
>
> We are confident that our business growth will remain strong
> throughout the remainder of this fiscal year and beyond. We
> vehemently disagree with the conclusions reached by the author of
> the report and believe strongly that our business model will
> continue to demonstrate the sustainable growth we have exhibited
> over the last 18 years.
>
> We urge all shareholders to focus on our exceptionally strong
> business fundamentals and welcome the opportunity to address any
> issues or legitimate concerns our shareholders may have.
>
> Sincerely,
>
> Brian Pardo Chairman

152.    In response to these reassurances by Defendant Pardo, on February 12, 2009, the

Company's stock rose 3.1% or $0.44, from the prior trading day's close of $14.33 per share, to

close at $14.77 per share.

153.    Although the Defendants sought to limit the damage to the Company's share price

caused by the uncertainties raised for the first time by the CITRON RESEARCH report, LPHI's

share price continued to slide, reaching a closing price of $11.85 per share on February 17, 2009, and $10.17 per share on February 18, 2009.

154.  On February 24, 2009, the Company issued a press release announcing that it had increased its quarterly cash dividend.  The press release was incorporated as an exhibit in a Form 8-K that was filed on February 25, 2009, and was signed by Defendant Martin.  In discussing the increase in the quarterly cash dividend, Defendant Pardo stated:

> We're very pleased that our strong earnings have enabled us to declare this dividend increase. We have always sought to increase shareholder value in a tangible way. I never dreamed our dividend would offer yields at this level, but if this money helps our shareholders, then that means we have accomplished our objective.

155.  On March 16, 2009, after the close of the market, the Company issued a press release over the BUSINESS WIRE announcing preliminary financial results for the fiscal year ended February 28, 2009.  The press release was incorporated as an exhibit, signed by Defendant Martin, and filed as a Form 8-K with the SEC on March 17, 2009.  The press release stated, in part:

> **LIFE PARTNERS TO POST RECORD YEAR EARNINGS**
>
> WACO, TX — March 16, 2009 — Life Partners Holdings, Inc. (NasdaqGS: LPHI), parent company of Life Partners, Inc.,  today released its preliminary earnings for its fiscal year and fourth quarter ended February 28, 2009.  For the year, Life Partners expects to report a 46% increase in net earnings of $27.4 million or $1.84 per split-adjusted share compared to $18.8 million or $1.25 per split-adjusted share for the previous year.  Revenues for the year are expected to be $103.6 million, a 43% increase over the $72.6 million reported for last year. All figures are adjusted for the 5-for-4 forward stock split which occurred on February 16, 2009.
>
> For the quarter ended February 28, 2009, the company expects to report earnings of $7.2 million on revenues of $26.3 million or $.49 per split-adjusted share compared with $4.5 million on $18.1 million or $.30 per split-adjusted share for the same period last year.

156.    In discussing these preliminary financial results, Defendant Pardo stated "[w]e are extremely pleased with our results for this year.  At a time when many companies are facing severe downturns in earnings, we are proudly growing our business and continuing to deliver value to our shareholders and our clients.  The demand for life settlements and our services continues to grow and our success is proven by these financial results."  These financial reported results, as well as Defendant Pardo's comments with respect to these financial results, were materially false and misleading in that they were generated through the use of a flawed and unsustainable business model that was only possible in the short term through the use of false LE estimates.  Further, the financial information contained in this release was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

157.    In response to these excellent reported financial results, LPHI shares climbed from $11.61 per share at the close of the market on March 16, 2009, to $12.38 per share at the close of the market on March 17, 2009 – a gain of $0.77 or 6.6%.

158.    On May 7, 2009, LPHI issued a press release announcing the issuance of the Company's quarterly cash dividend of $0.07 per share to shareholders on June 1, 2009.  The press release was incorporated as an exhibit to a Form 8-K that was filed with the SEC on May 13, 2009, and was signed by Defendant Martin.  In discussing the issuance of the quarterly cash dividend, Defendant Pardo stated:

> This dividend is a demonstration of our continued success and our growth in earnings. In today's market, shareholders are looking for tangible signs of strength and stability.  Nothing demonstrates those characteristics better than a steady history of dividend payments.

159.    On May 14, 2009, the Company filed a Form 12b-25 with the SEC, indicating that it would be unable to file its Annual Report on Form 10-K for the year ended February 28,

2009, due to the need for additional time to complete the footnotes.  The Form 12b-25 was signed by Defendant Martin.

160.    On May 14, 2009, LPHI issued a press release announcing that the Company would issue a special enhanced cash dividend of $0.25 per share.  The press release was incorporated as an exhibit to a Form 8-K which was filed with the SEC on May 20, 2009, and was signed by Defendant Martin.  In discussing the special enhanced dividend payment of $0.25 per share, Defendant Pardo stated:

> We are generating significant cash from our operations and, while we're keeping sufficient capital to continue growing the company, the board feels that our shareholders deserve to share in our success. This idea of "sharing in our success" is something the board intends to keep in mind each quarter when making decisions about declaring dividends. It may sound old-fashioned, but we still think of our shareholders as our partners in business.  If we're making money, they should be making money too.

161.    On May 14, 2009, in an interview on Bloomberg Television's *Taking Stock* program, Defendant Pardo discussed LPHI's business, specifically maintaining that investors in the life insurance policies would obtain "double-digit" returns.  This disclosure was materially false and misleading when made because Defendant Pardo was aware that these purported "double-digit" returns did not include approximately 2,900 life settlements brokered by LPHI for which the insureds had already outlived Dr. Cassidy's false LE projections.  Defendant Pardo made these statements despite his knowledge that "double-digit" returns were difficult or impossible to achieve under ideal circumstances and most certainly impossible in light of Dr. Cassidy's materially false LE calculations.[10]

162.    On May 29, 2009, the Company filed a Form 10-K with the SEC, reporting on financial results for the fiscal year ended February 28, 2009 (the "2009 Form 10-K").  The 2009

---

[10] SEC Complaint ¶ 11.

Form 10-K was signed by Defendants Pardo, Martin and Peden, and contained SOX

certifications signed by Defendants Martin and Pardo that were substantially similar to those

contained in the 2008 Form 10-K, and were materially false and misleading for the same reasons.

163.     The 2009 Form 10-K also specifically disclosed that the financial statements

contained therein "were prepared in accordance with accounting principles generally accepted in

the United States of America."  Likewise, in its unqualified audit opinion contained in the 2009

Form 10-K, LPHI's auditors stated that "[i]n our opinion, except for the error described in Note

17, the consolidated financial statements referred to above present fairly, in all material respects,

the consolidated financial position of Life Partners Holdings, Inc. and subsidiaries as of February

29, 2008, and the consolidated results of their operations, cash flows and shareholders' equity for

each of the years ended February 29, 2008, and February 28, 2007, in conformity with U.S.

generally accepted accounting principles."  In this filing, LPHI further disclosed that its revenue

recognition policy was to recognize revenues at the closing of the sale of a life settlement:

> Revenue Recognition – We recognize income at the time a
> settlement has been closed and the purchaser has obligated itself to
> make the purchase. We defer $50 per viatical settlement and $100
> per life settlement to cover minor monitoring services provided
> subsequent to the settlement date and to amortize this deferred cost
> over the anticipated life expectancy of the insureds.

These disclosures regarding the Company's revenue recognition policies and compliance

with GAAP were materially false and misleading when made because, inter alia, the Company's

financial statements were not prepared in compliance with GAAP, as discussed more fully

below.  Further, the disclosure of the Company's revenue recognition policy was false and

misleading because the Company had abandoned this reported policy by 2003, and was no

longer recognizing revenues at the closing of a sale, but at an earlier date, as described below.

164.    The 2009 Form 10-K reported net revenues of $54.4 million and net income of $27.2 million.  This financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition was flawed and did not comply with GAAP or SEC regulations.

165.    The 2009 Form 10-K was further materially false and misleading because it failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  The unsustainability of this business model built upon false LEs constituted a known trend to the Company which that would result in, or that were reasonably likely to result in, a material favorable or unfavorable impact on the Company's net revenue from continuing operations and was therefore required to be disclosed in the MD&A Section of the 2009 Form 10-KSB pursuant to Item 303 of Regulation S-K.

166.    The 2009 Form 10-K further provided the following description of the need for accurate life expectancy estimates:

> **Our Purchasers Depend on Our Ability to Predict Life Expectancies and Set Appropriate Prices; If Our Investment Returns Are Not Competitive, We May Lose Purchasers**
>
> A purchaser's investment return from a life settlement depends on three factors: the difference between the policy face amount and purchaser's cost basis (consisting of the acquisition cost and premiums paid to maintain the policy), the length of the holding period, and the demise of the insured.  We price settlements based on the policy face amount, the anticipated life expectancy of an insured and policy maintenance costs.  Life expectancies are generally estimated from standard medical and actuarial data based on the historical experiences of similarly situated persons.  The data is necessarily based on averages involving mortality and morbidity statistics.  The outcome of a single settlement may vary significantly from the statistical average.  It is impossible to predict any one insured's life expectancy exactly.  To mitigate the risk that an insured will outlive his or her predicted life expectancy, we price life settlements to yield competitive returns even if this life expectancy prediction is exceeded by several years.  In addition,

life settlement purchasers must be able to bear a non-liquid investment for an indeterminate period.

 If we underestimate the average life expectancies and price our transactions too high, our purchasers will realize smaller returns, demand may fall, and purchasers may invest their funds elsewhere. In addition, amounts escrowed for premiums may be insufficient to keep the policy in force, requiring purchasers to invest further proceeds to pay these additional premiums.  If we overestimate the average life expectancies, the settlement prices we offer will fall below market levels, supply will decrease, and sellers may engage in business with our competitors or pursue other alternatives.  Our ability to accurately predict life expectancies and price accordingly is affected by a number of factors, including:

- The accuracy of our life expectancy estimations, which must sufficiently account for factors including an insured's age, medical condition, life habits (such as smoking), and geographic location;

- Our ability to anticipate and adjust for trends, such as advances in medical treatments, that affect life expectancy data; and

- Our ability to balance competing interests when pricing settlements, such as the amounts paid to policy sellers, the acquisition costs paid by purchasers, and the compensation paid to ourselves and our referral networks.

To foster the integrity of our pricing systems, we use both in-house and outside experts, including medical doctors and published actuarial data.  We cannot assure you that, despite our experience in settlement pricing, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums.  If we do so, we could lose purchasers or policy sellers, and those losses could have a material adverse effect on our business, financial condition, and results of operations.

This disclosure was materially false and misleading because it failed to disclose that LPHI knowingly employed the services of Dr. Cassidy to perform virtually all life expectancy calculations and was aware that Dr. Cassidy's life expectancies were materially flawed and systematically understated the life expectancies of policy sellers.

167. The Company also issued a press release on May 29, 2009, announcing the financial results for the fiscal year ended February 28, 2009, as reported in the Form 10-K. The press release was incorporated as an exhibit to a Form 8-K that was filed with the SEC on May 29, 2009 and was signed by Defendant Martin. In discussing the financial results for the fiscal year ended February 28, 2009, Defendant Pardo was quoted in the press release, stating:

> We are extremely pleased with our results for this year. At a time when many companies are facing severe downturns in earnings, we are proudly growing our business and continuing to deliver value to our shareholders and our clients. The demand for life settlements and our services continues to grow and our success is proven by these financial results.

168. The press release also discussed financial results for the fourth fiscal quarter for the period ended February 28, 2009, stating:

> For the quarter ended February 28, 2009, the company reported earnings of $7.0 million on revenues of $26.3 million or $.48 per split-adjusted share compared with $4.5 million on revenues of $18.1 million or $.30 per split-adjusted share for the same period last year.

169. Based upon these excellent reported financial results, LPHI shares rose from the previous day's close of $9.42 per share to close trading on May 29, 2009, at $10.50 per share – a gain of $1.1.08 per share (11.4%).

170. On June 3, 2009, LPHI issued a press release over the BUSINESS WIRE announcing its prediction of a "strong first quarter":

> Life Partners Holdings, Inc. (Nasdaq GS: LPHI), parent company of Life Partners, Inc., a leader in the secondary life insurance market known as "life settlements," predicted strong first quarter earnings for the period ended May 31, 2009. The forecast was made in a conference call today by LPHI Chairman and CEO, Brian Pardo.
>
> "We will be issuing much more specific guidance around June 15th, but right now I can tell you that our first quarter is going to be strong." said Mr. Pardo.

- 76 -

The press release reflected comments made in a conference call of the same date.  This conference call was in the same faux-interview style, with Defendant Peden pitching softball questions for Defendant Pardo to answer:

> SCOTT PEDEN:  You talked about the key to our success being delivering value to our clients, but we're also focused on bringing value to our shareholders. One of the ways we do that, of course, is through dividends. Can you talk a little bit about the Board's decision to declare the recently announced special dividend of $0.25 per share?

> BRIAN PARDO:  Well, to be honest with you, I've always considered this business to be a partnership among our shareholders. And I'm talking about the shareholders who are people who buy our stock, own our stock for long-term appreciation and believe in what we're doing and believe that we're on the right track and it's going to grow.

> The stock took a big hit right after the first of the year. Obviously as we all know, or most of us know, big cause of that was short selling in a lot of cases, naked short selling and manipulative short selling. In some cases, legitimate short selling but either way, short selling. And then another aspect of that was just the fact that the financial sector that is the area that we're in, that we're classified in in the market just got hit anyway. And so stock is off about 50% right now from its high, but it's also off close to 50% from where it probably, in our view, ought to be trading.

> *     *     *

> SCOTT PEDEN:  Speaking of value, let's go ahead and turn, we just filed our 10-K, so let's go ahead and talk about some of the numbers here, and we can go over some highlights. These are pretty good numbers to look at.

> BRIAN PARDO:  Well, we have had good numbers and I would like to say by the time we have these calls and we report on our 10-K, we already have completed our first fiscal quarter. And so while we're expecting to announce guidance as we normally do about 15 or so days after the end of the quarter, which should be somewhere around the 15th or so of June, we're not prepared to provide guidance for the first fiscal quarter of what now is our 2010 fiscal year.  <u>But I can tell you that first quarter was a very strong quarter financially, and we think that our shareholders will be very, very</u>

<u>pleasantly -- there will be a very pleasant response when we do put those out</u>.

For the fiscal year ending on February 28, 2009, we had revenues of $103.6 million compared to $72.6 million the prior year, and our income from operations was about $40 million, $40.2 million versus $27 million, and our pretax income was $41.9 million versus $28.7 million. Net income was $27.2 million or $1.83 a share versus $18.8 million or $1.25 a share for the prior fiscal year. So you can see pretty stout growth.

Now for the quarter, usually -- this is just embedded in our numbers, but those of you who want to know what the quarterly numbers are, the revenues for the quarter were $26.3 million in the fourth quarter compared to $18.1 million last year. Income from operation was $10.7 million versus $6.9 million from the year. Pretax income 7. -- I mean $10.9 million versus $7.1 million for the prior year. And our net income was $7 million or $0.48 per share versus $4.5 million or $0.30 per share for the prior year. [Emphasis added.]

These comments and the reported results they were based upon were false and misleading in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  Further, this financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

171.    In response to these comments and strong financial results, LPHI shares closed trading on June 3, 2009, at $12.17 per share – up $0.97 per share (8.7%) from the previous day's closing price of $11.20 per share.

172.    On June 16, 2009, the Company issued a press release over the BUSINESS WIRE announcing the preliminary financial results for the first fiscal quarter ended May 31, 2009 ("Q1 2010").  The press release was incorporated as an exhibit and filed as a Form 8-K with the SEC on June 16, 2009, which was signed by Defendant Martin.  In discussing the financial results for the first fiscal quarter ended May 31, 2009, the press release stated:

WACO, TX — June 16, 2009 — Life Partners Holdings, Inc. (NasdaqGS: LPHI), parent company of Life Partners, Inc., predicted another quarter of record earnings as it announced its preliminary financial results for its first fiscal quarter ended May 31, 2009. Life Partners expects to report first quarter earnings of approximately $0.53 per share compared with earnings of $0.42 per share last year. Results for the quarter are expected to show a 26% increase in earnings over the same period last year. All earnings per share calculations are adjusted to account for the 5-for-4 stock split in February 2009.

For its first quarter ended May 31, 2009, Life Partners expects to report $27.4 million in revenues, a 12% increase over the $24.4 million it reported for the first quarter of last year.

173.    Defendant Pardo commented on the financial results for Q1 2010, stating:

We are continuing to see growth within the life settlement industry and, as a leader in this industry, we are continuing to grow as well. As the financial markets remain turbulent, we expect the interest in life settlements to continue. This is because the gains from life settlements come from the inherent value in these policies and not from market appreciation.  Smart investors recognize that life settlements are not susceptible to market fluctuations and are using them to diversify their portfolios from financial market risk.

These reported results were false and misleading in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs. Further, this financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.  Likewise, the SOX certifications were materially false and misleading because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."

- 79 -

174.    On July 10, 2009, the Company filed a Form 10-Q with the SEC for Q1 2010. The Form 10-Q was signed by Defendants Pardo and Martin, contained SOX certifications that were substantially similar to those contained in the 2007 Form 10-KSB, and reported the following financial metrics for the quarter:  (i) total net revenues of $15,285,484, (ii) brokerage fees totaled $12,158,120, and (iii) net income totaled $7,445,469.  These reported results were false and misleading in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  Further, this financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations. Likewise, the SOX certifications were materially false and misleading because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."

175.    On July 14, 2009, LPHI hosted a conference call to discuss the Q1 2010 reported financial results.  After congratulating themselves on LPHI being named the fastest growing small company by a magazine, talked about the Q1 2010 revenues and net income:

> SCOTT PEDEN, PRESIDENT, LIFE PARTNERS HOLDINGS, INC. :  Thank you, Justin. Good morning everyone. This is Scott Peden.  And Brian, first of all, I think congratulations are in order for everyone at Life Partners on being named the number one fastest-growing small public company in America by Fortune Small Business.
>
> BRIAN PARDO:  Yes, thanks. Doesn't he have a great voice? He ought to be on the radio or something.
>
> SCOTT PEDEN:  Oh, I used to be at one time -- a long time ago.

BRIAN PARDO:  Anyway, I'm sure everybody knows, but we were really thrilled to be recognized by Fortune, and also by CNN Moneyline, as the fastest-growing small public company in America.  Now, this, you may recall, is the list that we were number seven on last year.  And while we can't do any better than number one, I guess, [on with] some other category, I guess we'd get on a new list.

And anyway, I'm expecting [and] as we talk here, also [at the] beginning of the question-and-answer period, we are expecting to continue growth at a fairly robust rate.  And so who knows where it's going to go from here, but it's definitely looking good at the moment, Scott, so thank you for bringing that up.

SCOTT PEDEN:  Well, it's -- yes, we've all worked very, very hard to do that. I think with your leadership there's no question that we deserve to be number one, because it's a tough market out there. In fact, we finished up the first quarter of our 2010 fiscal year and hit another record quarter for earnings in what continues to be, I think, putting it lightly, a dismal economic climate.

So with so many well-known companies doing poorly, and maybe even some requiring bailouts from the federal government, can you tell us what the secret is of Life Partners' remarkable success?

BRIAN PARDO: Well, as you all know, we -- this economy has created for us, you might say, the perfect storm from an investor point of view. And what we're seeing happen is a tangible amount of a noticeable increase in capital flow coming in to buy policies, to buy more policies -- more policies on the market, because more people are looking to sell policies now, and also more people recognize they can sell their policies. You know what I mean?

\*   \*   \*

For the quarter, we did have a 12% increase in revenues. It went from $24.4 million to $27.4 million. Our income from operations increased 17%; it went from $9.4 million to $11 million. And our pretax income was a 19% increase from $9.8 million to $11.7 million. And our net income after tax went to $7.4 million from $6.2 million; again, a 19% increase.

I want to bring up a subject right upfront. We, in our guidance, had said that we were going to make $0.53 a share. And we pride ourselves on being right on the numbers with that. And we actually report it in our 10-K, $0.50 a share and not (multiple speakers) -- pardon me?

DAVID MARTIN, CFO, LIFE PARTNERS HOLDINGS, INC. : Our 10-Q.

BRIAN PARDO: In our 10-K. I'm sorry for that. In our 10-Q, $0.50 a share when our guidance said $0.53 a share. And I want to tell you from an operating point of view, it was $0.53; but I want to tell you why we dropped from $0.53 to $0.50. It has to do with the timing of recognition of accruals, and I'm going to read this so that I get it right. This is a prepared statement that explains that difference. I'll just take a minute. It's somewhat complex, so I want to read it to you.

And that is, that we have determined that under applicable GAAP accounting rules, we need to accrue the expense of officer bonuses in the quarter in which they are earned, rather than in the quarter in which they are actually paid, which was the previous treatment, in order to more accurately match expenses with revenues. So, this is a timing difference -- a matter of timing.

While the amount will not change, we will record the expense earlier than we would have under the previous policy. The change also means that we recognize -- we will recognize this expense twice in the first quarter only -- once when we actually pay out the fourth quarter bonuses, which was the fourth quarter of 2009, we're actually [paid] about 15 days later in the first quarter of 2010; this is fiscal years.

These reported results were false and misleading in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs. Further, this financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

176.    On July 27, 2009, the Company issued a press release over the BUSINESS WIRE announcing the issuance of a quarterly dividend of $0.25 per share to shareholders, on or about September 15, 2009.  The press release was incorporated as an exhibit and filed as a Form 8-K with the SEC on July 27, 2009, which was signed by Defendant Martin.  In discussing the quarterly dividend, Defendant Pardo stated:

> Our board has made it clear that we want LPHI shareholders to
> share in our success. Because of our unique business model, our
> shareholders can own a growth stock that also pays a healthy
> dividend.  There aren't many opportunities like that in today's
> market.

177.    On September 16, 2009, LPHI issued a press release over the BUSINESS WIRE
announcing preliminary financial results for the second fiscal quarter ended August 31, 2009
("Q2 2010").  The press release was incorporated as an exhibit and filed as a Form 8-K with the
SEC on September 16, 2009, and was signed by Defendant Martin.  In discussing the financial
results for the second fiscal quarter ended August 31, 2009, the press release stated:

> WACO, TX — September 16, 2009 — Life Partners Holdings,
> Inc. (Nasdaq GS: LPHI), parent company of Life Partners, Inc.,
> today announced its preliminary financial results for its second
> fiscal quarter and first half ended August 31, 2009. Life Partners
> expects to report second quarter earnings of $0.51 per share, a 16%
> increase compared with earnings of $0.44 per share last year.  For
> the six months ended August 31, 2009, the company expects to
> report earnings of $1.01 per share, a 17% increase compared with
> $0.86 per share for the same period last year.

> For the quarter ended August 31, 2009, Life Partners expects to
> report $29.1 million in revenues, a 17% increase over the $24.8
> million reported for the same period last year. For the six months
> ended August 31, 2009, the company expects to report revenues of
> $56.5 million, a 15% increase over the $49.2 million reported for
> the same period last year.

> All per share information is adjusted for the 5-for-4 stock split in
> February 2009.

178.    In this press release, Defendant Pardo also commented on the preliminary
financial results for Q2 2010, stating that he saw "substantial growth" for LPHI:

> As recent news reports and these numbers show, we continue to
> see substantial growth in the life settlement industry and in Life
> Partners specifically.  By concentrating on bringing value to all
> parties in our life settlement transactions, we ultimately bring value
> to our shareholders.  Our focus on bringing value is what made us
> the number one fastest-growing small public company in America
> according to Fortune Small Business magazine.

- 83 -

These comments, and the reported financial results upon which they were based were false and misleading in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  Further, this financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

179.    On October 9, 2009, the Company filed a Form 10-Q with the SEC, including LPHI's financial results for the second fiscal quarter ended August 31, 2009 ("Q2 2010").  The Form 10-Q was signed by Defendants Pardo and Martin, contained SOX certifications that were substantially similar to those contained in the 2007 Form 10-KSB, and reported the following financial figures for the second fiscal quarter:  (i) total net revenues of $16,201,940, (ii) brokerage fees of $12,853,626, and (iii) net income of $7,625,015.   These reported results were false and misleading in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  Further, this financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.  Likewise, the SOX certifications were materially false and misleading because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."

180.    On October 26, 2009, the Company issued a press release over the BUSINESS WIRE announcing that it was issuing a $0.25 per share quarterly dividend on or about December 15, 2009.  The press release was incorporated as an exhibit to a Form 8-K filed with the SEC on

- 84 -

October 26, 2009, which was signed by Defendant Martin.  In discussing the dividend,

Defendant Pardo stated:

> In keeping with our board's view that LPHI shareholders should
> share in our success, we are pleased to declare this dividend.  We
> are also very pleased to announce that, since our inception in 1991,
> we have now completed over 100,000 individual transactions for
> our clients and that number continues to grow every day.

181.    On December 17, 2009, the Company issued a press release over the BUSINESS

WIRE announcing preliminary financial results for the third fiscal quarter ended November 30,

2009 ("Q3 2010").  The press release was incorporated as an exhibit to a Form 8-K filed with the

SEC on December 18, 2009, which was signed by Defendant Martin.  In discussing the

preliminary financial results for Q3 2010, the press release stated, in part:

> LIFE PARTNERS PREDICTS RECORD EARNINGS FOR
> THIRD FISCAL QUARTER
>
> WACO, TX — December 17, 2009 — Life Partners Holdings, Inc.
> (NASDAQ GS: LPHI), parent company of Life Partners, Inc.,
> predicted another quarter of record earnings as it announced its
> preliminary financial results for its third fiscal quarter ended
> November 30, 2009.  Life Partners expects to report third quarter
> earnings of approximately $0.57 per share compared with earnings
> of $0.49 per share last year.  Results for the quarter are expected to
> show a 16% increase in earnings over the same period last year.
> All earnings per share calculations are adjusted to account for the
> 5-for-4 stock split in February 2009.
>
> For its third quarter ended November 30, 2009, Life Partners
> expects to report $31.0 million in revenues, a 10% increase over
> the $28.1 million it reported for the third quarter of last year.
>
> For the nine months ended November 30, 2009, Life Partners
> expects to report earnings per share of $1.58 compared to $1.35
> per share last year, a 17% increase. Total revenue for the nine
> months is expected to show an increase of 13%, from $77.3
> million last year to $87.5 million this year.

The press release also quoted Defendant Pardo as stating:

Life Partners has enjoyed continued growth in the life settlement industry because of our superior business model, our industry leadership and our commitment to providing service and value to our clients.  As the only publicly traded life settlement provider, our experience and transparency is important to individual accredited investors, institutional investors and lawmakers who want to know more about how our industry works.  We will continue to provide the leadership and innovation which has made us such an outstanding company.

These comments and the reported financial results upon which they were based were false and misleading in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  Further, this financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

182.    On January 11, 2010, LPHI issued a press release over the BUSINESS WIRE discussing the Company's financial results Q3 2010.  The press release was incorporated as an exhibit and filed as a Form 8-K with the SEC on January 14, 2010, which was signed by Defendant Martin.  The press release stated:

**LIFE PARTNERS REPORTS THIRD FISCAL QUARTER AND NINE MONTHS RESULTS**

WACO, TX — January 11, 2010 — Life Partners Holdings, Inc. (Nasdaq GS: LPHI) today announced a 16% increase in net income of $8.4 million or $0.57 per share for the three months ended November 30, 2009, compared to $7.3 million or $0.49 per share reported for the same period last year.  Third quarter revenues increased by 10% to $31 million compared with $28.1 million during the same period last year. All earnings per share calculations are adjusted to account for the 5-for-4 stock split in February 2009.

For the nine months ended November 30, 2009, the company reported a 17% increase in net income; $23.5 million or $1.58 per share compared to $20.1 million or $1.35 per share during the period last year.

> Life Partners' financial results met analyst expectations for the
> third fiscal quarter and were consistent with the company's
> guidance released on December 17, 2009.

This press release quoted Defendant Pardo as stating that "[t]his has been another record quarter for us and we are very pleased with our continued growth in revenues and net income." These comments and the reported financial results upon which they were based were false and misleading in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs. Further, this financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

183.     Also on January 11, 2010, the Company filed a Form 10-Q with the SEC, which included the financial results of the press release from the same day. The Form 10-Q was signed by Defendants Pardo and Martin and contained SOX certifications that were substantially similar to those contained in the 2007 Form 10-KSB. The reported financial results were false and misleading in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs. Further, this financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations. Likewise, the SOX certifications were materially false and misleading because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."

184.     On January 18, 2010, LPHI announced in a press release over the BUSINESS WIRE that it had been advised that Eide Bailly LLP had resigned as LPHI's auditor. This press release

falsely maintained that "the decision to change auditors was not the result of any disagreements between the Company and Eide Bailly on any matter of accounting principles or practices, financial statement disclosures, or auditing scope or procedure."  Despite these assurances, EideBailly would later disclaim its clean opinion on the fiscal year 2009 financial statements, and, as detailed below, would state that the fiscal year 2009 audit report should no longer be relied upon.  This press release was attached as an exhibit to a Current Report on Form 8-K which was signed by Defendant Martin and filed with the SEC on January 19, 2010.

185.    On January 25, 2010, the Company issued a press release announcing that it would pay shareholders a $0.25 per share quarterly dividend on or about March 15, 2010.  The press release was incorporated as an exhibit and filed as a Form 8-K with the SEC on January 26, 2010, and was signed by Defendant Martin.  In discussing quarterly dividend, Defendant Pardo stated:

> Our business is successful because of our commitment to bringing value to our clients. Likewise, we bring value to our shareholders by sharing our success through our consistent history of dividend payments.

186.    On March 2, 2010, LPHI issued a press release over the BUSINESS WIRE disclosing that it had retained E&Y as its new auditors.

187.    On March 26, 2010, the Company issued a press release over the BUSINESS WIRE announcing preliminary financial results for the fiscal year ended February 28, 2010.  The press release was also incorporated as an exhibit to a Form 8-K filed with the SEC on March 30, 2010, which was signed by Defendant Martin.  In discussing the financial results for the fiscal year ended February 28, 2010, the press release stated:

> LIFE PARTNERS PREDICTS INCREASE IN EARNINGS FOR FISCAL YEAR

WACO, TX — March 26, 2010 — Life Partners Holdings, Inc. (NASDAQ GS: LPHI), parent company of Life Partners, Inc., predicts an increase in earnings for its fiscal year ended February 28, 2010.  The company expects to report a 9% increase in revenues and a 5% increase in net income for its 2010 fiscal year over the same period of the prior year.  For the fiscal year, Life Partners expects to report revenues of $113 million compared to $104 million for its prior fiscal year. Net income for the current fiscal year will be $28.4 million, or $1.91 per share compared with net income of $27.2 million or $1.83 per split adjusted share during the previous fiscal year.

While income from operations was up by 11%, earnings were affected by a nonrecurring, non-operational charge in the fourth quarter resulting from a recognition of the decrease in market value of publicly traded securities acquired about five years ago for liquidity purposes, and the reclassification of those securities as other than temporarily impaired.  The decrease in market value coincides with the general decline in the securities markets over the past two years and, after having considered the markets' failure to completely recover during that time, management has determined that the impairment is no longer temporary.  Excluding the effect of the one-time charge, the company estimates earnings would have been $2.04 per share.

This press release quotes Defendant Pardo as stating that he expected "to continue our trend of growth in revenues":

Despite the impairment charge, this was still a record year for us and we expect to continue our trend of growth in revenues and earnings to continue during our next fiscal year.

These comments and the reported financial results upon which they were based were false and misleading in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  Further, this financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

188.    On April 26, 2010, the Company issued a press release announcing that it would issue a cash dividend of $0.25 per share to shareholders on or about June 15, 2010.  The press

release was incorporated as an exhibit to a Form 8-K filed with the SEC on April 27, 2010, which was signed by Defendant Martin.  In discussing the cash dividend, Defendant Pardo stated:  "The announcement reflects our company's continuing commitment to share our success with our shareholders.  We intend to continue to grow the company while, at the same time, reward our shareholders with a very competitive dividend."

189.    On May 12, 2010, the Company filed with the SEC its Form 10-K for the fiscal year ended February 28, 2010 (the "2010 Form 10-K").  The 2010 Form 10-K was signed by Defendants Pardo, Martin and Peden in their capacities as President, Chief Financial Officer and Secretary, respectively.  The 2010 Form 10-K also contained SOX certifications signed by Defendants Pardo and Martin that were substantially similar to those contained in the 2009 Form 10-K, and which were materially false and misleading for the same reasons.

190.    The 2010 Form 10-K also specifically disclosed that the financial statements contained therein "were prepared in accordance with accounting principles generally accepted in the United States of America."  In this filing, LPHI further disclosed that its revenue recognition policy was to recognize revenues at the closing of the sale of a life settlement:

> Revenue Recognition.  We recognize income at the time a settlement has been closed and the purchaser has obligated itself to make the purchase.  We defer $100 per life settlement to cover minor monitoring services provided subsequent to the settlement date and amortize this deferred cost over the anticipated life expectancy of the insureds.

These disclosures regarding the Company's revenue recognition policies and compliance with GAAP were materially false and misleading when made because, inter alia, the Company's financial statements were not prepared in compliance with GAAP, as discussed more fully below.  Further, the disclosure of the Company's revenue recognition policy was false and

misleading because the Company had abandoned this reported policy by 2003, and was no longer recognizing revenues at the closing of a sale, but at an earlier date, as described below.

191.    The 2010 Form 10-K contained the following financial results for the fiscal year ended February 28, 2010:  net revenues of $69.0 million and net income of $29.4 million.  This financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition was flawed and did not comply with GAAP or SEC regulations.

192.    The 2010 Form 10-K was further materially false and misleading because it failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  The unsustainability of this business model built upon false LEs constituted a known trend to the Company which that would result in, or that were reasonably likely to result in, a material favorable or unfavorable impact on the Company's net revenue from continuing operations and was therefore required to be disclosed in the MD&A Section of the 2010 Form 10-K pursuant to Item 303 of Regulation S-K.

193.    The 2010 Form 10-K further provided the following description of the need for accurate life expectancy estimates:

> **Our purchasers depend on our ability to predict life expectancies and set appropriate prices; if our investment returns are not competitive, we may lose purchasers**
>
> A purchaser's investment return from a life settlement depends on three factors: the difference between the policy face amount and purchaser's cost basis (consisting of the acquisition cost and premiums paid to maintain the policy), the length of the holding period, and the demise of the insured.  We price settlements based on the policy face amount, the anticipated life expectancy of an insured and policy maintenance costs.  Life expectancies are estimated generally from standard medical and actuarial data based on the historical experiences of similarly situated persons.  The data is based necessarily on averages involving mortality and morbidity statistics.  The outcome of a single settlement may vary

- 91 -

significantly from the statistical average. It is impossible to predict any one insured's life expectancy exactly. To mitigate the risk that an insured will outlive his or her predicted life expectancy, we price life settlements to yield competitive returns even if this life expectancy prediction is exceeded by several years. In addition, life settlement purchasers must be able to bear a non-liquid investment for an indeterminate period.

If we underestimate the average life expectancies and price our transactions too high, our purchasers will realize smaller returns, demand may fall, and purchasers may invest their funds elsewhere. In addition, amounts escrowed for premiums may be insufficient to keep the policy in force, requiring purchasers to invest further proceeds to pay these additional premiums. If we overestimate the average life expectancies, the settlement prices we offer will fall below market levels, supply will decrease, and sellers may engage in business with our competitors or pursue other alternatives. Our ability to accurately predict life expectancies and price accordingly is affected by a number of factors, including:

- The accuracy of our life expectancy estimations, which must sufficiently account for factors including an insured's age, medical condition, life habits (such as smoking), and geographic location;

- Our ability to anticipate and adjust for trends, such as advances in medical treatments, that affect life expectancy data; and

- Our ability to balance competing interests when pricing settlements, such as the amounts paid to policy sellers, the acquisition costs paid by purchasers, and the compensation paid to ourselves and our referral networks.

To support our pricing systems, we use both in-house and outside specialists, including medical doctors and published actuarial data. We cannot assure purchasers that, despite our experience in settlement pricing, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums. If we do so, we could lose purchasers or policy sellers, and those losses could have a material adverse effect on our business, financial condition, and results of operations.

This disclosure was materially false and misleading because it failed to disclose that

LPHI knowingly employed the services of Dr. Cassidy to perform virtually all life expectancy

calculations and was aware that Dr. Cassidy's life expectancies were materially flawed and systematically understated the life expectancies of policy sellers.

194. On May 13, 2010, the Company issued a press release over the BUSINESS WIRE disclosing the financial results for the fiscal year ended February 28, 2010. This press release was incorporated as an exhibit to a Form 8-K filed with the SEC on May 14, 2010, which was signed by Defendant Martin. While the financial results in the press release mirrored what had been announced in the Form 10-K filed on May 12, 2010, Defendant Pardo was also quoted in the press release regarding these results as follows:

> We received an unqualified opinion on Life Partners' fiscal 2010 financial results, as well on the effectiveness of Life Partners' internal control over financial reporting from Ernst & Young LLP, our independent registered public accountants. In a year in which our industry contracted, we continued to grow and capture greater market share. There is no doubt that we are well positioned to focus on moving forward into a new era of growth for the company.

This financial information was materially false and misleading when made in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs. The financial information was also false and misleading because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations. Likewise, Defendant Pardo's assertions regarding E&Y's audit report and report over LPHI's system of internal controls was materially false and misleading because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that E&Y would later announce that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."

195.    On June 24, 2010, the Company issued a press release over the BUSINESS WIRE

announcing preliminary financial results for the first fiscal quarter ended May 31, 2010 ("Q1

2011").  The press release was incorporated as an exhibit to a Form 8-K filed with the SEC on

June 24, 2010, which was signed by Defendant Martin.  In discussing the preliminary financial

results for Q1 2011, the press release stated:

### LIFE PARTNERS TO REPORT QUARTERLY RESULTS

WACO, TX — June 24, 2010 — Life Partners Holdings, Inc.
(Nasdaq GS: LPHI) today announced that it expects to report a 5%
increase in net income to $7.8 million or $0.52 per share for the
three months ended May 31, 2010, including a one-time charge of
$750,445 in deferred revenue.  This one time adjustment had a
$0.033 negative impact on net income, after taxes, on the period.
Net income for the period compares to $7.4 million or $0.50 per
share reported for the same period last year.

The financial results were in line with the company's expectations
for growth during the year.  The company also expects to report a
50% return on equity and a 75% return on capital for the period.

196.    In discussing the financial results for the first fiscal quarter ended May 31, 2010,

Defendant Pardo said the following:

In the midst of continued turmoil in the financial markets, we are
proud to post another outstanding quarter and expect to continue to
grow our revenues and net income.  Individual and institutional
investors all over the world are realizing the value of life
settlements and are turning to us because of our experience, our
infrastructure, and our leadership in the life settlement industry.

These comments and the reported financial results upon which they were based were

false and misleading in that they failed to disclose that LPHI's business model was unsustainable

and built upon LPHI's scheme of using false LEs.  Further, this financial information was

materially false and misleading when made because, as set forth in more detail below, LPHI's

revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

197.    On July 9, 2010, LPHI filed a Form 10-Q with the SEC for Q1 2011.  The Form 10-Q was signed by Defendants Pardo and Martin, contained SOX certifications that were substantially similar to those contained in the 2007 Form 10-KSB, and stated the following financial results:  (i) net revenues totaled $15,047,257, (ii) brokerage fees totaled $11,669,031, and (iii) net income totaled $7,610,595.  This financial information was materially false and misleading when made in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  The financial information was also false and misleading because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.  Likewise, the SOX certifications were materially false and misleading because, as described in more detail below, LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that E&Y would later announce that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."

198.    Another report by CITRON titled "The SEC Has Spoken – It's Time To Listen," which was published on July 28, 2010 (the "July 2010 CITRON Report").  In the July 2010 CITRON Report, Citron provided an update to its earlier report on February 11, 2009, and stated that it had "never seen a company so clearly pinned in the cross hairs of a government launched laser-guided smart bomb – at both state and federal levels."

199.    Further, the July 2010 CITRON Report also referenced a recent SEC report on the life settlement industry, which focused largely on LPHI's questionable business operations. According to CITRON, the SEC's report discussed how Life Partners had attempted to "skirt regulation," as seen by the following statement in the Company's Form 10-K:

> Some states and the Securities and Exchange Commission have attempted to treat life settlements as securities under federal or state securities laws. ***We have structured our settlement transactions to reduce the risk that they would be treated as securities under state or Federal securities law***, and the Federal Circuit Court for the District of Columbia has ruled that our settlement transactions are not securities under the Federal securities laws.  [Emphasis added.]

200.     Further, the July 2010 CITRON Report detailed how the SEC's investigation found discrepancies in LPHI's business model, stating, in relevant part:

> LPHI's filings with the SEC indicated that their business model was based upon sourcing capital from both retail investors and institutional investors. 2009's 10-K indicated that approximately 10% of its business came from institutional investors. ***This year's 10-K, however, reveals that the only institutional investor over the past 3 years has been a fund in which LPHI itself has made a $6.5 million investment.*** Thus, the company's prior SEC filings failed to identify the conflict of interest and disclosure deficiency that existed during fiscal 2008 and 2009. Further, it failed to disclose that the related fund paid LPHI fees approximating 2.0% of face value, compared to the 10.5% of face value it charged to its less sophisticated retail investors… but that is merely a sideshow of the larger issues.  [Emphasis added.]

In response to these significant questions, LPHI shares dropped 8.2% from $12.86 at the close of trading on July 27, 2010, to close trading on July 28, 2010 at $11.80.

201.     On August 25, 2010, LPHI issued a press release over the BUSINESS WIRE announcing that it had been awarded various industry honors for its growth, profitability, and financial health.  The press release was incorporated as an exhibit to a Form 8-K filed with the SEC on August 26, 2010, and was signed by Defendant Martin.  In responding to these industry awards, Defendant Pardo stated the following:

> Institutional investors and analysts understand the value of a strong balance sheet, a solid dividend and a business plan that brings value to all parties. Our current dividend rate is around 6% which makes LPHI very attractive to buyers of dividend stocks, but our real value is in our long term business plan.  We provide a valuable service to insurance consumers looking to reallocate their assets

- 96 -

> and to investors looking for an asset based investment which is not
> correlated to the financial markets.  With all of the uncertainty in
> the financial markets, life settlements are an essential financial
> option and will continue to be for years to come.  Life Partners has
> the infrastructure, the financial stability and the intellectual capital
> to maintain and grow its position as a leader of this industry.

This press release was materially false and misleading when issued in that Defendant Pardo failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  Accordingly, Life Partners did not have the "infrastructure, the financial stability and the intellectual capital to maintain and grow its position as a leader of this industry."

202.    On September 3, 2010, the Company issued a press release announcing that it would issue a special cash dividend payment of $0.25 per share to shareholders on or about October 29, 2010.  This press release was incorporated as an exhibit to a Form 8-K filed with the SEC on September 3, 2010, which was signed by Defendant Martin.  In discussing this special cash dividend, Defendant Pardo stated:

> We have an exceptionally strong balance sheet with a strong cash
> position and no debt. We are a very shareholder-friendly company.
> In view of the likelihood that favorable tax treatment for dividends
> will end this year, the board feels that declaring this special
> dividend is the right thing to do for our shareholders.

203.    On September 22, 2010, LPHI issued a press release over the BUSINESS WIRE announcing the Company's preliminary financial results for the second fiscal quarter ended August 31, 2010 ("Q2 2011").  This press release was also incorporated as an exhibit to a Form 8-K filed with the SEC on September 22, 2010, which was signed by Defendant Martin.  In regards to the financial results for Q2 2011, the press release stated:

**LIFE PARTNERS ISSUES PRELIMINARY 2Q EARNINGS**

WACO, TX — September 22, 2010 — Life Partners Holdings,
Inc. (NASDAQ GS: LPHI), parent company of Life Partners, Inc.,

- 97 -

> today announced its preliminary financial results for its second fiscal quarter and first half ended August 31, 2010. Life Partners expects to report second quarter earnings of $0.54 per share, a 5.9% increase compared with earnings of $0.51 per share last year. Income from operations is expected to increase 13% to $12.7 million, up from $11.2 million for the same period last year.  For the six months ended August 31, 2010, the company expects to report earnings of $1.05 per share, a 4.0% increase compared with $1.01 per share for the six months ended August 31, 2009.
>
> For the quarter ended August 31, 2010, Life Partners expects to report $30.3 million in revenues, a 4.1% increase over the $29.1 million reported for the same period last year. For the six months ended August 31, 2010, the company expects to report revenues of $57.0 million, a 0.8% increase over the $56.5 million reported for the same period last year.

This press release also quoted Defendant Pardo opining that LPHI's business would continue to increase with "steady and sustainable growth":

> Despite an uncertain economy and a slowdown in the life settlement industry, our business has continued to increase with steady and sustainable growth. We expect this trend to continue throughout the remainder of our fiscal year.

This press release was materially false and misleading when issued in that Defendant Pardo failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.

204.    On October 8, 2010, the Company filed its quarterly Form 10-Q with the SEC for Q2 2011.  The Form 10-Q was signed by Defendants Pardo and Martin, contained SOX certifications that were substantially similar to those contained in the 2007 Form 10-KSB, and disclosed total revenues of $6,343,856, brokerage fees of $3,980,016, and net income of $8,100,368 for Q2 2011.  This financial information was materially false and misleading when made in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  The financial information was also false and misleading because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and

- 98 -

did not comply with GAAP or SEC regulations.  Likewise, the SOX certifications were

materially false and misleading because, as described in more detail below, LPHI's accounting

systems of internal control were defective and a material weakness existed in these internal

controls such that E&Y would later announce that "there is a more than remote likelihood that a

material misstatement to the annual or interim financial statements could occur and not be

prevented or detected by the Company's internal controls in a timely manner."

205.    On October 21, 2010, LPHI issued a press release over the BUSINESS WIRE

announcing a quarterly dividend of $0.25 per share:

> Life Partners Holdings, Inc.  (NASDAQ GS: LPHI), parent
> company of Life Partners, Inc., announced that its quarterly
> dividend of $0.25 per share would be paid on or about December
> 15, 2010 for shareholders of record as of November 5, 2010. The
> announcement follows the schedule for dividend payments
> throughout the company's 2011 fiscal year, which was released on
> April 26, 2010 and is in addition to the previously announced
> $0.25 special dividend to be paid out on October 29, 2010, to
> shareholders of record on October 15, 2010.

206.    On January 10, 2011, the Company filed a Form 10-Q with the SEC for the period

ended November 30, 2010 ("Q3 2011").  The Form 10-Q was signed by Defendants Pardo and

Martin, contained SOX certifications that were substantially similar to those contained in the

2007 Form 10-KSB, and stated the following financial results for the three months ended

November 30, 2010:  (i) net revenues totaled $14,132,462, (ii) brokerage fees totaled $2,109,403,

and (iii) net income totaled $7,067,398.  This financial information was materially false and

misleading when made in that they failed to disclose that LPHI's business model was

unsustainable and built upon LPHI's scheme of using false LEs.  The financial information was

also false and misleading because, as set forth in more detail below, LPHI's revenue recognition

policies were flawed and did not comply with GAAP or SEC regulations.  Likewise, the SOX

certifications were materially false and misleading because, as described in more detail below,

- 99 -

LPHI's accounting systems of internal control were defective and a material weakness existed in these internal controls such that E&Y would later announce that "there is a more than remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner."

207.    Also on January 10, 2011, the Company issued a press release over the BUSINESS WIRE announcing financial results for Q3 2011.  This press release was incorporated as an exhibit to a Form 8-K filed with the SEC on January 11, 2011, which was signed by Defendant Martin.  The press release stated the following, in part:

### LIFE PARTNERS REPORTS THIRD FISCAL QUARTER AND NINE MONTHS RESULTS

WACO, TX — January 10, 2011 — Life Partners Holdings, Inc. (Nasdaq GS: LPHI) today announced a 15% decrease in net income, from $8.4 million or $0.57 per share for the three months ended November 30, 2009, to $7.1 million or $0.47 per share for the three months ended November 30, 2010.  Third quarter revenues decreased in the current period by 16%, from $31.0 million to $26.2 million.

For the nine months ended November 30, 2010, the company reported a 3% decrease in net income; $22.8 million or $1.53 per share compared to $23.5 million or $1.58 per share during the same period last year.

The company's balance sheet remained strong with $28.6 million in cash on hand, a current ratio of 4 to 1 and a 15% increase in shareholders' equity.

208.    In discussing the financial results for the third fiscal quarter and nine months ended November 30, 2011, Defendant Pardo stated:

While revenues for this quarter were somewhat lower than expected, our balance sheet grew stronger and investor interest in life settlements remains consistent. We believe that the volatility of the financial markets over the past few years underscores the importance of having a portion of investment capital in long-term, non-correlated assets like life settlements.

These comments and the reported financial results upon which they were based were false and misleading in that they failed to disclose that LPHI's business model was unsustainable and built upon LPHI's scheme of using false LEs.  Further, this financial information was materially false and misleading when made because, as set forth in more detail below, LPHI's revenue recognition policies were flawed and did not comply with GAAP or SEC regulations.

209.    Additional questions regarding the Company's business activities were raised by an article published by the WALL STREET JOURNAL on December 21, 2010.  The article stated the following, in part:

Odds Skew Against Investors in Bets on Strangers' Lives

* * *

Life Partners, a fast-growing company in Waco, Texas, has made large fees from its life-insurance transactions *while often significantly underestimating the life expectancies of people whose policies its customers invest in*, a WALL STREET JOURNAL investigation found. Life expectancies are a key factor in the business of investing in strangers' life insurance. If estimates are too low, investors face a double whammy: Their policy payout is delayed, and they must keep paying premiums as the person lives on. At Life Partners, according to the Journal investigation, the result is that 10% or 15% yearly returns promoted to investors may prove elusive for many.

Attractive projected returns for clients are part of the company's formula for success. Life Partners topped Fortune magazine's 2009 list of fastest-growing small companies in the U.S. In its fiscal year ended Feb. 28, it earned $29.4 million on $113 million of revenue, for a rich profit margin.

*Life Partners' filings with the Texas Department of Insurance, obtained by the Journal under an open-records request, show that in policies old enough to provide a measure, the insured people usually haven't died within the life expectancy Life Partners gave its clients, and often were still living beyond double or triple their projected span.*  In 2002, for instance, Life Partners brokered investments in 297 life policies. Actuaries say if life-expectancy calculations on a group of people are well done, half should die by their projected dates. *But in 95% of these policies, the insured was*

*still alive at the end of the life expectancy the company supplied to investors. Policies brokered in 2003 and 2004 show similar patterns.*

\*   \*   \*

The Journal also was able to review about 20 instances where specific individuals' longevity had been projected both by Life Partners and by independent firms that specialize in making such estimates. *The independent firms' estimates were greater, generally by 50% to 100%.* In September 2008, for example, Life Partners sold its clients a $10.8 million policy on the life of a 78-year-old New York man, telling them he had a life expectancy of three to five years. Two independent firms earlier that year separately projected the man had about 11 years to live. Marvin Aslett, 84, has outlived a longevity estimate given to investors in his life insurance by Life Partners.

\*   \*   \*

When Life Partners acquires policies, there's a market price that is based partly on life expectancies that sellers' agents or potential buyers obtain from the independent life-expectancy-calculation firms. Life Partners says it sometimes sees these predictions. *In brokering these policies to its clients, however, it attaches a different life expectancy, the one from its Reno doctor. In general, the lower the life expectancy on a policy, the more a firm like Life Partners can charge investors.* Life Partners in October said its policies are "priced to target a compounded return of 12-14% at life expectancy."

In late 2005, a policy on the life of an 80-year-old California woman was available for purchase. Life Partners acquired the $1 million policy on behalf of its clients, paying $300,000, according to company filings in Texas. It brokered the policy to the clients the same day for more than $492,000 plus five years of future premiums, an additional $58,000.

This spread is lower than typical. Mr. Pardo agreed with Journal estimates that on average, *Life Partners sells a policy for about 2.4 times what the owner is paid, much of which goes to its own fees.* In its most recent fiscal year, the firm reported receiving an average of $308,000 in fees from 201 policies sold.

Around the time this woman's policy was for sale, documents reviewed by the Journal show, two life-expectancy firms, AVS Underwriting and Fasano Associates, projected she had about 10 ½

- 102 -

years to live.  Life Partners told its investors she had three to five.
The woman, who at 85 has just exceeded Life Partners' longevity
estimate, said in an interview she has "aches and pains" but is
"reasonably healthy."

\*   \*   \*

*Life Partners doesn't tell clients about any longevity predictions
besides its own.*

Mr. Pardo, 68, is a college dropout who became a decorated
Vietnam War helicopter gunship pilot. He started a solar-heating
business, American Solar King, that became a stock-market
favorite in the early 1980s. The renamed ASK Corp. later filed for
bankruptcy, *and in 1989 the SEC accused it and Mr. Pardo of
overstating revenue and profits.* He settled in 1991 without
admitting or denying wrongdoing. The same year, he moved into
the nascent life-settlement industry by founding Life Partners. *Mr.
Pardo found himself in the SEC's sights again in 1994*, when it
charged his new firm with selling unregistered securities. Life
Partners won a federal-court ruling that U.S. securities law didn't
cover its products.

\*   \*   \*

Life Partners says its life-expectancy estimates have long been
provided by Donald T. Cassidy, a cancer specialist in Reno. The
physician described his work for the firm in a deposition two years
ago. *Colorado securities regulators had charged in state court that
Life Partners sold unregistered securities and didn't disclose "the
rate in which [the insured] outlived their life expectancies."* The
company settled the case, agreeing to repurchase policies from
certain state residents. In his deposition in the case, Dr. Cassidy
said Life Partners paid him a monthly retainer of $15,000, plus
$500 for every policy bought by Life Partners clients. That
translates to $270,000 annual pay for part-time work that has
brought him more than $1.3 million since 2002, Life Partners
confirmed.

Dr. Cassidy, who declined to be interviewed, testified that he
reviewed case histories three days a week for Life Partners and it
sent him 100 to 200 cases weekly. That translates to 33 to 66 per
working day.

At life-expectancy firm Fasano Associates, doctors review an
average of six a day, said Michael Fasano, president. "These are

- 103 -

complex medical histories of older people," he said. Mr. Pardo said Dr. Cassidy is under no time pressure.

Though *Dr. Cassidy has said he doesn't check the accuracy of his predictions*, his track record can be pieced together from the filings in Texas.  In 2002, Life Partners put a life expectancy of two years or less on the insured person in a third of the 297 policies it sold, and four years or less on all but a handful. Most were listed as HIV-positive. *If the projections were accurate, almost all of those policies should have "matured," with the insured dead, by the end of 2009, but instead the insured had outlived the estimate in 283 of the 297 policies.* A total of 262 were still alive, of whom 64% had lived at least twice the life expectancy Life Partners gave them, and 34% at least triple.

In 2003, of 299 policies the firm brokered, the insured as of a year ago had lived past the Life Partners life expectancy in 279 instances.

*"Dr. Cassidy's projections are largely far less than accurate," Mr. Pardo agreed in one email. He later contradicted that, saying the Journal had "misinterpreted" the statement as criticism of the oncologist's "superior" projections.*  [Emphasis added.]

210.   On December 21, 2010, Defendant Pardo issued an open letter to investors, in response to the article published in the WALL STREET JOURNAL, calling it a "misleading depiction of some of our business practices."  The open letter also stated, in relevant part:

One of the focal points of this article was the system utilized by Life Partners to obtain estimates of life expectancies ("LE"). According to the article, a higher-than-expected number of insureds are exceeding the LEs on policies purchased through Life Partners Holdings, Inc.'s operating subsidiary, Life Partners, Inc. ("LPHI"). However, as trade publications have reported, this phenomenon has been experienced throughout the life settlement industry and is not exclusive to LPHI. The one factor in a life settlement transaction that can be controlled and adjusted is the discount at which the policy is acquired.  Unlike other companies, LPHI calculates sensitivity of return utilizing LE to set a reasonable premium escrow amount, and does not rely exclusively upon LE as the primary factor for profitability. LPHI only purchases policies that are economically feasible, under both predicted circumstances as well as in the event the insured outlives their LE by a number of years.

- 104 -

LPHI also provides its clients with analytical tools that can be applied to any policy being considered for purchase, so that the breakeven point can be determined. This refocuses the key element of profitability from LE accuracy to the discount to face amount. Few if any LPHI clients are able to acquire interests in a large enough universe of policies to recreate statistical mortality tables. Therefore, statistical probabilities should not be considered to be the principal predictive factor with respect to potential returns. ***Instead, each life settlement transaction is structured with the goal of achieving the purchaser's target return and at a minimum, a positive return even if the insured outlives their LE prediction.*** In that way, the purchaser has the potential for superior returns, but also has a safety margin in the event that the LE for any or all policies is exceeded. [Emphasis added.]

211. Finally, on January 20, 2011, before the markets opened and amidst growing suspicion and concern in the life settlements industry, LPHI issued a press release over the BUSINESS WIRE confirming that the SEC had commenced an investigation into the business of LPHI, following press reports of the previously non-public investigation.

212. On January 19, 2011, prior to LPHI confirming the SEC's investigation, the Company's stock price had closed at $13.62 per share. However, after the Company issued its press release regarding the SEC's investigation, the stock price dropped to close at $11.28 per share – a decrease in price value of 17.2% in just ***one day***.

213. On January 20, 2011, the WALL STREET JOURNAL reported that the SEC was investigating LPHI regarding its calculations of life expectancies for insured individuals:

The Securities and Exchange Commission is investigating Life Partners Holdings Inc., a Waco, Texas, company that has arranged for investors to buy several billion dollars of life-insurance policies from their original owners, ac-cording to four people who have been contacted recently by the agency.

As part of its probe, the SEC's enforcement division has been seeking experts to analyze the way Life Partners has estimated the life expectancies of the insured individuals, these people say. The estimates -- projections of how long the people might have to live -- are a crucial part of the investment equation.

The shorter an insured person's expected life span, the more Life Partners generally can charge for that policy, be-cause investors expect a faster payout. If the death comes later than anticipated, not only is the policy payout delayed, but investors who buy policies or parts of them must continue to pay premium bills while they wait to collect on a death benefit.

\*   \*   \*

Life Partners says it has sold 6,400 policies with a face value of $2.8 billion to 27,000 clients since its 1991 founding. Life Partners extracts often-hefty fees in the deals, averaging $308,000 apiece for the 201 policies sold in its most recent fiscal year. Investors often buy pieces of multiple policies.

The company uses a Reno, Nev., physician, Donald T. Cassidy, to provide its life-expectancy estimates. Wednesday, Dr. Cassidy didn't respond to requests to his office for comment. He declined to be interviewed for the Journal's earlier story.

Rick Bergstrom, an actuary in Bellevue, Wash., who has worked in the life-settlements field since 1997, said an attorney from the SEC's Fort Worth, Texas, office called him last week, to ask whether he could help analyze Life Partners' life-expectancy projections.

Mr. Bergstrom said he and a partner five years ago examined Dr. Cassidy's work for an institutional investor that was thinking of hiring the physician. They concluded Dr. Cassidy was using an "unrealistic" approach that tended to produce inaccurately short life expectancies, Mr. Bergstrom said.

\*   \*   \*

In an interview with the Journal last week, an investor from St. Augustine, Fla., said he was personally assured in 2007 by Life Partners' chief executive, Brian Pardo, that the company's accuracy record on life-expectancy projections was "extremely high."

The investor, Charles A. Snell, a 71-year-old commercial real-estate developer, said in 2007 he invested $750,000 in Life Partners' fractional policies after traveling to Waco to meet with Mr. Pardo. Mr. Snell said he asked Mr. Pardo: "How accurate? Like 70 to 80%?" He said Mr. Pardo nodded and replied: "In that ballpark."

- 106 -

Of the six policies Mr. Snell invested in, most of the insureds were estimated to have five years or less to live. None have yet died, and he said he recently received a notice he will owe $20,000 in additional premiums by May. Mr. Snell, who hasn't yet earned any return on his investment, said he feels misled.

\*　　\*　　\*

Based on data Life Partners filed with the Texas Department of Insurance, the Journal found that, for policies sold from 2002 through 2005, insured people outlived Life Partners' projections about 90% of the time. Many of those policies were on HIV-positive people; Life Partners since 2004 mostly has sold policies on older people.

214. On January 21, 2011, LPHI issued a press release over the BUSINESS WIRE announcing that a quarterly dividend of $0.20 per share would be paid to shareholders of record as of February 4, 2011.

215. On January 27, 2011, the WALL STREET JOURNAL reported that LPHI was changing its sales pitch to investors by targeting 7% annual returns for investors in life insurance policies, rather than the 12% to 14% the Company had previously promised were possible:

A company that arranges for individual investors to buy pieces of strangers' life-insurance policies is altering the way it sells to those investors, amid growing scrutiny of the firm's practices.

Life Partners Holdings Inc. of Waco, Texas, arranges for investors to pay premiums, then collect when the insured person dies. It says it has sold about $2.8 billion worth of policies to 27,000 clients.

In an announcement emailed to its outside sales agents that was reviewed by the WALL STREET JOURNAL, Life Partners said the new approach would target annual returns for its clients of 7% over seven years, instead of the targeted 12% to 14% annual returns over shorter periods, typically four to six years, it had promoted as recently as last year.

In the announcement, the company told the agents it had conducted a review "in light of the issues raised by the WALL STREET JOURNAL," which published a Page One article in December focusing on Life Partners. The article reported that many of the insured people are living well beyond the estimates provided by

- 107 -

Life Partners, requiring the investors to pony up more money for annual premiums and cutting their eventual returns.

* * *

The Life Partners attorney said executives "do not anticipate making any change" to the way the company estimates life expectancies. That issue is a critical part of the investment equation and one focus of the SEC investigation, according to people contacted by the agency.

As previously reported, the life expectancies are calculated by a Reno, Nev., physician who in 2008 testified he sometimes did dozens a day and didn't review his prior predictions for accuracy. Life Partners has said it stands by the doctor's methods.

Because these new sales pitches called into question the many negatives set forth by the WALL STREET JOURNAL, CITRON RESEARCH and others, LPHI shares dropped $1.05 from the previous day's close to close at $9.89 per share on January 28, 2011 – a loss of 9.6%.

216.    A January 31, 2011 news article in INVESTMENT NEWS highlighted that LPHI's decision to change its marketing pitch to a 7% return from the previously advertised 12% to 14% returns was a "red flag" regarding the Company:

Life Partners Holdings Inc.'s decision to reduce the rate of return it advertises for segments of its life insurance policies likely will stir up a wave of litigation - and possibly closer regulatory scrutiny.

The settlement provider, which has confirmed that it is under investigation by the Securities and Exchange Com-mission, has told its sales agents that it will now aim for annual returns of 7% over seven years, instead of the generous 12% to 14% it claimed investors achieved over a shorter period, according to The Wall Street Journal.

The SEC has targeted the firm following a series of articles by the Journal that revealed that many of the insured individuals were living far beyond their life expectancies, dampening investors' returns.

Life Partners' choice to change its advertised rate of return is a red flag, attorneys said.

- 108 -

"You don't change your pitch unless you're concerned about what others are finding," said plaintiff's attorney Andrew Stoltmann. "It's an acknowledgement by the firm that something might be amiss, and it will embolden regulators." Regulators and plaintiff's attorneys may charge the firm with misrepresentation and omission for the change in re-turns, Mr. Stoltmann said.

217.    On February 15, 2011, LPHI issued a press release over the BUSINESS WIRE announcing that a special dividend of $0.04 per share would be paid to shareholders of record as of January 31, 2011.

218.    On May 4, 2011, LPHI issued a press release over the BUSINESS WIRE announcing that a quarterly dividend of $0.20 per share would be paid to shareholders of record as of May 16, 2011.

219.    On May 13, 2011, LPHI filed a Current Report on Form 8-K with the SEC. This report was signed by Defendant Martin and disclosed that the Company had received a "Wells Notice" from the SEC stating that the SEC staff would recommend bringing a civil action against LPHI and Defendants Pardo and Peden for violation of the federal securities laws:

**Item 8.01.  Other Events**

As Life Partners Holdings, Inc. ("we") previously disclosed, the Securities and Exchange Commission ("SEC") has been investigating our life settlement business. We have cooperated in the SEC's investigation and have provided information and testimony.

On May 9, 2011, we received a "Wells notice" from the staff of the SEC stating that the staff will recommend that the SEC bring a civil injunctive action against us and two of our directors and executive officers, Brian D. Pardo and R. Scott Peden, for possible violations of Section 17(a) of the Securities Act of 1933, Sections 10(b) and 13(a) of the Securities Exchange Act of 1934, and certain rules thereunder. We understand at present that the primary basis for the proposed civil action relates to our knowledge of and disclosures about the accuracy of the estimates of the life expectancies of settlors.

- 109 -

This bad news regarding the SEC staff's initial conclusion that civil actions should be brought against Defendants LPHI, Pardo and Peden for violations of the federal securities laws sent LPHI shares plummeting more than 20% from the previous days close of $6.69 per share to a closing price of just $5.34 on May 13, 2011.

220.     A May 14, 2011 article in the LOS ANGELES TIMES reported on the disclosure of the Wells Notice, and the impact of this disclosure on the Company's share price, noting that "Life Partners Holdings Inc. shares plunged 20% after it said that Securities and Exchange Commission investigators planned to recommend that the SEC file civil claims against the firm and Chief Executive Brian Pardo."

221.     On May 16, 2011, following the close of the stock market, LPHI filed a Notification of Late Filing on Form 12b-25 with the SEC.  This Current Report was signed by Defendant Martin, and disclosed that the Company would be unable to timely file its annual report for the fiscal year ended February 28, 2011, and that, even when such report was filed, the financial results would be well below the prior year's results:

> We anticipate reporting a significant change in results of operations for the year ended February 28, 2011 ("fiscal 2011"), compared to the year ended February 28, 2010 ("fiscal 2010"), primarily due to a large market drop in the estimated volume for life settlements generally and the impact in our fourth fiscal quarter of the publication of news articles criticizing our operations coupled with our disclosure of an SEC investigation.
>
> Management's determinations about the impairment changes may result in further significant changes to the results of operations for fiscal 2011.  On our balance sheet, investments in policies (life settlements) is the largest, long-lived asset ($16,640,353 at February 28, 2010), the value of which is carried at our total basis in the policies (original cost plus capitalized premiums).  To test whether the carrying value of these policies is impaired, we adjust the carrying values based on assumptions made about remaining life expectancy, the funds needed to maintain the policies until maturity, discount rates and potential return.  This evaluation provides us with an estimate of impairment of individual policies

and also provides us with an estimate of the policies' total fair value. For fiscal 2011, we have begun using a revised fair value approach to our impairment testing, which we believe will better comport with the long term trend within the accounting industry, the SEC and the approaching international accounting standards that may require us to value our investment in policies at fair value. We will continue to refine our impairment and fair value calculations as policies mature, we have more historical data to use for estimates, and as the life settlement industry matures and more empirical data is available.

Using this revised fair value approach, we estimate that we will incur a total impairment charge to investments in policies of approximately $8.0 million. A portion of this charge may be applicable to prior years and we are completing calculations and analysis to determine any amount that may be applicable to previous reporting periods. Until we complete the impairment analysis, we cannot determine the amount allocable to the current fiscal year and the amounts, if any, allocable to prior fiscal years.

Based on our unaudited, preliminary results and before adjustment for the impairment charges discussed above, we anticipate the following results of operations for fiscal 2011.

- Revenues decreased by $19,410,445, or 17.1%, from $112,996,283 to $93,585,838, primarily due to the decreased number of settlements from 201 to 158, a decrease in the total face value of policies from $590,189,000 to $492,323,743, and a $2.3 million decrease due to increased deferred monitoring costs.

- Net income decreased by $6,564,187, or 22.3%, from $29,426,278 to $22,862,091, primarily due to the reasons noted above for the decrease in revenues (before impairment charges).

- Operating and administrative expenses were comparable for the periods - $14,294,149 for fiscal 2011 and $14,581,310 for fiscal 2010 (before impairment charges).

- Net cash flows from operating activities decreased by 0.6%, decreasing $179,673 from $31,089,880 to $30,910,207. The decline in net income was largely offset by a reduction of account receivable of $5,928,109.

- Working capital was $30,173,799, which increased by $114,963.

These amounts are still subject to change because, as noted above, management has not yet completed its determination of the timing and amounts of the charge for impairment to our investments in policies.

The financial results and financial position for fiscal 2011 described above are unaudited and subject to change based on the completion of our 2011 Annual Report.

When trading resumed the next morning, LPHI shares dropped to close at $4.18 per share on May 17, 2011 – a decline of more than 18% from the previous day's close of $5.10 per share.

222.    On May 24, 2011, analyst and short-seller Henry Beck issued a negative assessment of LPHI stock over the SEEKING ALPHA website.

I believe the days of growth and profitability for Life Partners Holdings, Inc. (LPHI) are forever gone. My target price is $1.50 per share by August 2011 and $0.25 per share by July 2012.

*    *    *

I believe the recent Wells notice and horrible 4th quarter numbers are a precursor to a SEC injunctive action and even worse future earnings that will eventually bankrupt the company. I believe the many recent lawsuits filed against the company claiming stock fraud, RICO violations, fiduciary misconduct (effectively keeping two sets of books) and lack of registration will all gain traction in the coming months. The stock, despite its recent drop, is trading significantly above its fair market value. I recommend investors stay clear of LPHI, which is a train wreck in progress.

Another reason that this analyst recommended "staying clear" of LPHI is the dividend structure of the Company, which he asserted constitutes allowing Defendant Pardo to "run the Company for the exclusive purpose of enriching himself":

*The Dividend.*  The reason many investors own LPHI is the dividend, which is currently $0.20 per share for the last quarter. Approximately half of the dividend goes offshore to the island of Gibraltar, where a trust owns [Defendant Pardo's] shares.

Should LPHI stop paying the dividend, the share price will obviously fall.  Should LPHI's board of directors continue to issue high dividends in lieu of setting up reserves (for lawsuits and

- 112 -

> premium advances) and growing the business, investors may
> become angry.  Investors may claim that the BOD is allowing one
> large shareholder owning approximately half the shares to run the
> company for the exclusive purpose of enriching himself.

In response to these damning disclosures, LPHI shares sank from $4.44 to close at $3.67

– a loss of more than 17.3% for the day.

223.    On May 31, 2011, LPHI filed an "amended" Form 12b-25 with the SEC that

purported to amend the Form 12b-5 previously filed on May 16, 2011.  This filing was signed by

Defendant Martin and disclosed that the Company would continue to be unable to file its annual

report on Form 10-K for the fiscal year ended February 28, 2011, past the 15 day period

contemplated by the original Form 12b-25 filing on May 16, 2011.  According to this filing,

"[w]e have also encountered unanticipated delays from a reexamination of our revenue

recognition policies with our independent auditor."  No date for actually filing the required Form

10-K was given by the Company.

224.    On June 1, 2011, the WALL STREET JOURNAL reported on the twice-delayed

annual report filing and the accounting issue surrounding the delays:

> Life Partners Holdings Inc., which may be the subject of a civil
> action by the Securities and Exchange Commission, revised
> downward its net-income estimate for its most-recent year and said
> it would further delay filing its annual report while management
> and the company's outside auditor examine certain accounting
> matters, including a potential new issue.
>
> For the fiscal year ended Feb. 28, Life Partners Holdings estimated
> that its net income sank 46%, to $15.9 million, including the
> effects of an impairment charge of $10.9 million, which was larger
> than the company previously estimated.
>
> Based in Waco, Texas, Life Partners Holdings arranges to buy life-
> insurance policies from people who no longer need them, then sells
> fractional shares in those policies to its thousands of retail clients.
>
> The clients continue to pay the premiums, then collect when the
> insured person dies.

- 113 -

Life Partners Holdings has been enmeshed in controversy over whether it has provided inaccurately short estimates for how long the insured people are likely to live, a key part of the investment equation.

In mid-May, the company said it had received a so-called Wells notice from the SEC, which indicated the agency's staff planned to recommend to the commission civil charges against the company and two top executives related to the life-expectancy estimates. Such a notice gives potential targets a chance to dissuade the regulator from filing the charges.

The company previously said it intended to tell the SEC why it believed charges weren't merited.

In a filing late Tuesday, Life Partners Holdings disclosed a potential new accounting issue, saying the company had encountered unanticipated delays in completing its annual report because of "a re-examination of our revenue-recognition policies with our independent auditor."

The company said it believes its revenue-recognition policies are appropriate and doesn't "anticipate retroactive changes at this time."

225.    On June 3, 2011, LPHI issued a press release disclosing that "the Company received a letter from the staff of the NASDAQ advising that because the company has not yet filed its Form 10-K for the period ended February 28, 2011, the Company does not meet the criteria of Listing Rule 5250(c)(1)."  On June 3, 2011, LPHI filed a Current Report on Form 8-K with the SEC.  This Current Report was signed by Defendant Martin, and contained the June 3, 2011 press release as an exhibit.

226.    On June 9, 2011, LPHI filed a Current Report on Form 8-K with the SEC.  This Current Report, which was signed by Defendant Martin, disclosed the shocking news that Ernst & Young had resigned as LPHI's independent auditor:

### Item 4.01. Changes in Registrant's Certifying Accountant

 On June 6, 2011, Life Partners Holdings, Inc. ("we" or "Life Partners") received a letter from Ernst & Young LLP ("Ernst &

- 114 -

Young") addressed to the Chairman of our Audit Committee (the "Resignation Letter") confirming that it had resigned effective June 3, 2011, as our independent registered public accounting firm, as had been orally communicated to the Chairman of the Audit Committee on June 3, 2011.  The resignation means that Ernst & Young will not certify our financial statements for the fiscal year ended February 28, 2011 ("Fiscal 2011"), which is necessary for completing and filing our Annual Report on Form 10-K for Fiscal 2011 (the "2011 Annual Report").

 The resignation follows a letter from Mr. Brian Pardo, our Chairman and CEO, to our licensee network (persons who refer purchasers to us) commenting upon the delayed filing of our 2011 Annual Report.  The letter stated that it was Mr. Pardo's position that we would "take action" against Ernst & Young if it did not promptly complete its audit and sign off on our financial statements without adjustment.  Our Audit Committee wrote to Ernst & Young disclaiming the letter's statements and asserting that the letter did not speak for the Audit Committee. Notwithstanding the Audit Committee's disclaimer, Ernst & Young stated that the letter compromised its independence, and when considered with other recent developments, that it was no longer able to rely upon management's representations, and that it was unwilling to be associated with the financial statements prepared by management.

 In its Resignation Letter, Ernst & Young further stated that after a re-examination of our revenue recognition policy, it had concluded that we should revise the policy.  Our existing policy recognizes income at the time a settlement has been closed (that is, an agreement has been reached with the settlor and the purchaser has obligated itself to make the purchase).  Ernst & Young believes that revenues should be recognized no earlier than the final closing of escrowed funds with the settlor.   Ernst & Young also stated that some portion of our fee revenue should be allocated and deferred based the Company's practice of making premium advances.  It further concluded that the use of our current accounting policies and practices with respect to these matters results in a more than remote likelihood that a material misstatement in our annual and interim financial statements could occur and not be prevented or detected by our internal controls (which are based on existing policies).

 The revenue recognition matter constitutes a disagreement as defined under Item 304(a)(1)(iv) of Regulation S-K, as promulgated by the Securities and Exchange Commission (the "SEC").  Ernst & Young discussed the subject matter of the

disagreement with our Audit Committee and our Chief Financial Officer.  We have authorized Ernst & Young to respond fully to any successor independent registered public accounting firm that the Audit Committee appoints.

 We engaged Ernst & Young as our independent registered public accounting firm on March 2, 2010, and it had expressed an unqualified opinion on our Fiscal 2010 financial statements.  Ernst & Young followed Eide Bailly LLP ("Eide Bailly"), which had been our independent registered public accounting firm, which audited our Fiscal 2009 financial statements, and which expressed an unqualified opinion on such statements.  Except as described above, during the two most recent fiscal years and interim period preceding Ernst & Young's resignation, there were no other disagreements with either Ernst & Young or Eide Bailly as defined under Item 304(a)(1)(iv) of Regulation S-K and no other reportable events with either firm as defined under Item 304(a)(1)(v) of Regulation S-K.  While not a reportable event, our report on internal controls and Eide Bailly's opinion on internal controls include information related to material weaknesses in our internal controls, which were included in our Form 10-K for the year ended February 28, 2009.  The material weakness was unrelated to the matters cited as disagreements by Ernst & Young.

 We provided Ernst & Young with a copy of this Current Report on Form 8-K and asked that Ernst & Young furnish us with a letter addressed to the SEC stating whether it agrees with the above statements.  The Resignation Letter is attached as Exhibit 7.1.  Ernst & Young's letter dated June 9, 2011, addressed to the SEC is attached as Exhibit 16.1.

227.   E&Y's resignation letter, which was attached as Exhibit 7.1 to the June 9, 2011

Form 8-K, further detailed the shocking reasons for E&Y's resignation, and disclosed that E&Y

believed that LPHI's revenue recognition policies were contrary to GAAP, and would require "a

restatement of previously reported financial statements":

This letter is to confirm the following matters discussed with you on June 3, 2011:

- In a June 1, 2011 memo from Brian Pardo, CEO of Life Partners Holdings, Inc. (the Company), to certain licensees of the Company, Mr. Pardo threatened to "take action" against E&Y unless E&Y were to promptly sign off on the Company's 2011 financial statements "as is."  As a result

of that development, we are no longer independent of the Company, and as a result of other recent developments, we are no longer able to rely on management's representations, and we are unwilling to be associated with the financial statements prepared by management.

- Based on information obtained from the Company in connection with the 2011 audit, and upon a re-examination of the Company's revenue recognition policy, we have determined that the Company should revise its revenue recognition policy. <u>The Company should be recording revenue at the time of the final closing of the escrowed funds with the seller, unless a rescission occurs, rather than at an earlier date reflecting the purchaser's obligation to make an investment</u>. We have also determined that some portion of the brokerage fees received on closing of the escrowed funds should be allocated and deferred based on the Company's practice of making premium advances. Although we have not had sufficient time to determine the exact effects of these matters, **we believe they are material to prior annual and interim periods and a restatement of previously reported financial statements is required**. [Emphasis added.]

The E&Y resignation letter continued by citing material weaknesses in LPHI's system of accounting internal controls, and with E&Y's disclaiming of the fiscal 2010 financial statements, which E&Y maintained "may no longer be relied upon":

- As a result of the aforementioned accounting related to revenue recognition, a material weakness exists relating to the recording of revenue in the proper period. This deficiency will result in certain adjustments to revenues, deferred revenue, and related income tax accounts. Until this deficiency is remediated, there is a more than remote likelihood that a material misstatement to the annual or interim consolidated financial statements could occur and not be prevented or detected by the Company's internal controls in a timely manner.

- Our reports dated May 12, 2010, with respect to the fiscal year 2010 consolidated financial statements of the Company and the effectiveness of internal control over financial reporting of the Company as of February 28, 2010 may no longer be relied upon.

- 117 -

228.    As if the shocking news of E&Y's resignation, disclaiming of the 2010 financial statements and opinion that annual and interim financial statements would need to be materially restated was not bad enough, the June 9, 2011 Form 8-K also disclosed that the Company had received an "expanded Wells Notice" that, in addition to the actuarial problems focused on by the original "Wells Notice," now also included the accounting issues cited above.  However, the disclosures regarding the scope of the Wells Notice were defective in the June 9, 2011 Form 8-K. The Company filed an amended Current Report on Form 8-K/A on June 10, 2011, which corrected these defective disclosures:

> As we previously disclosed, on May 9, 2011, we received a "Wells Notice" from the Staff of the Fort Worth office of the SEC stating that the Staff will recommend that the SEC bring a civil injunctive action against us and two of our directors and executive officers, Brian D. Pardo and R. Scott Peden, for possible violations of Section 17(a) of the Securities Act of 1933, Sections 10(b) and 13(a) of the Securities Exchange Act of 1934, and certain rules thereunder.  On June 3, 2011, we received an amended Wells Notice expanding the scope of the recommendation for civil action. The expanded Wells Notice states that the Staff will recommend that the SEC bring a civil injunctive action against us and three of our directors and executive officers, Brian D. Pardo, R. Scott Peden and David M. Martin, for possible violations of Section 17(a) of the Securities Act of 1933, Sections 10(b) 13(a), 13(b)(2)(A) and (B) of the Securities Exchange Act of 1934, and certain rules thereunder.
>
> We understood that the initial Wells Notice related primarily to our knowledge of and disclosures about the accuracy of the estimates of the life expectancies of settlors.  **We understand that the expanded Wells Notice also includes allegations about the disclosures regarding and the propriety of certain of our accounting policies and practices, including revenue recognition, the impairment of life settlements held by us for investment, and the stated policy for premium advances that we might make on certain client policies**.  [Emphasis added.]

229.    On June 17, 2011, the Class Period ends when LPHI filed a Current Report on Form 8-K with the SEC.  This Current Report was signed by Defendant Martin and disclosed

- 118 -

that the Company had received a letter from Eide Bailly (the auditor of the Company's fiscal

2009 financial statements) disclaiming the Company's fiscal 2009 financial statements and

providing that their audit opinion regarding these financial statements "may no longer be relied

upon":

> **Item 4.02.  Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Audit Report**
>
>  On June 14, 2011, Life Partners Holdings, Inc. ("we" or "Life Partners") received a letter from Eide Bailly, LLP ("Eide Bailly") addressed to the Chairman of our Audit Committee stating that its reports dated May 29, 2009, with respect to our consolidated financial statements for the fiscal year ended February 28, 2009, and the effectiveness of our internal control over financial reporting as of and for the year ended February 28, 2009, may no longer be relied upon, until such time that an analysis has been completed and a determination made with respect to possible material misstatements related to the Company's revenue recognition policy.  The letter cites the disclosures made by Ernst & Young LLP in its letter to us dated June 6, 2011, as filed as Exhibit 7.1 in the Form 8-K we filed on June 9, 2011, regarding a disagreement about our revenue recognition policy and a possible material misstatement in our annual and interim financial statements as a result of the application of the policy.
>
>  Eide Bailly contacted the Chairman of our Audit Committee and our Chief Financial Officer before issuing its letter.  We provided Eide Bailly with a copy of this Current Report on Form 8-K and asked that Eide Bailly furnish us with a letter addressed to the SEC stating whether it agrees with the above statements.  Eide Bailly's letter dated June 14, 2011, addressed to us is attached as Exhibit 7.1.  Eide Bailly's letter dated June 17, 2011, addressed to the SEC is attached as Exhibit 16.1.

230.     Eide Bailley's letter attached as Exhibit 7.1 to the June 17, 2011 Form 8-K

reiterated the concerns expressed by E&Y and specifically withdrew and disclaimed their

previous clean audit opinion for the fiscal 2009 financial statements:

> Based upon the disclosures made by Ernst & Young, LLP in their communication to you dated June 6, 2011, and as filed as Exhibit 7.1 in the Form 8-K filed by Life Partners Holdings, Inc. (the

- 119 -

Company) on June 9, 2011, **we believe that there is a possibility that the Company's consolidated financial statements as of and for the year ended February 28, 2009 may have material misstatements related to improper revenue recognition**.

Accordingly, until an analysis has been completed and a determination made with respect to the Company's revenue recognition policy, **our reports dated May 29, 2009 with respect to the consolidated financial statements of the Company and the effectiveness of internal control over financial reporting as of and for the year ending February 28, 2009, may no longer be relied upon**.  [Emphasis added.]

When the market opened the next morning on June 20, 2011, LPHI shares dropped another 8.8% from the previous day's close of $4.19 per share to $3.82 per share.

## VII.    POST-CLASS PERIOD DISCLOSURES CONFIRM THE FRAUD

231.    On November 22, 2011, LPHI finally filed its annual report on Form 10-K for the year ended February 28, 2011, with the SEC.  This 2011 Form 10-K disclosed that the Company was forced to restate its financial statements for fiscal 2009 and 2010 due to the false and misleading financial information contained in those previously issued financial statements.  The net effect of these restatements was to lower fiscal 2009 Net Income from $27.2 million ($1.46 per share) to $25.5 million ($1.37 per share) and to lower fiscal 2010 Net Income from $29.4 million ($1.58 per share) to $26.1 million ($1.40 per share).

232.    In addition to restating fiscal 2009 and 2010, the Company disclosed that retained earnings at March 1, 2008, had been overstated by $3.8 million.  This means that, although the Company was not going to the trouble of restating the 2008 or earlier financial statements, net income in one or more of these years had been overstated by a total of $3.8 million.

233.    The 2011 Form 10-K also admitted that, despite the previous certifications of the effectiveness of internal controls described above, the Company admitted that its lack of internal controls constituted a "material weakness":

We assessed the effectiveness of our internal control over financial reporting as of February 28, 2011, under the supervision and with participation of our management, including our Chief Executive Officer and Chief Financial Officer.  In making this assessment, management used the criteria set forth in Internal Control—Integrated Framework issued by COSO.  A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim consolidated financial statements will not be prevented or detected.  We have identified the following material weakness in our internal control over financial reporting as of February 28, 2011.

*Control Environment and Control Activities*.  We did not maintain an effective control environment based on criteria established in the COSO framework.  We did not maintain effective controls over our accounting for and disclosure of revenue recognition, deferred policy monitoring costs, impairment of investment in policies, investment in life assets trust, and accrued liabilities.  Specifically, effective controls, including monitoring, were not maintained to ensure the existence, completeness, accuracy, valuation and presentation of activities related to revenue recognition, deferred policy monitoring costs, impairment of investment in policies, investment in life assets trust, and accrued liabilities.  This control deficiency resulted in the misstatement of our revenue, brokerage fees, accounts receivable, investment in policies, investment in life assets trust, deferred policy monitoring costs, accounts payable and accrued liabilities and related disclosures, the failure to recognize certain related tax liabilities, and in the restatement of our consolidated financial statements for each of fiscal 2010 and 2009, for each of the quarters of 2010 and 2009, and for the first three quarters of fiscal 2011.  This control deficiency could result in misstatements of the aforementioned accounts and disclosures that would result in a material misstatement of our annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, our management has determined that this control deficiency constitutes a material weakness.

 Due to the material weakness, we did not maintain effective internal control over financial reporting as of February 28, 2011, based on the criteria in Internal Control — Integrated Framework issued by COSO.  To remediate these weaknesses, we have taken the following steps:

- We have changed the date at which we recognize revenue from life settlement transactions,

- We have improved the methodology for estimating life expectancies, which affects our calculation of possible impairment of the life settlements in which we have invested and our determination of deferred policy monitoring costs,

- We have changed the date at which we recognize executive bonus expense, and,

- We have amended our formal written policies and procedures regarding internal controls to reflect these changes.

234.    On January 4, 2012, the Associated Press reported that the U.S. Securities and

Exchange Commission had filed a lawsuit against Defendants LPHI, Pardo, Peden and Martin,

accusing them of defrauding Company shareholders:

> Federal securities regulators filed suit Tuesday against a Texas-based provider of so-called "life settlements," accusing it and three top executives of defrauding shareholders by overvaluing the life insurance policies it buys from its customers.
>
> In a statement, the Securities and Exchange Commission said Life Partners Holdings Inc.  and its top management lowballed life-expectancy estimates used to price the settlements they pay customers.
>
> With life settlements, policyholders sell their life insurance policies in return for a lump-sum payment. Investors buy the right to collect the policy's death benefits, but must continue to pay premiums until the original policyholder dies.
>
> The lawsuit the SEC filed in federal court in Waco, Texas, also names as defendants the company's founder, chairman and chief executive, Brian Pardo, its president and general counsel, R. Scott Peden, and Chief Financial Officer David Martin.
>
> In its civil complaint, the SEC alleges that Life Partners and its executives engaged in deceptive disclosures and improper accounting to overvalue its assets and exaggerate its revenue stream from brokering life settlements. The SEC also accused Pardo and Peden of insider trading.
>
> "Life Partners duped its shareholders by employing an unqualified medical doctor to assign baseless life-expectancy estimates to the

- 122 -

underlying insurance policies," said Robert Khuzami, head of the
SEC's enforcement division. "This deception misled shareholders
into thinking that the company's revenue model was sustainable
when in fact it was illusory."

## VIII.   LPHI'S FALSE AND MISLEADING FINANCIAL STATEMENTS

235.   These improper accounting practices and manipulations were in direct violation of

GAAP and SEC rules, as described below, and resulted in materially overstated financial results

for each quarter ended between February 28, 2006, and November 30, 2010, as well as the years

ended February 28, 2006, February 28, 2007, February 29, 2008, February 28, 2009, and

February 28, 2010.

236.   GAAP is the set of conventions, rules and procedures which constitute the

professional standards of the accounting profession.  Regulation S-X (17 C.F.R. § 210.4-

01(a)(1)) provides that financial statements filed with the SEC which are not prepared in

compliance with GAAP are presumed to be misleading or inaccurate.

237.   On June 6, 2011, Ernst & Young resigned as LPHI's independent auditor.  In its

resignation letter, E&Y disclaimed its earlier audit opinion related to the annual financial

statements dated February 28, 2010, as well as its opinion regarding LPHI's system of

accounting internal controls, and provided that this report "may no longer be relied upon":

> Our reports dated May 12, 2010, with respect to the fiscal year
> 2010 consolidated financial statements of the Company and the
> effectiveness of internal control over financial reporting of the
> Company as of February 28, 2010 may no longer be relied upon.

In this resignation letter, E&Y also identified specific problems with LPHI's revenue

recognition policies and opined that LPHI's improperly recorded revenues were "material" and

would require restatement of previously reported financial statements:

> Based on information obtained from the Company in connection
> with the 2011 audit, and upon a re-examination of the Company's
> revenue recognition policy, we have determined that the Company

- 123 -

should revise its revenue recognition policy.  The Company should be recording revenue at the time of the final closing of escrowed funds with the seller, unless a rescission occurs, rather than at an earlier date reflecting the purchaser's obligation to make an investment.  We have also determined that some portion of the brokerage fees received on the closing of the escrowed funds should be allocated and deferred based on the Company's practice of making premium advances.  Although we have not had sufficient time to determine the exact effects of these matters, we believe that they are material to prior annual and interim periods and a restatement of previously reported financial statements is required.

238.    The authoritative provisions of GAAP are set forth in the FASB Accounting Standards Codification ("ASC"), which was completed by the Financial Accounting Standards Board in 2009.  This codification is not a change in GAAP, but rather a reorganization of existing principles to provide greater ease of usage.  The substance of the accounting principles remains constant throughout the Class Period, despite the change in codification.

239.    Beginning in 2003, and continuing throughout the Class Period, LPHI instituted a revenue recognition practice that was in direct contradiction of its stated revenue recognition policy, and which prematurely recognized revenues from the life settlement transactions it brokered.  In 2004, LPHI misled its auditor about the criteria the Company used to recognize revenue and continued to improperly recognize revenue throughout the Class Period based on ill-gotten guidance from the auditor, even though the Company knew that the guidance was based on incomplete and misleading information.[11]

240.    LPHI also backdated certain transactional documents to hide the Company's premature revenue recognition from its auditors and lied to shareholders about its revenue recognition practices in various, inconsistent disclosures in public filings.  LPHI adhered to its

---

[11] SEC Complaint ¶ 64.

inappropriate practice of prematurely recognizing revenue from fiscal year 2003 through the end of the Class Period.[12]

241.    In addition, in analyzing the carrying value of life settlements owned by LPHI – which, in most cases, became Company-owned because LPHI elected to acquire them to settle disputes with investors – LPHI's used the same LEs it assigned to the policies when it originally brokered the interests, which LEs the Company knew to be  flawed. Through its use of the same flawed and materially short LEs to assess the value policy interests on its books, the Company materially understated impairment of its assets.[13]

242.    On November 22, 2011, the Company announced in its Form 10-K for fiscal year 2011 that it was restating financial results for fiscal years 2007 through 2010 and the first three quarters of 2011 to correct these and other accounting errors (the "Restatement").  The Restatement addresses, among other things, errors related to revenue recognition, impairment of investments in Company-owned policies, accrued liabilities, and the related tax impact, all of which LPHI admitted had been previously "incorrectly accounted for under [GAAP]."

**A.    Revenue Recognition Problems**

**1.    Recognition of Revenues Before Closing of the Transaction**

243.    According to their annual reports filed during the Class Period, LPHI recognizes revenues "at the time a settlement has been closed and the purchaser has obligated itself to make the purchase."

244.    Prior to fiscal year 2003, LPHI recognized revenue as of the Closing Date.  In fiscal year 2003, LPHI began recognizing revenue prior to the Closing Date and, in so doing, began recognizing revenue from life settlement transactions in a manner inconsistent with

---

[12] SEC Complaint ¶ 65.

[13] SEC Complaint ¶ 67.

GAAP.  Specifically, the Company changed its policy in fiscal 2003 to instead recognize revenue based on:  (i) the receipt date of an executed Seller Agreement; (ii) the receipt date of documents from the seller authorizing assignment of the insurance policy; and (iii) the date of the Policy Funding Agreement from an investor committed to purchasing an interest in the policy.  Upon the occurrence of the last of these three dates for a given policy, the Company recognized, for the reporting period in which the last date fell, a pro rata portion of the total revenue it expected to earn when it completed the sale of 100% of the interests in that policy.  For example, if the Company had received a signed Seller Agreement and assignment documents, along with Policy Funding Agreements from purchasers to acquire 2% of a policy, the Company would recognize, in that reporting period, 2% of the total revenue anticipated from that life settlement transaction.[14]

245.    Under GAAP, LPHI should not have recognized revenues from its transactions until the final closing of escrowed funds with the seller, rather than when LPHI believed that a purchaser was "obligated" to make the purchase.  ASC 605-10-25-1 provides that revenue is not recognized until it is both (i) realized or realizable; and (ii) "earned."

246.    As stated by former auditor E&Y in its resignation letter, it was plainly improper recognize revenues pursuant to this post-2003 revenue recognition policy under clear GAAP and SEC authority because the Company recognizes revenues prior to the Closing Date, a point before revenue becomes either (i) realized or realizable or (ii) earned

247.    Revenues are only "realized or realizable" when related assets are received or held are "readily converted into cash."  *Id.*  Revenue is not realized or realizable before the Closing Date because LPHI receives no cash, and has no claim to cash, until a life settlement is

---

[14] SEC Complaint ¶¶ 74-75.

purchased by investors and the policy owner/seller is paid by the escrow agent. The

policy/owner seller does not get paid until, at the earliest, the Closing Date. Moreover, LPHI

cannot readily convert an investor's commitment to purchase a life settlement interest into cash

or a claim to cash prior to delivering the corresponding interests in the underlying policy, which

it cannot possibly do prior to the Closing Date. Accordingly, prior to the Closing Date, LPHI's

revenues are neither realized nor realizable.

248.    This GAAP standard considers the revenue "earned" when the entity "has

substantially accomplished what it must do to be entitled to the benefits represented by the

revenues." Revenue is not earned before the Closing Date because the policy owner is not

obligated to sell the policy to LPHI prior to the Closing Date. LPHI's revenues do not qualify as

"earned" until such time as it fully brokers the sale of 100% of a policy. Policy owners sell their

policies in a single transaction under the Seller Agreement, not on a prorated basis, as LPHI

identifies investors interested in purchasing fractional interests in the policy. Consequently, after

the Company identifies one or more interested investors in a given policy, LPHI still has

substantial continuing obligations to identify investors sufficient to purchase all the unsold

interests in the policy before it becomes entitled to any portion of the proceeds from the sale.

LPHI is not entitled to any proceeds from the sale until investors purchase 100% of a policy,

which does not happen until the Closing Date, at the earliest.

249.    Likewise, LPHI's program of advancing premium payments for its clients

rendered a material portion of the brokerage revenues unrecognizable because the Company had

not done all it needed to do to be entitled to the benefits. The impropriety of recognizing these

revenues was confirmed by E&Y's resignation letter where it described this problem:

> We have also determined that some portion of the brokerage fees
> received on the closing of the escrowed funds should be allocated

and deferred based on the Company's practice of making premium
advances.  Although we have not had sufficient time to determine
the exact effects of these matters, we believe that they are material
to prior annual and interim periods and a restatement of previously
reported financial statements is required.

**2.    Recognition of Revenues from Transactions Occurring After Period End[15]**

250.    Apart from prematurely recognizing revenue as a matter of course, Pardo and

Peden developed, and Martin implemented, a policy that authorized the Company to recognize in

a given quarter revenue from events that occurred as many as 15 business days following quarter

end (the "15-business-day Policy").

251.    According to an April 2010 internal accounting policy memorandum from Pardo

and Peden to Martin (the "Cutoff Memo"), the Company had a policy of "clos[ing] the books

and records for a quarter on or about 15 business days after the end of the quarter."  The

Company made it a practice to keep the books and records open for purposes of recording

revenues since at least fiscal year 2004. The Cutoff Memo set a uniform period of time during

which the Company kept its books and records open for revenue recognition purposes at 15

business days. The Cutoff Memo rationalized the practice on the ground that it "allowed time for

transactions conducted in the latter part of the quarter to clear and to receive bills for goods and

services rendered in the latter part of the quarter."

252.    Under the 15-business-day Policy, Defendants recognized revenue from a life

settlement transaction, whether that revenue was recognizable under GAAP or not, in the quarter

immediately prior to the quarter in which the events on which the Company based its decision to

recognize revenue had occurred.

---

[15] SEC Complaint ¶¶ 108-113.

253.    For example, if an investor committed in a Policy Funding Agreement to purchase an interest in a policy after quarter end, but prior to 15 business days into the current quarter, LPHI recognized the pro rata revenues and costs associated with the transaction in the previous quarter.  This practice is contrary to Pardo and Peden's stated rationale for the policy, which suggested that the policy was intended only to allow the paperwork for a transaction occurring in the previous quarter to be returned to LPHI before being recorded in the previous quarter.

254.    Through its adherence to the 15-business-day policy, LPHI recorded revenue in a particular quarter based on events that occurred in a future quarter, which is contrary to GAAP.

255.    After the SEC staff began its investigation of the claims underlying this lawsuit, Defendants informed the SEC that the Company had decided to discontinue its practice of recognizing revenue under the 15-business-day Policy.

**B.     LPHI's Understatement of Impairment in Policies[16]**

256.    As of November 30, 2010, LPHI has spent in excess of $18.6 million to purchase more than one thousand life settlement interests that it had previously brokered to investors. LPHI acquired the majority of these interests to settle disputes with investors.  For example, LPHI acquired over half ($12.8 million) of its investments in policies to settle a lawsuit that the Colorado Securities Commissioner brought against the Company in 2007 for violations of the Colorado Securities Act.  Despite their awareness that these policies may have been impaired when acquired, Defendants failed to properly evaluate potential impairment.  As a consequence, by understating the dollar amount by which its investments in policies should have been impaired, LPHI has overstated those investments in its previously reported financial statements since fiscal year 2009.

---

[16] SEC Complaint ¶¶ 119-128.

257.    Pursuant to ASC 360-10, a long-lived asset shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable.  LPHI's investments in policies are "long-lived" because LPHI expects to hold these assets for longer than one year.  The "carrying amount" for LPHI's investments in policies is equal to the amount reported on its balance sheet, which represents historical cost less any previously recorded amounts of impairment.

258.    Under ASC 360-10, an impairment loss shall be recognized if the carrying amount is not recoverable and exceeds its fair value.  The carrying amount is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset.  ASC 360-10 states that an impairment loss shall be measured as the amount by which the carrying amount exceeds fair value.  Fair value is the price that would be received to sell an asset in an orderly liquidation.  For long-lived assets having uncertainties in both in timing and amounts, such as life settlements, ASC 360-10 states that "an expected present value technique will often be the appropriate technique with which to estimate fair value."

259.    Since fiscal year 2007 through at least fiscal year 2009, LPHI has reported its investments in policies at the lesser of cost – i.e., the dollar amount it spent to purchase the policies – or 75% of the face value of the policy.  LPHI recorded the difference between cost and 75% of the face value of the policies as settlement expense.  LPHI's practice of recording the difference as settlement expense is not consistent with either evaluation of recoverability or determination of fair value under ASC 360-10.  The practice of recording policy value at the lesser of cost or 75% of face value also evidences Defendants' awareness that LPHI's investments in policies acquired to settle disputes may have been impaired when acquired.

260.     LPHI disclosed in its SEC filings that it evaluated the carrying value of its investments in policies on a regular basis "using new or updated information that affects our assumptions about remaining life expectancy, credit worthiness of the policy issuer, funds needed to maintain the asset until maturity, capitalization rates and potential return."  LPHI disclosed that it would recognize an impairment of individual policies "if the expected undiscounted cash flows are less than the carrying amount of the investment, plus anticipated undiscounted future premiums and capitalizable direct external costs, if any."  For the fiscal years ended February 28, 2010 and 2009, LPHI reported impairments of investments in policies of $281,882 and $151,810, respectively.  For the nine months ended November 30, 2010, LPHI reported impairments of investments in polices of $111,333.

261.     From fiscal year 2009 through the period ended November 30, 2010, contrary to these disclosures, Defendants failed to appropriately evaluate and reduce the carrying value of the Company's investments in policies to fair value.  In its SEC filings, LPHI disclosed that impairment is "generally caused by the insured significantly exceeding the estimate of the original life expectancy, which causes the original policy costs and projected future premiums to exceed the estimated maturity value."  Yet, when Defendants evaluated LPHI's investments in policies for potential impairment, Defendants relied on the LEs Cassidy provided when the Company originally brokered interests in the policies, which Defendants knew to be materially short.  As the number and percentage of insureds outliving Cassidy's LEs increased over time, this event or change of circumstances, known to Defendants, necessitated an evaluation and assessment of the reliability of Cassidy's LEs – a critical assumption in the Company's impairment analysis.  Instead, the Company used the same LEs Cassidy provided at the time LPHI originated the interests, which Defendants knew to be underestimated.  As a result, the

Company misled investors by materially understating impairment for its investments in life settlement policies.

262.    Despite their improper reliance on Cassidy's flawed LEs, Pardo, Peden, and Martin informed the Company's auditor at fiscal year-end 2009 of their belief that "[w]e have reviewed long-lived assets and investments in life insurance policies and tested for impairment whenever events or changes in circumstances have indicated that the carrying amount of assets might not be recoverable and have appropriately recorded the adjustment, if any."

263.    This representation was false. Pardo, Peden, and Martin understood that the Company's impairment calculations depended on the validity of Cassidy's LEs. They also knew, before year-end 2009, that the LEs were unreliable, and, in fact, systematically and materially underestimated

264.    In July or August 2010, E&Y requested data from LPHI to support the LEs underlying the Company's investments in policies and the Company's related impairment analysis. In response, Peden and Martin submitted a chart with information on the most recent 300 maturities of viatical and life settlement policies sold by LPHI. According to the chart, which covered a ten-year period, the ratio of policies that matured before, versus after, the date projected by Cassidy's LEs was roughly 50%/50%. But Peden and Martin failed to alert E&Y that, of the more than 4,000 total outstanding policies brokered by the Company that had yet to reach maturity, insureds underlying approximately 1,200 of those policies had outlived Cassidy's LE, and those policies thus failed to mature by the dates Cassidy projected.

265.    In a letter to the Company's audit committee dated May 2010, E&Y reported that it had noted control deficiencies and other matters. E&Y considered the Company's internal control in order to design audit procedures in connection with its engagement to express an

opinion on the Company's fiscal year 2010 financial statements.  E&Y reported that the Company did not have a formal process in place to assess actual-to-expected LEs.  E&Y recommended that "[a] formal analysis, prepared quarterly, would provide management with an after the fact assessment of how accurate its initial LEs were and if any adjustments need to be made to its underwriting process."

## IX.  DEFENDANTS DECEIVE THE AUDITORS TO HIDE THEIR ACCOUNTING FRAUD

266.  In an effort to conceal its improper revenue recognition practices from its auditor, LPHI routinely backdated certain transactional documents underlying the Company's life settlements.  Unbeknownst to the Company's auditor, the Company's practice was to backdate closing letters, which instructed the escrow agent to execute a closing, to coincide with the month the Company received an executed Seller Agreement from the policy owner.  In many instances, the Company received executed Seller Agreements from policy owners weeks or months before the actual Closing Date for a particular transaction.  By backdating closing letters, which cued the Closing Date, the Company made it appear as though, for certain transactions, the Company's criteria for revenue recognition had been met around the time of the actual closing, which was not the case. Defendants' False and Misleading Management Representation Letters to Auditors[17]

267.  Pardo, Peden, and, for certain periods after February 2008, Martin signed management representation letters to LPHI's auditors containing materially misleading statements and omissions.

268.  From at least fiscal year 2006 through the third quarter of fiscal year 2011, Defendants Pardo and Peden signed quarterly management representation letters to the

---

[17] SEC Complaint ¶¶ 129-131.

Company's auditors dated January 15, 2007; May 25, 2007; July 16, 2007; October 12, 2007;

January 14, 2008; May 14, 2008; July 9, 2008; October 9, 2008; January 9, 2009; May 29, 2009;

July 10, 2009; October 9, 2009; January 11, 2010; May 12, 2010; July 8, 2010; October 8, 2010;

and January 10, 2011, stating that the Company's financial statements were fairly presented in

conformity with GAAP; that there were no material transactions that had not been properly

recorded; and that they had no knowledge of fraud or suspected fraud involving management.

269.    Defendant Martin signed management representation letters dated May 14, 2008;

July 9, 2008; October 9, 2008; January 9, 2009; May 29, 2009; July 10, 2009; October 9, 2009;

January 11, 2010; May 12, 2010; July 8, 2010; October 8, 2010; and January 10, 2011,

containing these representations with respect to financial statements starting at fiscal year-end

2008 through the third quarter of 2011.

## A.    Defendants Misleading Disclosures to Auditors[18]

270.    In 2004, Pardo and Peden asked LPHI's outside auditor if the Company could

recognize revenue under a hypothetical scenario based on four assumptions.  For its review,

Pardo and Peden asked the auditor to assume that:  (i) the policy owner has signed a Seller

Agreement, (ii) "[n]o additional action of any kind is required on the part of either the seller, the

purchasers, or LPHI to finalize [the] transaction," (iii) investors have signed purchase documents

and "funded in full the purchase price for the policies" as wells as amounts required to be

escrowed for future premium payments, and (iv) the escrow agent has taken steps necessary to

ensure that the insurance carrier is legally obligated to transfer ownership of the policy.

271.    Despite their knowledge of the policy owner's rescission rights under the Seller

Agreement, Pardo and Peden omitted those known contingencies from the hypothetical scenario

---

[18] SEC Complaint ¶¶ 81-86.

they asked the auditor to consider.  Due to the omission, the hypothetical was incomplete, and therefore misleading.  Based on the incomplete and misleading hypothetical, the auditor advised the Company in January 2004 that it could recognize revenue under the circumstances presented.

272.    Moreover, the auditor's 2004 guidance was based on unfounded assumptions. Pardo and Peden asked the auditor to assume that investors "had funded in full the purchase price for the policies" and that "[n]o additional action of any kind is required on the part of either the seller, the purchasers, or LPHI to finalize [the] transaction."  These assumptions presuppose that LPHI had identified a sufficient number of investors to purchase 100% of the interests in a given policy.  As adopted by Pardo and Peden, and implemented by Martin, the Company's revenue recognition policy was inconsistent with the 2004 guidance in that LPHI recognized revenue after identifying investors sufficient to purchase as little as 2% of a given policy, a point after which substantial additional steps were required to finalize the transaction.  Namely, finding enough investors to purchase the remaining 98% of the policy.

273.    In an April 2010 memorandum addressed to Martin and others, Pardo and Peden memorialized LPHI's improper revenue recognition policy, described above.  Pardo and Peden sent the memo to Martin, the Company's CFO, to codify policies and procedures that, according to Pardo and Peden, LPHI had "regularly utilized" since they obtained the January 2004 guidance from the Company's auditor.  The memorandum also contemplated that the Accounting Department, which Martin oversaw, "may audit and test" revenue recognition qualifications for a given reporting period by verifying the receipt of Seller Agreements and assignment forms, and the dates of the Policy Funding Agreements.

274.    For fiscal year end 2010 through the third quarter of 2011, Pardo, Peden, and Martin signed management representation letters to the Company's auditor dated May 12, 2010,

July 8, 2010, August 31, 2010, and January 10, 2011, falsely stating that LPHI had adequately disclosed a description of the revenue recognition policies that the Company applied to major revenue-generating products, which products include life settlements.

275.   These management representation letters also stated:  All revenue recognized as of the balance sheet date has been realized and earned.  Revenue has not been recognized before (1) persuasive evidence of an arrangement exists, (2) goods have been delivered or services rendered, (3) consideration to be received is fixed or determinable and (4) collectability is reasonably assured.  The representation that all revenue recognized has been realized and earned is false for the reasons stated above.  Additionally, the lack of an obligation on the policy owner's behalf to sell the policy prior to the Closing Date indicates an absence of persuasive evidence that an arrangement exists.  Finally, prior to the Closing Date, the Company has not delivered policy interests to investors, and collectability of the Company's receivables is not reasonably assured.  Collectability cannot be assured until such time as the seller has been paid and the policy interests are delivered to the investors, which cannot occur prior to closing.

## B.   Defendants Backdated Documents to Deceive Auditors[19]

276.   In an effort to conceal its improper revenue recognition practices from its auditor, LPHI routinely backdated certain transactional documents underlying the Company's life settlements. Unbeknownst to the Company's auditor, the Company's practice was to backdate closing letters, which instructed the escrow agent to execute a closing, to coincide with the month the Company received an executed Seller Agreement from the policy owner.  In many instances, the Company received executed Seller Agreements from policy owners weeks or months before the actual Closing Date for a particular transaction.  By backdating closing letters,

---

[19] SEC Complaint ¶¶ 96-107.

which cued the Closing Date, the Company made it appear as though, for certain transactions, the Company's criteria for revenue recognition had been met around the time of the actual closing, which was not the case.

277.   LPHI's practice of backdating closing letters hindered the Company's auditor's ability to evaluate when the closing for a particular transaction actually occurred versus when the Company recognized revenue from that transaction.  Through the practice, LPHI concealed from its auditor repeated instances in which the Company's revenue recognition policy, as applied by the Company, was inconsistent with GAAP.  Closing letters containing accurate dates would have alerted the auditor that adherence to the Company's revenue recognition policy permitted the Company to recognize revenue prematurely, for transactions that did not close until months or weeks after the Company's criteria had been met.

278.   The Company also routinely backdated Policy Funding Agreements to coincide with the month that the Company received an executed Seller Agreement.  As alleged above, investors purchased life settlement interests under the terms set forth in the Company's Policy Funding Agreements.  The agreements consist of two pages, with the date and purchase terms printed on the first page and the investor signature on the second page.

279.   At all times during the Class Period, it was LPHI's practice to collect and maintain executed, but undated, signature pages for Policy Funding Agreements in a filing cabinet.  The Company received, through its Licensees, signature pages from investors before such time as the investors had made a decision as to which or how much of a policy the investors wanted to buy.  When the investors made these decisions, the Company would complete the first page of the Policy Funding Agreement, which set forth purchase terms based on which and how much of the policy the investor had elected to purchase.  At the same time, the Company stapled

the investor's undated signature pages to the first page of the Policy Funding Agreement, and inserted a date in the first page that coincided with the month it had received the executed Seller Agreement for the interests the investor had elected to purchase.

280.    As a result of this practice, and despite the fact that the date of the Policy Funding Agreement constituted one of the Company's three criteria for revenue recognition, the date reflected on the Policy Funding Agreement was not the date the investor "signed" the agreement or reserved an interest in a given policy.  Rather, the date LPHI selected for the Policy Funding Agreement – a date in the month that the Company received an executed copy of the corresponding Seller Agreement – could have been and, in some instances was, weeks or months prior to either of these events.

281.    The Company's practice of backdating Policy Funding Agreements hindered its auditor's ability to evaluate whether the Company followed its own revenue recognition policy. By backdating Policy Funding Agreements to a date in the month it received Seller Agreements from the owner of the policy that investors had agreed to buy, the Company made it appear as though all three of its internal criteria for revenue recognition occurred in or around the same month, and that that point in time coincided with the date the Company recognized revenue from a particular transaction.  In reality, the Company was recognizing revenue before the final criteria of its stated policy had been met – i.e., before the date of the Policy Funding Agreement from an investor committed to purchasing a life settlement interest.

282.    The Company's practice of backdating Policy Funding Agreements also interfered with its auditor's ability to determine whether the Company's revenue recognition policy was consistent with GAAP.  Had Policy Funding Agreements reflected their true execution dates, the Company's auditors would have seen that, in many instances, the Company

recognized revenue before such time as investors had committed to purchase any interest, much less the totality of the interests, in a policy.  Revenue from life settlement transactions was neither realized nor realizable nor earned before such time.

283.    In a December 2006 email, the Company employee responsible for coordinating the funding of policies explained to a Licensee the reason LPHI backdated Policy Funding Agreements. The Funding Coordinator's email explained that she had finished the paperwork for a particular policy, including "changing the dates on the [funding status report] – you know for those who predated their [Policy Funding Agreements].  *Everything has to match for the auditors*."  (Emphasis added.)

284.    Defendants have admitted to the SEC that the dates on the Policy Funding Agreements did not reflect the dates that the agreements were signed by investors (unless the investor manually signed a date next to his signature).

285.    Defendants have also admitted that certain employees "had the ability to change the automatically generated [Policy Funding Agreement] date to match the month in which the policy originated, and not the date of reservation.  Consequently, the [Policy Funding Agreement] date utilized by the accounting department may have reflected a date as of quarter-end even if the corresponding reservations did not occur until after the 15 business-day period after quarter end."

286.    In July 2011, Peden sent an email to Martin and others, copying Pardo, in which he explained that the Company had adopted a new document dating policy under which Policy Funding Agreements would be generated automatically to reflect the date on which an investor's reservation to purchase an interest in a policy was accepted by LPHI and the funds on deposit

had been allocated to a particular policy.  Importantly, Peden's new policy stated that "[t]hese dates cannot be edited."

287.    Finally, despite the July 2011 policy changes, Pardo, Peden and Martin failed to disclose LPHI's backdating practices to the Company's current auditor until October 2011, over 40 days after LPHI admitted the Company's document backdating history to the SEC.  The Company's backdating practices evidence Defendants' Pardo, Peden and Martin's knowledge that  LPHI's revenue recognition practices were improper.

## X.    LPHI'S RESTATEMENT OF ITS FINANCIAL STATEMENTS

288.    On November 22, 2011, LPHI announced, in Form 10-K for fiscal year 2011, a Restatement that addresses, among other items, errors related to revenue recognition and impairment expense for investments in Company-owned policies.

289.    The Company's Form 10-K also reported that it had "improved" the method by which it calculated impairment on investments in policies by, among other things, increasing "the amount of actuarial data to improve our methodology for estimating life expectancy."  The Company reported that, rather than relying solely on Cassidy, the Company had obtained a second LE for each insured from an industry provider, typically 21st Services, LLC.  Not surprisingly, the addition of a second, well-known LE provider resulted in increased LEs for insureds underlying life settlements brokered by the Company and increased impairment expense in prior periods.

290.    The Restatement, as it relates to impairment of investments in policies, however, does not exclusively result from a refinement of the Company's estimation process, which, under GAAP, should be reported prospectively.  To the contrary, the Restatement, as it relates to impairment of investments in policies, is due to misuse or oversight of facts that existed at the time the previously-issued financial statements were prepared.  In particular, Defendants' misuse

or oversight of facts indicating that Cassidy's LEs were materially short is what caused the Company to understate impairment of investments in policies.

291.    According to the Company's Form 10-K for fiscal year 2011, the Company also corrected errors related to deferred policy monitoring costs, accrued liabilities, certain other items, and the related tax impact.

292.    LPHI's 2011 Form 10-K also reports Pardo and Martin's conclusion that the Company did not maintain effective internal control over financial reporting as of the start of the end of fiscal year 2011, including effective controls to ensure the existence, completeness, accuracy, valuation, and presentation of activities related to, inter alia, revenue recognition and impairment of investment in policies.  These internal control deficiencies, according to the Company, resulted in the aforementioned misstatements of revenue and investments in policies.

293.    LPHI's misstatements of net income range from negative 29% to positive 11% for fiscal years 2007, 2008, 2009, and 2010. Similarly, the Company misstated net income for the first, second, and third quarters of fiscal year 2011 by 7%, 2%, and (78)% respectively.  The misstatements of net income resulting from prematurely recognizing revenue prior to the Closing Date and inadequate impairment of investments in policies are material to LPHI consolidated financial statements for fiscal years 2006, 2007, 2008, 2009, 2010 and for the first, second, and third quarters of fiscal year 2011.

## XI.    ADDITIONAL SCIENTER ALLEGATIONS

294.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their

receipt of information reflecting the true facts regarding LPHI, their control over, and/or receipt

and/or modification of LPHI's allegedly materially misleading misstatements and/or their

associations with the Company, which made them privy to confidential proprietary information

concerning LPHI, participated in the fraudulent scheme alleged herein.

295.    LPHI's fraudulent business practice is central to its operations and crucial to its

profits.  LPHI is a small company that is essentially a "one-product" company – brokering and

selling life settlements to unsuspecting investors based upon faulty LEs.  As a one-product

company, LPHI had strong incentive to make the life settlements appear more attractive to

potential investors to encourage them to purchase policies and allow LPHI to earn an outsized

commission.  A key component of the selling price of a life settlement to an investor (and the

only component capable of manipulation) is the determination of the LE of the insured, which is

performed by LPHI's purported "expert," and not subject to review by the purchaser.  LPHI had

all of the relevant information to prepare such an analysis of the LE in its sole possession and

had a powerful incentive to manipulate the results.

296.    Additionally, scienter is demonstrated by the scheme to divert more than $20

million in cash from the Company to an offshore account established by Defendant Pardo in

addition to the more than $11 million Defendant Pardo received in gross proceeds from his sales

of LPHI stock during the Class Period while in possession of material non-public information

about LPHI.

297.    Defendant Pardo owns approximately 50.3% of the outstanding shares of LPHI.

In order to profit from the scheme to make the Company appear more profitable than it was, the

Defendants concocted a scheme to pay abnormally large and unsustainable dividends, knowing

that 50.3% of this money would go directly to Defendant Pardo's offshore trust.  During the Class Period, more than $20 million was paid to Defendant Pardo's offshore trust:

| Date | Dividend | Type | Pardo Shares | |
|---|---|---|---|---|
| 5/29/2007 | 0.0625 | Regular | 3,841,067 | $       240,066.69 |
| 8/29/2007 | 0.0600 | Regular | 4,801,334 | 288,080.03 |
| 11/28/2007 | 0.0600 | Regular | 6,001,667 | 360,100.03 |
| 11/28/2007 | 0.0100 | Special | 6,001,667 | 60,016.67 |
| 2/27/2008 | 0.0600 | Regular | 6,001,667 | 360,100.03 |
| 5/28/2008 | 0.0700 | Regular | 6,001,667 | 420,116.70 |
| 8/27/2008 | 0.0700 | Regular | 6,001,667 | 420,116.70 |
| 11/25/2008 | 0.0700 | Regular | 6,001,667 | 420,116.70 |
| 11/25/2008 | 0.0100 | Special | 6,001,667 | 60,016.67 |
| 3/4/2009 | 0.0700 | Regular | 7,502,084 | 525,145.88 |
| 5/18/2009 | 0.0700 | Regular | 7,502,084 | 525,145.88 |
| 8/5/2009 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 11/4/2009 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 2/3/2010 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 5/5/2010 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 8/4/2010 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 10/13/2010 | 0.2500 | Special | 7,502,084 | 1,875,521.00 |
| 11/3/2010 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 1/27/2011 | 0.0400 | Special | 9,377,605 | 375,104.20 |
| 2/2/2011 | 0.2000 | Regular | 9,377,605 | 1,875,521.00 |
| 5/12/2011 | 0.2000 | Regular | 9,377,605 | 1,875,521.00 |
| | | | | |
| | | | | $ 20,933,815.19 |

298.     Scienter is further demonstrated by Defendants' backdating of certain documents relevant to the auditors' analysis of whether LPHI's revenue recognition policies complied with both the Company's stated revenue recognition policies and with GAAP and SEC regulations.  There is simply no innocent explanation for backdating documents given to auditors.

299.     Likewise, Defendants Peden and Martin provided a spreadsheet to the Company's auditors that they represented described 300 of the "most recent" maturities of life settlements, in an effort to convince the Company's auditors that the LEs were reasonable.  In this spreadsheet, however, Defendants Peden and Martin deliberately excluded 1,230 policies for which the insureds had already outlived their LEs as calculated by Dr. Cassidy.  The provision of backdated and incomplete analyses to the Company's auditors is a significant indicator of scienter.

- 143 -

## XII.   LOSS CAUSATION

300.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

301.    Throughout the Class Period, as set forth above, the market price of LPHI shares was inflated by the material omissions and false and misleading statements made by the Company and the Individual Defendants, which were widely disseminated to the securities markets, investment analysts and the investing public.  The false and misleading statements materially misrepresented to the market the Company's financial results and prospects, and caused LPHI shares to trade at prices in excess of their true value.

302.    As a result, Lead Plaintiff and the additional named plaintiffs purchased LPHI shares at artificially inflated prices.  When the truth about LPHI's financial results and prospects was revealed to the market through several partial disclosures, the price of LPHI shares declined in response, as the artificial inflation caused by Defendants' misrepresentations and omissions was removed from the price of LPHI shares, thereby causing substantial damages to the Lead Plaintiff, the additional named plaintiffs and the Class.

303.    Immediately prior to the Class Period, LPHI shares closed trading at $2.19 per share on May 25, 2006.[20]  As the Company began misrepresenting its financial results and future prospects, its share price began to rise significantly.  By January 16, 2007, when the Company announced outstanding financial results for the quarter ended November 30, 2006, LPHI shares had climbed to close trading at $4.23 per share.  By May 29, 2007, when LPHI filed its annual report with the SEC, its shares had climbed to close at $7.23 per share.

---

[20] All share prices are split-adjusted for consistency.

304.    On June 4, 2007, following the announcement of better-than-expected earnings guidance for Q1 2008, LPHI's shares rose nearly 30% – to close trading at $9.64 per share. When the favorable Q1 2008 results were formally announced on June 14, 2007, LPHI shares climbed another 9.3% to close at $11.52 per share.  While LPHI shares got caught up in the general decline of most companies during the financial crisis of 2008, the Company's shares reached their low point of a little less than $6.50 per share in March of 2008.

305.    A steady drumbeat of excellent reported financial results served to drive LPHI's share price from the lows it had reached in the stock market crisis of 2008 up as high as about $22.50 per share in early 2009.  For example, on March 26, 2008, LPHI issued a press release providing surprisingly good earnings guidance for the fiscal year ended February 29, 2008, and the Company's shares traded up from $7.72 per share to close at $9.45 per share on March 27, 2008.  From April 2008 through September of 2008, excellent and steadily increasing reported financial results caused LPHI shares to steadily climb to close at $15.73 per share on September 17, 2008.  On September 18, 2008, LPHI pre-announced "record earnings" for Q2 2009, sending the Company's shares up sharply higher, closing at $17.83 per share a few days later.  On October 17, 2008, when the Company reported its final numbers for Q2 2009 on an analyst conference call, its shares jumped again to close at $20.17 per share.  Buoyed by continuing strong earnings reports, LPHI shares continued to trade in a range between $17.00 and $22.00 until mid-February 2009.

306.    On February 11, 2009, CITRON RESEARCH published an analyst report that was sharply critical of LPHI.  For the first time, a number of "red flags" against the Company were reported, including significant questions regarding LPHI's ability to maintain its unusually large fee structure.  For the first time, the market acknowledged substantial risk in LPHI's shares by

- 145 -

dropping the shares from $16.60 per share at the close of trading on February 10, 2009, to $14.33 per share on February 11, 2009 – a decline of $2.27 per share, or 13.7%.  Although the Defendants were able to stop the slide on February 12, 2009, with a carefully worded press release refuting the CITRON RESEARCH report, the 3.1% share price gains from this letter on February 12, 2009, were quickly reversed as the risk introduced into LPHI's share price by the CITRON RESEARCH report caused the Company's shares to slip as low as $10.17 per share on February 18, 2009.

307.    Continuing good reported financial results kept LPHI trading in a range between $10.00 and $17.00 between February 19, 2009, and July 27, 2010, when CITRON RESEARCH issued another analyst report highly critical of the Company.  This research report caused LPHI shares to drop from $12.86 on July 27, 2010, to close at $11.80 on July 28, 2010 – a decline of 8.2%.  LPHI's shares continued to trade in a fairly tight range between approximately $12.00 per share and approximately $15.00 per share between July 29, 2010 and January 19, 2011.

308.    On January 20, 2011, the "wheels began to come off the bus," and LPHI shares began their precipitous decline to their current level.  On January 20, 2011, LPHI's share price opened trading at $14.03 per share.  When the Company was forced to admit that the SEC had commenced an investigation into the Company, the share price plummeted 15.4% to close at $11.87 per share.

309.    On January 27, 2011, when the WALL STREET JOURNAL reported that LPHI was being forced to change its sales pitch to investors to claim a 7% return instead of the previously advertised returns of 12% to 14%, this revised sales pitch called into question the many negatives set forth by the WALL STREET JOURNAL, CITRON RESEARCH and others regarding LEs prepared

by Dr. Cassidy and other problems at the Company.  LPHI shares dropped $1.05 from the previous day's close to close at $9.89 per share on January 28, 2011 – a loss of 9.6%.

310.    On May 13, 2011, LPHI filed a Form 8-K disclosing the existence of a "Wells Notice" from the SEC.  This notice – which evidences an intent by the staff to bring civil charges against the Company – was a shock to the market – sending LPHI shares plummeting to close at $5.62 per share – a loss of $1.42, or 20.2% from the previous day's close.

311.    On May 16, 2011, following the close of the market, LPHI filed a Notification of Late Filing with the SEC disclosing that it would be unable to file its annual report on Form 10-K with the SEC on a timely basis due to some unspecified accounting issues.  This surprising and disturbing disclosure sent LPHI shares down to close at $4.18 per share from the previous day's close of $5.10 – a drop of $0.92 per share, or 18.1%  The filing of an amended Notification of Late Filing disclosing that LPHI could not file within the 15 day deadline for extensions served to keep LPHI's share price in the $4.00 range.

312.    Just when it looked as if no worse news could possibly come out of the Company, on June 9, 2011, LPHI was forced to admit that E&Y had resigned as its auditor, and E&Y submitted a public resignation letter detailing accounting disagreements with the Company, stating that E&Y withdrew its fiscal 2011 audit opinion and disclosing E&Y's opinion that LPHI had improper revenue recognition policies and needed to restate annual and interim financial statements to correct material errors.  This horrible disclosure sent LPHI shares down from a close of $3.58 the day before this announcement to a close of $3.09 on June 10, 2011 – a loss of $0.49, or 13.7%.

313.    During the next week, LPHI shares rebounded slightly to close at $4.19 per share on June 17, 2011.  Finally, the Class Period closes on June 17, 2011, when Eide Bailly

disclaimed its opinion on the fiscal 2009 audited financial statements, asserting that these financial statements should "no longer be relied upon," thus causing LPHI's already decimated share price to fall another 8.8% to close at $3.82 per share.

314.    As a result of their purchases of LPHI shares during the Class Period, and the corrections removing the artificial inflation of the prices paid for those securities, Lead Plaintiffs, the Co-Lead Plaintiff and the Class suffered economic harm under the federal securities laws.

## XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

315.    At all relevant times, the market for LPHI common stock was an efficient market for the following reasons, among others:

(a)     LPHI common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, LPHI filed periodic public reports with the SEC and the NASDAQ;

(c)     LPHI regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     LPHI was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

316.    As a result of the foregoing, the market for LPHI common stock promptly digested current information regarding LPHI from all publicly available sources and reflected

such information in the prices of the stock.  Under these circumstances, all purchasers of LPHI

common stock during the Class Period suffered similar injury through their purchase of LPHI

common stock at artificially inflated prices and a presumption of reliance applies.

### XIV.   NO SAFE HARBOR

317.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made.  To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements were made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of LPHI who knew that those statements were false

when made.

### COUNT I

**Violation of Section 10(B) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

318.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

319.    During the Class Period, Defendants disseminated or approved the materially

false and misleading statements specified above, which they knew or deliberately disregarded

were misleading in that they contained misrepresentations and failed to disclose material facts

- 149 -

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

320.    Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

321.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LPHI common stock.  Plaintiffs and the Class would not have purchased LPHI common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

322.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of LPHI common stock during the Class Period.

## COUNT II

### Violation of Section 20(A) of
### the Exchange Act Against the Individual Defendants

323.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

324.    The Individual Defendants acted as controlling persons of LPHI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of LPHI, and their ownership of LPHI stock, the Individual Defendants had the power and authority to cause LPHI to engage in the wrongful conduct complained of

herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XV.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED this 10tj day of February, 2012.

Respectfully submitted,


By _____/s/ Steve W. Berman_____
        Steve W. Berman
        Erin K. Flory
        Karl P. Barth
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594

- 151 -

Reed R. Kathrein
Peter E. Borkon
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001

*Interim Lead Counsel for the Proposed Class*

John D. Fraser
**FERGUSON LAW GROUP, P.C.**
2500 Dallas Parkway
Suite 260
Plano, TX 75093
Telephone:     (972) 378-9111
Facsimile:     (972) 378-9115

*Interim Liaison Counsel for the Proposed Class*

Marc I. Gross
Jeremy A. Lieberman
**POMERANTZ HAUDEK GROSSMAN**
   **& GROSS, LLP**
100 Park Ave.
26th Floor
New York, NY 10017-5516
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

Lionel Z. Glancy
Ex Kano S. Sams II
Robert V. Prongay
**GLANCY BINKOW & GOLDBERG LLP**
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160

Samuel K. Rosen
**HARWOOD FEFFER LLP**
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone : (212) 935-7400
Facsimile:   (212) 753-3630

*Additional Counsel for the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing *First Amended Complaint for Violation of the Federal Securities Laws* has been served on counsel by ECF, in accordance with the Rules of Civil Procedure as set forth below, on this 10th day of February, 2012.  All others were served by mail.

_____/s/ Steve W. Berman_____
Steve W. Berman
