SELMA STONE, Individually and on Behalf
of All Others Similarly Situated,

                         Plaintiff,

        v.

LIFE PARTNERS HOLDINGS, INC.,
BRIAN D. PARDO, DAVID M. MARTIN,
and NINA PIPER,

                     Defendants.

Cause No. DR-11-CV-016-AM

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   STATEMENT OF FACTS .......................................................................... 3

     A.    The Defendants ................................................................................ 3

     B.    LPHI's Fraudulent Business Model Reaps Extraordinary Short-Term
           Profits .............................................................................................. 3

           1.    LPHI Purchases Policies From Sellers at a Substantial
                 Discount Below the Face Amount and Sells to Investors at
                 exorbitant commissions. ...................................................... 3

           2.    Defendants use false life-expectancy estimates to increase
                 revenues. .............................................................................. 4

     C.    Defendants Falsified LPHI's Financial Statements in Violation of
           GAAP and LPHI's Own Stated Revenue Recognition Policies ........... 5

     D.    Defendant/CEO Pardo Engaged in an Insider Selling Program and
           Used A Lucrative Dividend Program to Divert a Total of $32 Million
           to His Own Pockets.......................................................................... 7

     E.    Defendants Misrepresented LPHI's Business to Investors................... 8

     F.    Defendants' Scheme Unravels............................................................ 9

III.  ARGUMENT............................................................................................ 10

     A.    Background on Federal Securities Laws............................................ 10

     B.    Plaintiffs Sufficiently Plead Falsity Because the Complaint Identifies
           Misstatements, Who Made Them, and Specifically Alleges Why
           They Were False or Misleading......................................................... 11

           1.    Defendants admit that Plaintiffs' allegations regarding
                 LPHI's false and misleading accounting demonstrate a
                 material false statement.......................................................... 12

           2.    The Complaint identifies numerous statements that concealed
                 LPHI's fraudulent LE underestimation practice. ..................... 13

                a.    Plaintiffs plead that LEs were systematically
                     underestimated. ........................................................... 13

b. Defendants' public statements during the Class Period regarding the Company's results and successes were false and misleading because they concealed LPHI's use of bogus LEs. ........................................................ 14

c. The statements at issue are not forward looking. ......................... 16

d. The Statements Are Not "Puffery." ............................................. 17

e. LPHI's Form 10K filed annually with the SEC similarly misrepresented LPHI's business. ................................. 19

(1) LPHI's risk disclosures about LE estimations were false and misleading for failing to disclose that the estimations were actually inaccurate and unreliable. ................................................. 19

3. Pardo and Martin's SOX certifications were also false. .......................... 21

C. Plaintiffs Sufficiently Plead a Strong Inference that Defendants Acted with Scienter because (i) the Nature of the Accounting Misconduct Provides Strong Circumstantial Evidence; (ii) LPHI's Fraudulent Business Practice was too Important to Escape Senior Management's Attention and (iii) Pardo Directly Profited from the Practice ............................................................................................ 22

1. Standard for pleading a strong inference of scienter. ............................. 22

2. Plaintiffs plead a cogent and compelling inference of scienter. ...................................................................................... 23

a. Plaintiffs' allege strong circumstantial evidence of scienter. ...................................................................................... 24

(1) LPHI was a single-product company based entirely on a fraudulent business model .......................... 24

(2) The accounting violations are indicative of scienter. ........................................................................... 27

(3) Pardo's Intimidation of E&Y, and the auditor's subsequent "Noisy" withdrawal is evidence of scienter. .......................................................... 31

(4) Allegations that Defendants attempted to "cover-up" the indicate scienter. ...................................... 32

(5)    Falsification of audit evidence demonstrates scienter. ........................................................... 32

(6)    Defendants continued the Company's practice of systematically using underestimated LEs despite the presence of numerous "red flags" calling the practice into question. ................................... 33

(7)    LPHI's weak internal controls and SOX certifications are probative of scienter. ........................... 34

(8)    The small size of LPHI strengthens scienter allegations. ..................................................... 34

(9)    LPHI's Quick Settlement of Ancillary Litigation is Indicative of Scienter. ................................. 35

b.    The complaint pleads motive and opportunity because Pardo pocketed more than $31 million from the scheme. ...................................................................................... 35

(1)    The insider selling prong of the scheme. ........................ 37

(2)    The dividend prong of the scheme. .................................. 38

D.    The Complaint sufficiently states a primary violation and thus also states control-person liability against the Individual Defendants ....................... 40

IV.    CONCLUSION ........................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abrams v. Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002) ................................................................................38

*Bailey v. Linsco/Private Ledger Corp.*,
    136 F.R.D. 11 (D. Me. 1991) .........................................................................14, 33

*Barrie v. Intervoice-Brite, Inc.*,
    397 F.3d 249 (5th Cir. 2005) .................................................................36, 39, 40

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).......................................................................................13

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ............................................................................25

*Cental Laborers' Pension Fund v. Integrated Elec. Servs.*,
    497 F.3d 546 (5th Cir. 2007) .................................................................12, 28, 38

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
    686 F. Supp. 2d 404 (D. Del. 2009)......................................................16, 21, 22

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989) ................................................................................25

*Dorsey v. Portfolio Equities, Inc.*,
    540 F.3d 333 (5th Cir. 2008) ............................................................................25

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).......................................................................................11

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y 2010)...................................................................20

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) .........................................................................34

*Goldstein v. MCI Worldcom*,
    340 F.3d 238 (5th Cir. 2003) ............................................................................23

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999).............................................................................42

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) ............................................................................35

*Hopson v. MetroPCS Communs., Inc.*,
    2011 U.S. Dist. LEXIS 47177 (N.D. Tex. Mar. 25, 2011) ....................................................18

*Huddleston v. Herman & MacLean*,
    640 F.2d 534 (5th Cir. 1981), *aff'd in part, rev'd in part*, 459 U.S. 375 (1983) ....................20

*In re Ambac Fin. Group, Inc.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ...................................................................................16

*In re ArthroCare Corp. Secs. Litig.*,
    726 F. Supp. 2d 696 (W.D. Tex. 2010) ........................................................................ *passim*

*In re Biogen Sec. Litig.*,
    179 F.R.D. 25 (D. Mass. 1997) ..............................................................................................18

*In re Daou Sys.*,
    411 F.3d 1006 (9th Cir. 2005) .........................................................................................28, 30

*In re Dell Inc., Sec. Litig.*,
    591 F. Supp. 2d 877 (W.D. Tex. 2008) ..................................................................................36

*In re Ford Motor Co. Sec. Litig.*,
    381 F.3d 563 (6th Cir. 2004) .................................................................................................16

*In re JPMorgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ...................................................................................25

*In re Katrina Canal Breaches Litig.*,
    495 F.3d 191 (5th Cir. 2007) .................................................................................................14

*In re MicroStrategy Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ..............................................................................28, 38

*In re Nature's Sunshine Prods. Sec. Litig.*,
    486 F. Supp. 2d 1301 (D. Utah 2007) ...................................................................................32

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................................................................36

*In re Stone & Webster, Inc., Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005) .................................................................................................25

*In re Toyota Motor Corp. Secs. Litig.*,
    2011 U.S. Dist. LEXIS 75732 (C.D. Cal. July 7, 2011) ........................................................18

*In re Xerox Corp. Secs. Litig.*,
    165 F. Supp. 2d 208 (D. Conn. 2001) ...................................................................................25

*In re Yukos Oil Co. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 78067 (S.D.N.Y. 2006) ................................................................39, 40

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008) ................................................................22, 23, 34, 36

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)................................................................25

*Kaltman v. Key Energy Servs.*,
    447 F. Supp. 2d 648 (W.D. Tex. 2006)................................................................17, 31

*Litwin v. Blackstone Group, L.P.*,
    634 F.3d 706 (2d Cir.), *cert. denied*, ___ U.S. ___ 132 S. Ct. 242 (2011)................................................................20

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ................................................................16, 17, 20

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ................................................................24

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ................................................................ *passim*

*New York City Emples. Ret. Sys. v. Berry*,
    616 F. Supp. 2d 987 (N.D. Cal. 2009) ................................................................31

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America
West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ................................................................25, 36

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................31

*Patel v. Patel*,
    761 F. Supp. 2d 1375 (N.D. Ga. 2011) ................................................................40

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ................................................................29

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)................................................................31

*SEC v. Life Partners Holdings, Inc.*,
    No. 1:12-cv-033-JRN, slip op. (W.D. Tex. Apr. 19, 2012) ................................................................2, 10

*SEC v. Lucent Techs., Inc.*,
    363 F. Supp. 2d 708 (D.N.J. 2005) ................................................................32

*SEC v. Mutual Benefits Corp.*,
    408 F.3d 737 (11th Cir. 2005) ...........................................................................4, 26

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)....................................................................................16

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) ..................................................................................27

*Tamar v. Mind C.T.I., LTD.*,
    723 F. Supp. 2d 546 (S.D.N.Y. 2010)....................................................................40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)....................................................................................22, 23, 24

*Varghese China Shenghuo Pharm. Holdings*,
    672 F. Supp. 2d 596 (S.D.N.Y. 2009)....................................................................34

## STATUTES

15 U.S.C. § 78.......................................................................................................11

## OTHER AUTHORITIES

17 C.F.R. § 229.303(a)(3)(ii) ...............................................................................20

Certification of Disclosure in Companies' Quarterly and Annual Reports, Securities Act
    Release No. 8124, Exchange Act Release No. 46,427, Investment Company Act
    Release No. 25,722, 78 SEC Docket 875, 2002 SEC LEXIS 2240 (Aug. 28, 2002) ..............21

# I.     INTRODUCTION

Defendant Life Partners Holding, Inc. ("LPHI") was built on a fraud:  As the Securities Exchange Commission has alleged in recent litigation against LPHI after a lengthy investigation, LPHI's short-lived success in the marketplace stemmed directly from its practice of deceiving its customers.  But Defendants could not and did not tell investors that a fraudulent business practice was the source of LPHI's growth and profits.  The Individual Defendants, Brian D. Pardo ("Pardo"), R. Scott Peden ("Peden") and David M. Martin ("Martin") implemented this fraud on LPHI's customers, which created excellent (but unsustainable) financial results.  To further enhance the reported financial results, the Individual Defendants also caused LPHI to materially overstate its revenues and net income during the Class Period in violation of GAAP and the Company's own stated accounting policies.  By employing these two schemes simultaneously, LPHI reported quarter after quarter of excellent or "record" earnings, and LPHI's share price soared from $2.19 per share prior to the Class Period to as high as $22.50 per share in early 2009.  Knowing that the fraud could not be sustained in the long run, Pardo sold more than $11.2 million of LPHI stock and implemented a second strategy to pay unsustainable dividends exceeding $20 million to his offshore trust before the company unraveled.

The fraud began to unwind when market analysts and the WALL STREET JOURNAL uncovered pieces of the puzzle.  Eventually, the truth was fully disclosed when:  (1) *both* of the Company's former auditors resigned *and withdrew their previously issued audit opinions*; (2) the Company was forced to restate its previously issued financial statements to correct the above-described accounting misconduct; and (3) the Securities and Exchange Commission filed a civil lawsuit against these same Defendants, making similar factual allegations to those in the Complaint and also charging the Defendants with violations of Section 10(b) of the Exchange

Act.[1]  As best summed up by the head of the SEC's Enforcement Division:  "Life Partners duped its shareholders by employing an unqualified medical doctor to assign baseless life-expectancy estimates to the underlying insurance policies . . .This deception misled shareholders into thinking that the company's revenue model was sustainable when in fact it was illusory."  ¶ 234.

Despite the damning facts specifically alleged in the 151 page First Amended Complaint ("FAC"), the Defendants bring a motion to dismiss Plaintiffs' claims on the basis that: (1) Plaintiffs have failed to allege a false and misleading statement; and (2) Plaintiffs' have failed to adequately allege scienter.

But, as demonstrated below, the FAC adequately alleges that LPHI falsified its reported financial results by recognizing material amounts of revenue in violation of GAAP and LPHI's stated revenue recognition policies.  The Defendants do no contest, and therefore admit, that this adequately pleads a material false statement.  *See infra* at 12.  Plaintiff also alleges, with great specificity, the scienter of each of the Individual Defendants (and thus the Company) in perpetrating this accounting deceit.  *See infra* at 27-31.  These arguments alone are sufficient to defeat Defendants' motion, and the Court need look no further in its analysis.

However, the FAC also describes numerous other material false statements, including how the Defendants implemented an undisclosed scheme to artificially manipulate the selling price of its products to its clients (*see infra* at 13-14), and then kept this misconduct hidden by deceiving its own shareholders.  *See infra* at 14-22.  The FAC further details each of the Defendants' role in making these false statements, and demonstrates that each acted with the requisite scienter.  *See infra* at 22-40.

For these reasons, the Court should deny Defendants' motion in its entirety.

---

[1] On April 19, 2012, the Court denied the motions to dismiss of all of the defendants in that action.  *SEC v. Life Partners Holdings, Inc.*, No. 1:12-cv-033-JRN, slip op. at 3 (W.D. Tex. Apr. 19, 2012) (*See* Appendix at App. 8).

## II.    STATEMENT OF FACTS

### A.    The Defendants

LPHI's main business is as a "life settlement broker," buying life insurance policies in the secondary market and reselling those policies to investors. ¶ 2.[2] Defendant Pardo is the President and Chief Executive Officer of LPHI and owns 9,377,605 shares of LPHI (approximately 50.3% of the outstanding shares of the Company). ¶ 30(a). Defendant Peden serves as General Counsel and President of LPHI. ¶ 30(b), and Defendant Martin has served as the Chief Financial Officer of LPHI since February 2008. ¶ 30(c).

### B.    LPHI's Fraudulent Business Model Reaps Extraordinary Short-Term Profits

#### 1.    LPHI Purchases Policies From Sellers at a Substantial Discount Below the Face Amount and Sells to Investors at exorbitant commissions.

The "life settlements" business is a secondary financial marketplace for the purchase and sale of life-insurance policies. In this marketplace, purchasers buy all or part of the death benefits of other people's life-insurance policies for an upfront payment. ¶ 42.

The life-settlements business is highly competitive, with buyers' brokers typically receiving commissions of approximately 6%. LPHI, however, took commissions over twice that – approximately 14%. ¶ 46. To make these excess commissions in a highly competitive marketplace, LPHI had to convince potential purchasers that they would obtain market or above-market returns on their purchases. A common measure of one's return in such an investment is the Internal Rate of Return ("IRR"), the annual interest rate achieved by an investor based upon the timing and amounts of cash inflows relative to the purchase price of this investment. *Id.*

There are three factors in purchasing a life-settlement policy that can impact the IRR. First is the purchase price, which is readily apparent to the purchaser. The premium amount that will need to be paid is second. Third – the most important factor – is the insured's life

---

[2] "¶ __" refers to paragraphs of the First Amended Complaint for Violation of the Federal Securities Laws (Dkt. No. 42), filed February 10, 2012, unless otherwise noted.

expectancy ("LE"), because it is at the insured's death that the policy matures and the investor gets paid. The LE is the most important factor in pricing.[3] If the LE is calculated correctly, the policy will mature when expected and the purchaser will achieve his targeted returns. If the LE is too short, the purchaser will receive less than his or her targeted returns. ¶¶ 4, 47.

The excessive fees that LPHI obtained on its policies went directly to its "bottom line," allowing LPHI to report "record" revenues and earnings quarter after quarter and sending its stock price soaring from $7 per share (split-adjusted) before the Class Period to nearly $24 per share in early 2009. ¶ 9. LPHI was able to charge a 14% commission only because it (i) failed to adequately disclose its fees to investors; (ii) prevented the transactions from being priced competitively; and (iii) failed to disclose the true LE of the insured – instead using the false projections created by LPHI's in-house actuarial consultant to make investors think that they would achieve "double digit" returns. Because LPHI's fees exceeded its competitors', the IRR achieved by its clients should have been correspondingly lower if the LEs were properly calculated and disclosed. But because of the competitive nature of the business, this would cause the clients to purchase from another broker with a lower commission model. ¶ 6.

> 2. **Defendants use false life-expectancy estimates to increase revenues.**

To induce its clients to purchase life-settlement policies from them, LPHI devised a scheme to deliberately overstate the value of such insurance policies by providing potential purchasers with false and artificially low LE estimations. With an artificially low LE estimation, an investment's IRR would be overstated, making it appear to be a far better investment than it was. Defendants did not tell LPHI clients, of course, of LPHI's higher fee structure, or even the

---

[3] Indeed, in a life settlement valuation, "it is of paramount importance that an accurate determination be made of the insured's expected date of death." *SEC v. Mutual Benefits Corp.*, 408 F.3d 737, 738 (11th Cir. 2005). "If the insured lives longer than expected, the purchaser of the policy will realize a reduced return, or may lose money on the investment." *Id.*

fact that LEs prepared by the seller's brokers had dramatically higher LE estimations.  The only information LPHI clients had to calculate their IRR was given to them by LPHI, and consisted primarily of LPHI's in-house LEs.  ¶ 7.[4]

The *Wall Street Journal* reported in late 2010 that its investigation revealed that LPHI's LEs were materially understated, reporting exhaustive details about the scope and pervasiveness of the underestimation using LPHI's own internal data.   ¶ 209.

## C.     Defendants Falsified LPHI's Financial Statements in Violation of GAAP and LPHI's Own Stated Revenue Recognition Policies

Simultaneously, LPHI was employing a separate but interrelated scheme to overstate its reported financial results using fraudulent accounting practices that violated General Acceptable Accounting Practices ("GAAP") and the Company's own stated revenue recognition policies.

LPHI's own revenue recognition policy, as stated in the Company's sworn public filings, promised that the Company would not recognize revenues until "a settlement has been closed." ¶¶ 90, 102, 122, 163, 190.  This revenue recognition policy facially comported with the simple and unambiguous provisions of GAAP (specifically ASC 605-10-25-1) mandating that revenue may not be recognized until it is both (i) realized or realizable; and (ii) "earned."  ¶ 245. Pursuant to these requirements, LPHI could not recognize revenues from a transaction until that transaction has "closed."  ¶¶ 247-48.  Despite these promises regarding LPHI's revenue recognition policy, and the clear requirements of GAAP, LPHI recognized material amounts of revenue in violation of this simple policy.  ¶ 293.

Likewise, LPHI recognized revenues from transactions that occurred *after the end of the*

---

[4] Importantly, sellers and their brokers regularly obtain LE estimates in order to know the proper price at which to sell their policies.  LPHI evaluates each seller's LE when it determines whether or not to purchase any given policy.  This is not the same LE, however, that LPHI provides purchasers to aid their evaluation of the likely payout on the policy and whether to invest.  Instead, when placing policies with purchasers, LPHI uses a so-called "independent medical doctor" to provide a new – and always shorter – LE estimation.  ¶ 56.  Defendants also do not tell policy purchasers the actual amount LPHI pays the seller, which amount provides an appropriate estimate of the policy's true value.  ¶ 49.

*accounting period.* ¶¶ 250-55. Since at least fiscal year 2004, LPHI improperly kept its books

open for 15 business days *after* the end of the quarter. ¶ 251. This improper policy was

memorialized in an April 2010 accounting policy memorandum from Defendants Pardo and

Peden to Defendant Martin. ¶¶ 250-51. Following Pardo and Peden's illicit program violated

GAAP by allowing LPHI to "borrow" revenues that rightfully belonged in the next financial

quarter. ¶ 254. After the SEC began investigating LPHI's fraudulent accounting in 2011, the

Company agreed to discontinue this scheme. ¶ 255.

LPHI also falsified its reported financial results by understating the impairment of life

insurance policies that the Company itself owned. ¶¶ 256-61. The Company owned a significant

amount of insurance policies for its own account. A majority of these policies were impaired

policies that the Company was forced to purchase from former customers to settle the securities

fraud litigation brought by the Colorado Securities Commissioner. ¶ 256. GAAP, specifically

ASC 360-10, plainly requires that an impairment loss must be recognized if the "fair value" of

the asset is less than its carrying value. ¶ 258. The Company's sworn SEC filings also promised

that it would recognize appropriate expenses from the impairment of policy values. ¶ 260.

Despite these promises and plain GAAP requirements, LPHI failed to properly recognize such

impairment charges from fiscal year 2009 through the quarter ended November 30, 2010.

LPHI was only able to pull off its accounting charade because Defendants Pardo, Peden

and Martin were each participants in a scheme to deceive LPHI's auditors regarding the actual

financial results of the Company. For example, at fiscal year-end 2009, Defendants Pardo,

Peden and Martin each informed LPHI's auditor that they had personally reviewed the carrying

value of insurance policies owned by the Company and determined that they did not require

adjustment, despite the fact that each of them knew that Cassidy's LEs, which provided the basis

for the valuations, were materially flawed and understated. ¶¶ 262-63. In response to a request for information from E&Y in 2010, Peden and Martin submitted a misleading chart to E&Y that contained only 300 "cherry-picked" results, and failed to alert E&Y that data regarding the broader 4,000 total outstanding policies demonstrated problems with the LEs. ¶ 264. Likewise, the Company "routinely" backdated certain transactional documents to create the false appearance that the Company's criteria for revenue recognition had been met in advance of the date in which it actually had. ¶ 266.

With the Defendants willing to pull any tricks they could imagine to make LPHI appear to be a profitable and growing, sustainable company, LPHI was reporting excellent earnings, which allowed its share price to soar from $2.19 prior to the Class Period to as high as $22.50 per share in 2009. ¶ 305.[5] The Company, which was "rotten to the core" and based on a fraudulent secret of ripping off its customers, appeared to be wildly successful. Defendant Pardo, mindful that such a fraud could not continue indefinitely, needed a way to "cash out" before the Company's ugly secrets were uncovered.

**D. Defendant/CEO Pardo Engaged in an Insider Selling Program and Used A Lucrative Dividend Program to Divert a Total of $32 Million to His Own Pockets**

Defendant Pardo owns approximately 50.3% of its shares through an offshore trust he set up on the island of Gibraltar. He knew the Company's business model was an unsustainable fraud and the long-term prospects for the Company were poor. He therefore conjured a two-prong scheme to "cash out" of the Company: First, Defendant Pardo sold more than 450,000 shares of stock during the Class Period, realizing proceeds of approximately $11.2 million. ¶ 86. Those same shares would only be worth slightly more than $1 million at the current share price of $2.39. Secondly, Pardo set up a scheme to loot the Company by declaring large and

---

[5] All share prices are split-adjusted.

unsustainable dividends, the majority of which would go to his offshore trust in Gibraltar. By keeping his slim majority stake rather than selling shares of stock, he retained control of LPHI and could unilaterally set its dividend policies. ¶ 49. In the beginning of the Class Period, as shown in the following chart, dividends were a relatively modest 6¢ per share. *After reporters and analysts began raising doubts about LPHI and it became clear that the end was near for LPHI's scheme to understate LEs, Pardo and the Company ramped up the dividends to 25¢ per quarter, even declaring an additional "special" dividend of 25¢ per share in October of 2010.* In all, during the Class Period, Pardo diverted nearly $21 million to his offshore trust (¶ 50):

| Date | Dividend | Type | Pardo Shares | |
|---|---|---|---|---|
| 5/29/2007 | 0.0625 | Regular | 3,841,067 | $  240,066.69 |
| 8/29/2007 | 0.0600 | Regular | 4,801,334 | 288,080.03 |
| 11/28/2007 | 0.0600 | Regular | 6,001,667 | 360,100.03 |
| 11/28/2007 | 0.0100 | Special | 6,001,667 | 60,016.67 |
| 2/27/2008 | 0.0600 | Regular | 6,001,667 | 360,100.03 |
| 5/28/2008 | 0.0700 | Regular | 6,001,667 | 420,116.70 |
| 8/27/2008 | 0.0700 | Regular | 6,001,667 | 420,116.70 |
| 11/25/2008 | 0.0700 | Regular | 6,001,667 | 420,116.70 |
| 11/25/2008 | 0.0100 | Special | 6,001,667 | 60,016.67 |
| 3/4/2009 | 0.0700 | Regular | 7,502,084 | 525,145.88 |
| 5/18/2009 | 0.0700 | Regular | 7,502,084 | 525,145.88 |
| 8/5/2009 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 11/4/2009 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 2/3/2010 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 5/5/2010 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 8/4/2010 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 10/13/2010 | 0.2500 | Special | 7,502,084 | 1,875,521.00 |
| 11/3/2010 | 0.2500 | Regular | 7,502,084 | 1,875,521.00 |
| 1/27/2011 | 0.0400 | Special | 9,377,605 | 375,104.20 |
| 2/2/2011 | 0.2000 | Regular | 9,377,605 | 1,875,521.00 |
| 5/12/2011 | 0.2000 | Regular | 9,377,605 | 1,875,521.00 |
| | | | | |
| | | | | $ 20,933,815.19 |

## E.     Defendants Misrepresented LPHI's Business to Investors

Defendants, of course, could not tell shareholders that LPHI's sales, above-market commissions and profits all derived from its practice of deceiving purchasers with bogus LE estimations. They thus provided innocent – and false – explanations for LPHI's apparent successes in SEC filings and other public disclosures. LPHI's increasing earnings coupled with

these explanations satisfied the market and kept LPHI's stock prices high. ¶¶ 89-208.

F.    **Defendants' Scheme Unravels**

By late 2010, market analysts, newspaper reporters, the Texas Department of Insurance and the SEC had begun to unravel this elaborate scheme. When research firm Citron Research first raised questions about LPHI's business model on February 11, 2009, LPHI's share price fell dramatically over the next week from $18.47 per share to close as low as $10.70 per share on February 18, 2009. Because this report was somewhat speculative and the extent of the falseness of Dr. Cassidy's LEs could not yet be demonstrated, LPHI's share price rebounded somewhat, and stayed in the $12.00 to $15.00 per share range until late 2010. ¶ 12.

By late 2010, many of Dr. Cassidy's LEs had been performed long enough ago that they reported that insureds "often" lived beyond double or triple the life span projected by LPHI. In a review of 1,197 LPHI policies, the article noted that only 6.8% of insureds passed away at or before LPHI's projected life expectancy. Over nine of ten of the insureds for Defendants' life settlements thus lived longer than the life expectancy LPHI provided Purchasers. The article quotes Pardo as admitting that LPHI's life-expectancy estimates "are probably wrong." ¶ 44.

Shortly thereafter, on January 20, 2011, LPHI admitted that the SEC was investigating LPHI and specifically the methods it used to calculate LEs for its clients. Seeing this as confirmation of the misconduct alleged in the *Wall Street Journal* article, investors sent LPHI shares down 15.4% in one day to close at $11.87 per share. ¶ 15.

Investors' prospects deteriorated further when LPHI announced it would be unable to file its annual report for the year ended February 28, 2011, because of certain undefined accounting issues. Days later, on June 9, 2011, its independent auditor Ernst & Young ("E&Y") resigned and took the highly unusual step of disassociating itself from the previously audited February 28, 2010 financial statements, maintaining that these statements "should no longer be relied upon."

Further, E&Y publicly stated that LPHI's revenue-recognition policies did not comply with GAAP or SEC regulations and that both annual and quarterly previously filed financial statements would need to be restated for "material" amounts. This controversy caused LPHI shares to plummet as low as $3.25 per share on June 10, 2011. ¶ 17.

The Class Period ends on June 17, 2011, when Eide Bailly (the Company's prior auditors), announced that its audit report covering the February 28, 2009 financial statements should likewise "no longer be relied upon." ¶ 18.

Following the end of the Class Period, further developments confirmed the massive fraud perpetrated by the Defendants. On November 22, 2011, LPHI filed its Form 10-K for the year ended February 28, 2011 with the SEC. This filing admitted that LPHI was forced to restate its previously issued financial statements. ¶¶ 231-32. The Form 10-K also admitted that the restatement resulted from a lack of internal controls at LPHI. ¶ 233.

On January 3, 2012, the Securities and Exchange Commission filed a civil lawsuit against these same Defendants, making similar factual allegations and also charging the Defendants with violations of Section 10(b) of the Exchange Act. On April 19, 2012, the Court denied the motions to dismiss of all of the defendants in that action. *SEC v. Life Partners Holdings, Inc.*, No. 1:12-cv-033-JRN, slip op. at 3 (W.D. Tex. Apr. 19, 2012).[6]

### III.    ARGUMENT

#### A.    Background on Federal Securities Laws

Section 10(b) of the Securities Exchange Act of 1934 forbids (i) the "use or employ[ment] … of any … deceptive device," (ii) "in connection with the purchase or sale of any security," and (iii) "in contravention of" SEC "rules and regulations." 15 U.S.C. § 78j(b). In cases such as this involving publicly traded securities, the action's basic elements are: (i) a

---

[6] See Appendix in support of Plaintiffs' Memorandum in Opposition to Motion to Dismiss ("App.") at App. 8.

material misrepresentation (or omission), (ii) scienter, *i.e.*, a wrongful state of mind, (iii) a connection with the purchase or sale of a security, (iv) reliance; (v) economic loss; and (vi) "loss causation," *i.e.*, a causal connection between the material misrepresentation and the loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

To plead a false statement, a complaint need "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001). The PSLRA also provides that a plaintiff must allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

**B.      Plaintiffs Sufficiently Plead Falsity Because the Complaint Identifies Misstatements, Who Made Them, and Specifically Alleges Why They Were False or Misleading**

Defendants made a series of affirmative statements to the market that were either flatly false, or were rendered materially misleading by the failure to disclose LPHI's unlawful activity. First, LPHI was forced to restate its previously issued financial statements to correct errors related to revenue recognition and the failure to recognize expenses related to the impairment of policies owned by the Company. ¶¶ 21, 231. Defendants do not contest Plaintiffs' allegations relating to this accounting misconduct, and thus are deemed to have admitted the "false statement" requirement to state a claim under Section 10(b). *See infra* at 12.

Even though the accounting allegations are sufficient in themselves, Plaintiffs also allege that LPHI disregarded its duty to inform investors that the Company's entire business model was based on the short-term (but unsustainable) strategy of defrauding its customers to make outsized returns. Instead, the Defendants continuously disclosed excellent reported financial results, attributing LPHI's success to "growth in the life settlements business," "conservative management" or even LPHI's "long term business plan" for the Company's growth, rather than

describing the unsustainable short-term excess profits available from defrauding its customers. In doing so, the violated their duty to disclose the full truth about LPHI. *See infra* at 13-22.

1. **Defendants admit that Plaintiffs' allegations regarding LPHI's false and misleading accounting demonstrate a material false statement.**

The Complaint alleges that LPHI's reported financial results in its 10-Ks were false and misleading for violating Generally Accepted Accounting Principles ("GAAP"). ¶¶ 12, 102-03, 122-23, 163-64, 189-91, 235-265. Defendants repeated this false financial information in numerous press releases and other public statements that accompanied the filing of LPHI's various periodic reports. ¶¶ 12, 90, 94, 96, 98, 100-01, 108, 110-11, 113-14, 116-17, 129, 131, 134-36, 142-43, 145-46, 156, 170, 173-75, 178-79, 181-83, 194, 196-97, 204, 206, 208.

The FAC contains detailed allegations regarding the specific accounting misconduct that led to LPHI's restatement of all of its previously reported financial results for the years 2007 through 2010, and the first three quarters of 2011. ¶ 242. These highly specific allegations detailed how the Defendants caused LPHI to improperly inflate its financial results by: (1) recognizing revenues before the closing of transactions (¶¶ 243-49); (2) recognizing revenues from transactions that occurred after the end of the period (¶¶ 250-55); and (3) understating the impairment of life insurance policies owned by LPHI (¶¶ 256-65). The FAC also specifically alleges that these overstatements of reported financial results for the years 2007 through 2010, and the first three quarters of 2011 were material. ¶ 293. Plaintiffs also detail Defendants Pardo, Peden and Martin's substantial role in making these misrepresentations (¶¶ 250-51, 253, 262-64, 267-74, 286-87) because "after all, books do not cook themselves." *Central Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d 546 (5th Cir. 2007) (quoting *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)). Defendants do not contest these allegations, thus admitting the "material misstatement" element of a 10(b) claim.

## 2. The Complaint identifies numerous statements that concealed LPHI's fraudulent LE underestimation practice.

LPHI is a single-product company that buys life settlements from policyholders and sells them at a higher price to investors, keeping the difference as a "commission." ¶ 2. Throughout the Class Period, the Defendants reported outstanding financial results and attributed them to "growth in the life settlement market," "conservative management" or even LPHI's "long term business plan" to obscure the truth – that LPHI was only able to generate these outsized commissions by deceiving its customers into paying an artificially high price, thus eventually dooming the Company when this scheme was revealed.

### a. Plaintiffs plead that LEs were systematically underestimated.

Defendants assert that Plaintiffs have failed to adequately allege how the LEs were materially false. Defs' Br. at 15.[7] To the contrary, Plaintiffs make highly detailed and specific allegations about the scheme to underestimate LEs, and using the false LEs to convince unsuspecting customers to pay an artificially high price and thus an oversized "commissions" to LPHI. *See supra* at 3-5. The FAC alleges numerous facts corroborating these allegations, including that the average LEs generated by LPHI during the Class Period were 3.8 years from 2000 through 2005 and 4.6 years from 2000 through 2010, *but were underestimated by at least 8 years*. ¶ 67. The FAC further specifically alleges that the percentage of policies that have exceeded LPHI's LEs has consistently been between 88% and 91% from 2006 through 2010. ¶ 69.[8] Further, LPHI's data as filed with the Texas Department of Insurance ("TDI") reveal that

---

[7] Defendants' contention that the false LEs cannot be actionable statements because the scheme was deployed by its wholly-owned subsidiary is meritless. Defs' Br. at 16. Likewise, whether LPHI's revenues relate to a product that may or may not be a security is not relevant. Defs' Br. at 16. The false statements identified in the FAC were all made "in connection with" the purchase or sale of LPHI stock. To state a claim, Plaintiffs need only allege that LPHI's statements in public filings and other public statements made by the Defendants regarding LPHI's business, revenues, net income or accounting practices was material to the "total mix of information" available about LPHI shares. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

[8] Defendants' objection to this allegation is baseless. Defs' Br. at 19. Rule 9(b) requires a plaintiff to allege the "who, what, when, where and how" of false representations, not of evidence alleged in support. Nothing in Rule

80% of matured policies that LPHI brokered had outlived their LEs. ¶ 72. Likewise, a WALL STREET JOURNAL article examining the TDI records reported that LPHI "often significantly" underestimated LEs, and that 9 out of 10 of the insureds outlived the LEs. ¶¶ 79-80. Attempting to contradict Plaintiffs' factual allegations, Defendants offer a confusing set of "evidence" and a chart prepared by an undisclosed source that purports to "summarize" certain data provided to TDI.[9] Defs' Br. at 18-19. The WALL STREET JOURNAL and the SEC have analyzed this TDI data and come to the same conclusions listed in Plaintiffs' allegations. Whether Defendants' analysis of this evidence is correct will be an issue for expert testimony and trial, *not* a question for judicial notice on this motion to dismiss, in which Plaintiffs' allegations must be accepted as true. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).[10]

      **b.**     **Defendants' public statements during the Class Period regarding the Company's results and successes were false and misleading because they concealed LPHI's use of bogus LEs.**

Throughout the Class Period, LPHI reported excellent quarterly and annual financial results in SEC filings and various press releases. *See, e.g.*, ¶¶ 94-98, 101-03, 108, 110-14, 116-17, 129-33, 136, 143, 145, 155, 160, 162, 167, 172, 174, 176-77, 181-83, 187, 191, 197, 203-07. Reported financial results are unquestionably statements of historical fact that are important to the "total mix" of information available to investors. These disclosures were materially false and misleading because they omitted to disclose that such results were not sustainable, and had only

---

9(b) requires a plaintiff to plead the evidentiary details sought by Defendants. *Bailey v. Linsco/Private Ledger Corp.*, 136 F.R.D. 11, 13-14 (D. Me. 1991) (Rule 9(b) does not require plaintiffs to plead evidentiary details sufficient to prove a claim of fraud). Regardless, this chart was properly attributed to the SEC complaint against these same Defendants, and was identified by the SEC as containing Defendants' own data from LPHI's internal policy tracking system. *See SEC Complaint*, App. 12, ¶¶ 41-44, 49-55.

[9] Plaintiffs sought to obtain this information in a records request to TDI, but was rebuffed because this information was "confidential" and thus not a public record. App. 69.

[10] When confronted with this same "evidence" in Defendants motion to dismiss their civil complaint, the SEC confirmed that the 80% figure was accurate when all LEs used by the Company were included (including Cassidy's predecessor), and that Cassidy's predecessor's results are necessary to a pertinent analysis. Defendants admit that they are making certain assumptions in characterizing their evidence. *See, e.g.*, "45.6% of the matured policies from 2003-2009 that *arguably* based on Dr. Cassidy's Les." Defs' Br. at 18 (emphasis added).

been achieved through the scheme to use underestimated LEs throughout the Class Period.

In addition, Defendants also made a series of affirmative misrepresentations in various press releases and conference calls during the Class Period purporting to explain LPHI's dramatic growth in revenues and earnings. For example, LPHI issued a press release announcing a "large earnings increase" for the second quarter of fiscal 2008. ¶ 113. In this press release, Defendant Pardo falsely attributed LPHI's excellent reported financial results to "incredible growth in the life settlement market" rather than the underestimated LE scheme and accounting manipulations that were the real cause. ¶ 113. Similarly, Defendant Peden falsely credited LPHI's "conservative management" for the "outstanding financial results" of a 40% increase in revenues for Q2 2009 on October 17, 2008. ¶ 137. Also on this conference call, Defendant Pardo falsely represented that investors in policies brokered by LPHI could look forward to "double-digit" returns, despite knowing that such returns were impossible under ideal circumstances, and particularly when investors overpaid due to the underestimated LE scheme. ¶ 138.[11] When questions began to be raised by media and other sources, the Defendants took to the offensive, making material false statements to deflect criticism and pump up the price of LPHI shares. Following the Citron Research report in February of 2009 questioning the sustainability of LPHI's business model, Defendant Pardo in a June 3, 2009 conference call falsely blamed "manipulative short selling" for the decline in LPHI's share price, rather than admitting to the problems set forth in the Citron report. ¶ 170.

---

[11] Other LPHI press releases and conference calls throughout the Class Period repeated these and similar representations. See, e.g., ¶ 147 ("double-digit returns" for investors); ¶ 156 ("we are proudly growing our business and continuing to deliver value to our shareholders and our clients"); ¶ 158 ("[t]his dividend is a demonstration of our continued success"); ¶ 161 ("double-digit" returns for investors); ¶ 167 ("growing our business"); and even ¶ 181 ("Life Partners has enjoyed continued growth in the life settlement industry because of our superior business model . . ."); ¶ 201 ("our real value is in our long term business plan . . . Life Partners has the infrastructure, the financial stability and the intellectual capital to maintain and grow its position as a leader of this industry"). Each paragraph alleges the date and speaker. See, for example, ¶ 113 (Pardo, September 26, 2007); ¶ 137 (Pardo and Peden, October 17, 2008); ¶ 147 (Pardo, January 13, 2009); and ¶ 181 (Pardo, December 17, 2009).

In each instance, the FAC describes the false statements made during this period, identifies who made the statement, and describes why it is false. Defendants' press releases and other public statements during this period were materially misleading because LPHI's scam was unsustainable. Fraud was at the heart of LPHI's returns. The other stories conjured by Defendants – "conservative management," or a "superior business plan," or the like – were false and designed to obscure the true nature of the Company.

Making inaccurate, incomplete or misleading disclosures regarding LPHI's financial results and the reasons attributed for the results, gave rise to an affirmative duty to disclose the full truth. "Once the defendants engaged in public discussions" concerning some matter, "they had a duty to disclose a 'mix of information' that is not misleading." *Lormand*, 565 F.3d at 248-49. The Fifth Circuit explained that "under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything." *Id*. at 249 (quoting *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994)). "Even absent a duty to speak, a party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects." *In re Ford Motor Co. Sec. Litig*., 381 F.3d 563, 569-70 (6th Cir. 2004).[12]

### c. The statements at issue are not forward looking.

The Defendants attempt to hide behind the "safe harbor" for "forward looking statements" is misguided. Defs' Br. at 24-25.[13] This protection only applies to statements that are identified as forward-looking, and that are accompanied by meaningful cautionary language.

---

[12] *See also City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 416 (D. Del. 2009); *In re Ambac Fin. Group, Inc*., 693 F. Supp. 2d 241, 277 (S.D.N.Y. 2010); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992).

[13] The Court should disregard Defendants' Ex. H, which is nothing more but an attempt to insert an additional unauthorized 13 pages of argument into its brief. Further, it is misleading in that it attempts to prove their point by highlighting insignificant terms, and then complaining that they are insignificant. For example, Plaintiffs do not complain that the Defendants misleadingly identify themselves as being "proud" or "delighted" (¶ 126) or "pleased" (¶ 146). However, the reported historical financial results are alleged to be false and misleading. ¶ 146.

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009). All, or most of the above-referenced misstatements are statements of historical fact such as earnings reports, and thus are not covered. *Id.* Regardless, the FAC adequately alleges "actual knowledge" that the LE scheme rendered the above referenced statements false. The Fifth Circuit does not extend the safe harbor to knowingly false forward-looking statements. *Lormand*, 565 F.3d at 244 ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable.").

> **d.    The Statements Are Not "Puffery."**

Neither are earnings reports or the other statements actually identified as misleading in the FAC properly considered "corporate puffery." Defs' Br. at 25-26. "Puffery refers to generalized positive statements about a company's competitive strengths or future prospects that are not actionable *because they are immaterial*." *Kaltman v. Key Energy Servs.*, 447 F. Supp. 2d 648, 659 (W.D. Tex. 2006). Defendants largely isolate words or phrases in a long paragraph (that are not the specific statements in that paragraph challenged by Plaintiffs), and complain they are mere "puffery." As described above, Plaintiffs complain of false and misleading earnings reports and Defendants attempts to mischaracterize them as being the result of something other than the LE underestimation scheme. For example, ¶ 175 specifically identifies that Plaintiffs allege the *reported financial results* were false, and do not complain that Pardo was not actually "thrilled" to be recognized by Fortune magazine. Defs' Appendix, Ex. H, p. 9 (highlighting statement not contended to be false and then complaining it is irrelevant "puffery.")

Defendants insist LPHI has a sustainable business model in part because it is not "currently" in bankruptcy. Defs' Br. at 14. LPHI may not have filed bankruptcy yet, but can hardly be described as a thriving company. Its share price has collapsed. ¶¶ 303-13. The SEC filed securities-fraud claims against Defendants LPHI, Pardo, Peden and Martin. ¶ 234. LPHI

was forced to restate its financial statements and admit that its system of accounting internal controls was ineffective. ¶¶ 233, 288-93. Its *two* most recent auditors took the highly unusual step of withdrawing previously issued audit opinions on LPHI's financial statements. ¶¶ 227-30. Whether or not LPHI has yet filed for bankruptcy, it is not a "sustainable" business.

Defendants' two authorities on this topic are distinguishable. Defs' Br. at 14. Neither involved a company that, like LPHI, was built on a fraudulent business practice. In *Hopson v. MetroPCS Communs., Inc.*, 2011 U.S. Dist. LEXIS 47177 (N.D. Tex. Mar. 25, 2011), the Court dismissed a complaint alleging that statements regarding a company's business prospects were misleading for failing to disclose the impact of the current economic recession. The court found that the statements were immaterial as a matter of law. *Id.* at *70 (a reasonable investor, aware of the recessionary economy, would likely give little, if any, weight to these statements). Likewise, in *In re Toyota Motor Corp. Secs. Litig.*, 2011 U.S. Dist. LEXIS 75732, at *8 (C.D. Cal. July 7, 2011), there was no duty to disclose Toyota's cost-saving efforts.

But here, far from alleging innocuous information about difficult economic conditions or cost-saving efforts, Plaintiffs allege that Defendants built LPHI on an illegal and deceptive practice that produced LPHI's earnings and growth, information that was material to investors in part because the scam – and LPHI's profits – were unsustainable.[14]

Lastly, the "puzzled" Defendants maintain that a disclosure that should have been a red flag to alert the Defendants of the LE underestimation also alerts all investors to the scope and nature of the Defendants' schemes. Defs' Br. at 19-20. This lone and somewhat confusing disclosure could not "effectively counter-balance any misleading impression created by" LPHI's one-sided representations. *In re Biogen Sec. Litig.*, 179 F.R.D. 25, 38 (D. Mass. 1997).

---

[14] While Defendants have not yet admitted their fraudulent practice, LPHI's earnings plummeted concurrently with the public exposés. *See, e.g.*, ¶ 215.

### e. LPHI's Form 10K filed annually with the SEC similarly misrepresented LPHI's business.

LPHI filed three reports on SEC Form 10K with the SEC during the Class Period. Each repeated the same or similar set of misrepresentations and misleading statements.

### (1) LPHI's risk disclosures about LE estimations were false and misleading for failing to disclose that the estimations were actually inaccurate and unreliable.

Each 10K contained a "risk disclosure" that warned investors that LPHI's LE estimations were essential to its life-settlement sales but *might* prove to be inaccurate. Defendants highlighted in LPHI's 10K filed at the May 2007 beginning of the Class Period the fundamental importance of accurate, solid LE predictions to LPHI's business:

> **Our Purchasers Depend on Our Ability to Predict Life Expectancies and Set Appropriate Price ….**
>
> **…**
> If we underestimate the average life expectancies and price our transactions too high, our purchasers will not realize the returns they seek, demand may fall, and purchasers may invest their funds elsewhere…. Our ability to accurately predict life expectancies and price accordingly is affected by a number of factors, including:
>
> - the accuracy of our life expectancy estimations …;
>
> …
> To foster the integrity of our pricing systems, we use both in-house and outside experts, including medical doctors and published actuarial data. We cannot assure you that, despite our experience in settlement pricing, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums. If we do so, we could lose purchasers or policy sellers, and those losses could have a material adverse effect on our business, financial condition, and results of operations. ¶ 105.[15]

This statement created a duty to disclose that LPHI's estimates were *in fact* inaccurate and unreliable and that LPHI *had already* built its business on underestimated LEs in order to make LPHI's life-settlement policies attractive to purchasers – even when including LPHI's imbedded above-market 14% commissions. *See supra* at 3-5. Defendants thus misleadingly

---

[15] LPHI's subsequent 10-Ks filed with the SEC also repeated this risk statement. ¶¶ 124, 166, 193.

characterized the inaccuracy of LE estimations as a mere *risk* when it was actually *already a fact*. Once the Defendants engaged in public discussions about the importance to LPHI's business of accurate LE estimates, they had a duty to disclose that its LE estimates were systematically underestimated. *Lormand*, 565 F.3d at 248-49 (quoting *Rubinstein*, 20 F.3d at 170). Furthermore, Defendants' downplaying of unreliable and inaccurate LE estimates as merely a *risk* is itself misleading when the systematic underestimation of LEs was *already* taking place. As the Fifth Circuit succinctly stated:

> To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.

*Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd in part, rev'd in part*, 459 U.S. 375 (1983). *See also Lormand*, 565 F.3d at 249 (holding that company officials engaged in fraud by omitting known risks to their business plan, although they recognized signs that the dangers they privately predicted had already materialized).

The Complaint identifies who made the misrepresentations and when they were made, as the PSLRA requires. Defendants Pardo and Peden signed the 10K on May 29, 2007.[16] The Complaint thus identifies the particulars of this misrepresentation sufficiently under the PSLRA.

Defendants were also required, under Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), to disclose the known trend of chronic LE underestimation because such trend was both: (1) known to management; and (2) reasonably likely to have material effects on the Company's financial condition. *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 716 (2d Cir.), *cert. denied*, ___ U.S. ___ 132 S. Ct. 242 (2011); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y 2010).

---

[16] Defendant Martin also signed the subsequent 10-Ks. ¶¶ 121, 162, 189.

### 3.      Pardo and Martin's SOX certifications were also false.

Certifications required by the Sarbanes-Oxley Act of 2002 ("SOX") that are false can

constitute an actionable misrepresentation under federal securities laws.  *E.g.*, *City of Roseville*,

686 F. Supp. 2d at 418.  Under § 302(a) of SOX, a company's "principal executive officer or

officers and the principal financial officer or officers" must certify the accuracy and reliability of

its financial reports.  The Complaint identifies the following SOX certifications as actionable

misrepresentations:  (i) one stating that, to the knowledge of the certifying officers, the financial

information included in the report is "fairly present[ed]"; (ii) one stating that, to the knowledge

of the certifying officers, the report does not contain misleading statements or omissions,

(iii) those declaring the adequacy of the Company's "internal control over financial reporting";

and (iv) those declaring the adequacy of the Company's "disclosure controls and procedures." [17]

Defendants asserted these and similar certifications in LPHI's quarterly reports throughout the

Class Period.  ¶¶ 111, 114, 117, 121, 131, 136, 145, 162, 174, 179, 183, 189, 197, 204, 206.

The SOX certifications were false for several reasons:  First, the Complaint alleges that

LPHI's financial reports violated GAAP and hence are false and misleading.  ¶¶ 235-265.  The

falsity was later confirmed when the Company restated its financial statements.  ¶¶ 21, 288-293.

The certification that the financial statements "fairly presented" LPHI's financial information is

thus also necessarily false.  Second, the SOX certifications were also materially false because

LPHI failed to disclose it was using bogus LE estimates to deceive LPHI's policy purchasers,

thus failing to fairly present a complete picture of LPHI's financial condition.[18]   Thirdly, the

---

[17] *See, e.g.*, ¶ 93 (2006 10-K, signed by Pardo); ¶ 106 (2007 10-K, signed by Pardo), ¶ 121 (2008 10-K, signed by Pardo and Martin), ¶ 162 (2009 10-K, signed by Pardo and Martin); 189 (2010 10-K, signed by Pardo and Martin).

[18] The SEC interprets "fair presentation" of financials to include "any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition."  Certification of Disclosure in Companies' Quarterly and Annual Reports, Securities Act Release No. 8124, Exchange Act Release No. 46,427, Investment Company Act Release No. 25,722, 78 SEC Docket 875, 2002 SEC LEXIS 2240 (Aug. 28, 2002).  *City of Roseville* rebuts Defendants' assertion that LPHI's fraudulent business practice did not make its

certifications regarding LPHI's systems of internal control were false. This was confirmed in E&Y's resignation letter (¶ 227) and LPHI's 2011 Form 10-K, when the company admitted "we do not maintain an effective control environment" and that "this control deficiency" resulted in the accounting problems that led to the restatement of LPHI's financial statements. ¶ 233.

## C. Plaintiffs Sufficiently Plead a Strong Inference that Defendants Acted with Scienter because (i) the Nature of the Accounting Misconduct Provides Strong Circumstantial Evidence; (ii) LPHI's Fraudulent Business Practice was too Important to Escape Senior Management's Attention; and (iii) Pardo Directly Profited from the Practice

As § 10(b) requires, Plaintiffs also allege that Defendants made these false and mislead-ing statements with scienter. Scienter is "the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("*Tellabs I*"). Scienter encompasses at least "severe recklessness," meaning recklessness involving "highly unreasonable omissions or misrepresentations" or "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson*, 267 F.3d at 408. Defendants dispute whether Plaintiffs have alleged scienter with sufficient particu-larity as required by § 21D(b)(2) of the PSLRA, 15 U.S.C. § 78u-4(b)(2).

### 1. Standard for pleading a strong inference of scienter.

The PSLRA requires a plaintiff alleging that a defendant made a false or misleading statement to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Supreme Court has detailed a three-step process for reviewing allegations of scienter on a motion to dismiss under the PSLRA. *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537

---

financial earnings statements false or misleading. Defs' Br. at 13-14. SOX is not directed solely at ensuring numerical accuracy and preventing dishonest accounting practices. Any interpretation restricting its scope to these purposes would be artificially narrow and inconsistent with the statute's remedial purpose. *City of Roseville*, 686 F. Supp. 2d at 419.

F.3d 527, 533 (5th Cir. 2008) ("*Shaw*") (citing *Tellabs I*, 551 U.S. at 322-23).

First, the facts alleged in the complaint are to be taken as true. *Id.* Second, those facts must be considered holistically, rather than in isolation, to determine whether scienter has been properly pled, as the proper inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs I*, 551 U.S. at 322-23. *See also id.* at 326 ("assess all the allegations holistically," not in isolation). This holistic approach incorporates all direct and circumstantial evidence of scienter, including whether a defendant had a motive and opportunity to commit securities fraud. The Fifth Circuit considers all the facts and circumstances alleged to determine whether they, *in toto*, raise a requisite strong inference of scienter. *Goldstein v. MCI Worldcom*, 340 F.3d 238, 246 (5th Cir. 2003); *Nathenson*, 267 F.3d at 410. Finally, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. *Indiana Elec.*, 537 F.3d at 533 (citing *Tellabs I*, 551 U.S. at 317). "[T]o qualify as 'strong'… an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs I*, 551 U.S. at 314. The inference of scienter need not be irrefutable, but it must be strong in light of other explanations. *Id.* It need merely be "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

### 2. Plaintiffs plead a cogent and compelling inference of scienter.

Accepted as true and viewed collectively, Plaintiffs' allegations would lead a reasonable person to conclude that it is at least as likely as not that Defendants knew or recklessly disregarded that LPHI's statements discussed above were false and misleading. Plaintiffs plead with particularized facts a cogent and compelling story that Defendants made LPHI into a lucrative business built on a fraudulent practice that made its investment products appear

profitable to purchasers while concealing LPHI's above-market commissions and that Pardo then diverted more than $30 million to himself.

### a. Plaintiffs' allege strong circumstantial evidence of scienter.

Defendants announce the unremarkable principle that GAAP violations, standing alone, fail to establish scienter. Defs' Br. at 28.[19] However, violations of GAAP may give rise to an inference of fraudulent intent when they are particularly egregious or are coupled with other specific and properly pled allegations of fraud. *In re ArthroCare*, 726 F. Supp. 2d 696, 734 (W.D. Tex. 2010). The FAC pleads a long list of factors that, when viewed collectively, draw at least as compelling an inference of scienter as any other inference one could draw from these factual allegations. *Tellabs I*, 551 U.S. at 324.

### (1) LPHI was a single-product company based entirely on a fraudulent business model

A key circumstance to the strong inference of scienter in this case is the "gravity" of the risk of falsity, namely, whether "the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) ("*Tellabs II*") held that *knowledge is inferable from gravity* ('the danger was either known to the defendant or so obvious that the defendant must have been aware of it'). The Fifth Circuit has long embraced this approach. Ten years ago the court in *Nathenson* found strong evidence of a CEO's scienter where the company was essentially a one-product business. The CEO had represented that a company patent protected the product when in fact it did not. Plaintiff sufficiently pleaded the CEO's scienter where the company devoted nearly all of its

---

[19] Defendants are mistaken in their assertion that GAAP is an "elaborate hierarchy" rather than a canonical set of rules and rely on outdated cases to make this incorrect pronouncement. Defs' Br. at 28. To remedy this previous problem, the Financial Accounting Standards Board completed and released its project to codify all GAAP standards in 2009, at which time the "elaborate hierarchy" of former GAAP pronouncements were all withdrawn. GAAP now consists entirely of the Accounting Standards Codification (¶ 238) which probably is best described as a canonical set of rules. Accordingly, the reasoning for Defendants "well-established principle" is faulty.

efforts to that product, its prospects substantially depended on that product and the company was small.  267 F.3d at 425-26.  The court found that patent protection for that product was "obviously important" and the company had ample opportunity to discover whether or not the company's patent covered it.  *Id*. at 425.  Similarly, *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342 (5th Cir. 2008) affirmed scienter allegations under PSLRA standards[20] against senior company officers based on allegations of circumstances showing that misrepresented information was sufficiently important to the company that the officers "knew or were severely reckless in not knowing" that their statements were false.  540 F.3d at 342-43.  *See also Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 271 (3d Cir. 2009) ("[t]he perceived importance of margins supports an inference that McGuire, Avaya's Chief Financial Officer, was paying close attention to these numbers") (citing *Dorsey*); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-89 (9th Cir. 2008) (management defendants responsible for company's day-to-day operations "must have known" about "stop-work orders that allegedly halted tens of millions of dollars of the company's work"); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) ("America West") (scienter sufficiently alleged where the "facts [are] prominent enough that it would be 'absurd to suggest' that top management was unaware of them").[21]

In the present case, it was patently obvious to Pardo and LPHI's other senior officers that LPHI sold life-settlement policies based on bogus LE estimates and used them to conceal its

---

[20] Although the federal-securities claims had been dismissed for failure to allege purchase of a security, 540 F.3d at 340, the court applied the PSLRA standard for pleading scienter to the common-law fraud claim, *id*. at 342.

[21] *See also In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 211 (1st Cir. 2005); *Cosmas v. Hassett*, 886 F.2d 8, 10, 12-13 (2d Cir. 1989) (strong inference of scienter where import restrictions would have "eliminated a potentially significant source of income for the company"); *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005) ("[w]hen information is at the core of a company's business, it may be properly ascribable to senior officers"); *In re Xerox Corp. Secs. Litig.*, 165 F. Supp. 2d 208, 223 (D. Conn. 2001) (scienter adequately alleged because, *inter alia*, "[t]he problems Xerox was having, the plaintiffs allege, affected the company's 'core operations' and jeopardized the success of the company's most significant initiative at that time").

above-market commissions. First, the Individual Defendants were LPHI's most senior executive officers. As such, they were privy to confidential and proprietary information concerning LPHI, its operations, finances, financial condition and present and future business prospects. ¶¶ 31, 294. Such information was available to them by means of internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. *Id.*

Second, LPHI's fraudulent business practice was central to its operations and crucial to its profits. Like the defendant company in *Nathenson*, 267 F.3d at 425, LPHI was a one-product company. LPHI's principal business is selling life-settlement policies. ¶¶ 2, 42-46, 295. LPHI made its money strictly from commissions on policy sales, so its income depended on sales volume, not the level of returns of its policies. ¶ 3. Defendants thus had a strong incentive to make the life-settlement policies appear more attractive to potential investors to encourage them to purchase policies and allow LPHI to earn a commission. *Id.*; ¶ 295.

Perhaps most telling of scienter, accurate LE estimations are the single most important factor in the life-settlement business, with the Eleventh Circuit specifically finding that "it is of paramount importance that an accurate determination be made of the insured's expected date of death." *SEC v. Mutual Benefits Corp.*, 408 F.3d 737, 738 (11th Cir. 2005). "If the insured lives longer than expected, the purchaser of the policy will realize a reduced return, or may lose money on the investment." *Id.* Indeed, LPHI itself relies on accurate LE estimations in deciding whether to purchase a given policy from a broker. ¶ 56. But LPHI does *not* give these accurate estimations to purchasers to help them determine a policy's likely payout and whether to invest. *Id.* LPHI instead gives them the bogus – and always shorter – LE estimations. ¶ 56. As LPHI

founder, CEO and controlling shareholder, Pardo knew this, as did the two other Defendant senior executives.

Also as in *Nathenson*, defendant and CEO Pardo was quoted in *Wall Street Journal* as conceding that Cassidy's estimations were "probably wrong." *Compare* ¶¶ 80, *with* 267 F.3d at 425 (CEO concedes that "no patent specifically covers Vasomax").

The allegations of the FAC mirror the *Nathenson allegations* that the Fifth Circuit found to sufficiently allege scienter. The truth about the bogus LE estimations were too central to LPHI's operations and profits for Pardo and the other Defendants to overlook. They thus knew or recklessly disregarded that their misrepresentations were false. As in *Nathenson*, these allegations alone sufficiently allege scienter for all Defendants.[22]

**(2)    The accounting violations are indicative of scienter.**

Even though GAAP violations are not, in and of themselves, sufficient to establish scienter, "when the number, size, timing, nature, frequency, and context of the misapplication [of accounting principles] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor or scienter." *In re ArthroCare*, 726 F. Supp. 2d 696, 721 (W.D. Tex. 2010). The balance of these factors compel a strong inference of scienter, as described immediately below:

The size and nature of the accounting errors. "[S]ignificant overstatements of revenue tend to support the conclusion that the defendants acted with scienter." *In re ArthroCare*, 726 F. Supp. 2d at 721 (quoting *In re Seitel, Inc. Secs. Lit.*, 447 F. Supp. 2d 693, 705 (S.D. Tex. 2006)). In this case, the restatements were undeniably significant, as much as 29% for fiscal year 2008, and 78% for the third quarter of fiscal 2011. ¶ 293. It is significant that much of this restatement

---

[22] Because scienter is adequately alleged for the Individual Defendants, it is imputed to defendant LPHI. *See Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

relates to the failure to properly value LPHI's own investments in insurance policies. As described above, the accurate valuation of life settlements was the "core business" of the Company, and the Individual Defendants were complicit in and aware of the fraudulent basis for preparing the LEs as described therein. *Supra* at 3-5 and 13-14. The other accounting issues requiring the restatement were improper revenue recognition. ¶¶ 243-55. "Many courts have held significant overstatements of revenue or income tend to support the conclusion that defendants acted with scienter." *ArthroCare*, 726 F. Supp. 2d at 721.

The simplicity of the accounting rules that were violated. "When significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves." *Central Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d at 552 (quoting *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)). The simplicity or obviousness of the GAAP violation increases the probability of scienter. *In re Daou Sys.*, 411 F.3d 1006, 1020 (9th Cir. 2005); *In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) ("violations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious"). The relevant GAAP provisions are remarkably simple. ASC 360-10 required LPHI to recognize an impairment loss on policies owned by LPHI that had a fair value less than their carrying cost. ¶ 258. LPHI failed to recognize appropriate impairment charges on these assets.[23] Defendants Pardo, Peden and Martin each signed LPHI's 2009 Form 10-K, which disclosed a "material weakness" in LPHI's accounting controls, specifically that "we did not have procedures in place for testing our purchased policies for possible impairment." 2009 Form

---

[23] The majority of the policies owned by LPHI were acquired pursuant to the terms of the settlement with the Colorado Securities Commissioner that required LPHI to buy back $12.8 million in policies from Colorado residents. ¶ 256. It would make so sense for the Colorado Securities Commissioner to agree to such a settlement unless the policies were materially impaired.

10-K, p. 25.[24]  Accordingly, these individuals either knew, or were reckless in not knowing, that LPHI did not properly account for impaired policies.  Not surprisingly, LPHI later restated its 2009 and 2010 financial statements to include an additional $2 million in impairment expenses in 2009 and an additional $1.8 million in 2010.  *See* LPHI 2011 Form 10-K, p. 65.[25]

Likewise, ASC-605-10-25-1 simply provides that revenue may not be recognized until it is "earned," *i.e.*, until the final closing of escrowed funds.[26]  ¶¶ 245-46.  The fact that LPHI violated these clear and simple accounting principles thus raises an inference of scienter. *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996).

The Individual Defendants directed, established and implemented the fraudulent accounting policies.  Defendants argue that Plaintiffs have failed to allege that any Defendant had actual knowledge that revenue was being recognized prematurely.  Defs' Br. at 27-28.  But in doing so, they ignore the detailed allegations of the FAC describing how Pardo, Peden and Martin each played a key role in developing and implementing the fraudulent accounting manipulations.[27]  In 2004, shortly after the Company began to recognize revenues in violation of GAAP and its stated revenue recognition policies, Pardo and Peden misled LPHI's auditor by seeking "guidance" as to the treatment of revenue recognition based on a misleading hypothetical example, specifically by failing to include rescission rights (which they knew to

---

[24] Available at http://www.sec.gov/Archives/edgar/data/49534/000114420409030009/v149169_10k.htm.  A true and correct copy of the relevant pages is attached at App. 70.

[25] Available at http://www.sec.gov/Archives/edgar/data/49534/000114420411066513/v241450_10k.htm.  A true and correct copy of the relevant pages is attached at App. 73.

[26] Prior to the "Closing Date," the seller agreements are non-binding and unenforceable against the owner of the policy.  ¶ 52.  Thus, the "closing date" is when the money can be rightfully considered "earned."  It is for that reason that LPHI's stated revenue recognition policy also requires that revenues not be recognized until closing (although its actual practice was different, as described below).

[27] As alleged in the FAC, "Pardo, Peden, and Martin participated in and/or monitored the process by which the Company processed and recorded revenue from life settlement transactions.  Martin, as CFO and head of the Accounting Department, was responsible for reviewing and approving the quarter-end accrual journal entry reflecting revenues. . .."  ¶ 55.

exist) in their hypothetical.  ¶¶ 270-71.  The guidance issued by the auditor, which these

Defendants knew to be based upon false facts, was used to provide "cover" for LPHI's improper

revenue recognition.  Likewise, Pardo and Peden developed (and Martin implemented) the

scheme to book additional revenues by failing to close the quarter on a timely basis.  ¶¶ 250-255.

In April 2010, Pardo and Peden sent Martin an accounting policy memorandum (the "cutoff

memo") confirming LPHI's official policy of keeping the books open for fifteen days after the

end of a period.  ¶ 251.  Martin implemented this illicit policy, which was contrary to GAAP.

¶¶ 250, 254.  Even "non-accountants" could not reasonably think that it is acceptable to

recognize revenues in December that you do not earn until the first fifteen days of January.

Defs' Br. at 27.  Allegations such as these that "top executives actually directed the improper

revenue recognition in violation of both GAAP and their own accounting practices" supports a

strong inference of scienter.  *In re Daou Sys.*, 411 F.3d at 1023.

 <u>LPHI's actual accounting policies differed from its stated policies</u>.  LPHI disclosed its

unambiguous revenue recognition policy in each of its Form 10-K's during the Class Period,

specifically that revenue would not be recognized until a settlement had closed:

> Revenue Recognition – We recognize income at the time a
> settlement has been closed and the purchaser has obligated itself to
> make the purchase.[28]

 This policy was actually followed by LPHI through 2003.  ¶ 244.  But in 2004, LPHI

made an undisclosed change to instead recognize revenues *prior to closing*, based on other

undisclosed milestones.  *Id*.  Additionally, Peden and Pardo are alleged to have been directly

involved in misleading LPHI's auditor to hide this illicit revenue recognition scheme from it.

¶¶ 270-72.  A second, but related revenue recognition scheme was to hold a quarter open for an

---

 [28] *See* ¶ 90 (2006 Form 10-K); ¶ 102 (2007); ¶ 122 (2007); ¶ 163 (2009); ¶ 190 (2010).

additional 15 days after the end of the period to allow additional revenues to be pushed back into that quarter. ¶¶ 250-55. As described above, this scheme was devised by Pardo and Peden, memorialized in an April 20, 2010 "Cutoff Memo" and implemented by Defendant Martin. ¶¶ 250-51. Both schemes violated the stated revenue recognition policies by recognizing revenues prior to the "closing" of the transaction, and therefore support a strong inference of scienter. *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) (failure to write-down inventory in violation of stated policy supported inference of scienter); *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000) (failure to follow disclosed accounting policies supported inference of scienter).[29]

The restatement . A restatement of financial statements, while not dispositive by itself, can be also considered as evidence of scienter. *Kaltman v. Key Energy Servs.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006) (the "need to file a restatement, although not dispositive, adds weight to the scienter calculus due to the magnitude of the Restatement"); *New York City Emples. Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 1000 (N.D. Cal. 2009).

The long time period of accounting violations. Accounting violations occurring over a long period of time are indicative of scienter. *In re ArthroCare*, 726 F. Supp. 2d at 722 (the fact that the accounting manipulation occurred over a "substantial period of time" [four years] "significantly contribute" to a finding of scienter). Here, the complaint specifically alleges a pattern of accounting manipulations spanning a five year period.

### (3) Pardo's Intimidation of E&Y, and the auditor's subsequent "Noisy" withdrawal is evidence of scienter.

After being threatened by Defendant Pardo that he would "take action" if E&Y did not promptly finish their audit of the Company and sign off on the financial statements without adjustment, E&Y not only resigned, but took the highly unusual step of withdrawing its

---

[29] The company-wide practice of backdating documents to conceal premature revenue recognition from auditors further supports this inference. ¶¶ 276-87.

previously issued audit opinion for the fiscal 2010 financial statements of the Company. ¶ 19, 226. E&Y also stated that LPHI's revenue recognition policies were improper. Shortly thereafter, Eide Bailly (the Company's auditor prior to E&Y) followed suit and withdrew its opinion on the 2009 financial statements. ¶ 20. Such an extreme measure by *two* independent auditors is compelling evidence of misconduct occurring at the Company.

### (4) Allegations that Defendants attempted to "cover-up" the indicate scienter.

Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter. *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301 (D. Utah 2007); *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708 (D.N.J. 2005). Defendant Peden is alleged to have tried to "cover-up" the Underestimated LE by misrepresenting, on at least two occasions, that Cassidy's LEs were based on a mortality table that is widely used in the life settlement industry, when, in fact, Peden knew that Cassidy did not use the table. Cassidy actually used a census table, and his use of the census table deviated from standard practices in the life settlement industry. ¶¶ 77-78. Peden lied about Cassidy's methodology because he knew it was unsound, and that it resulted in chronic LE underestimation.

### (5) Falsification of audit evidence demonstrates scienter.

Evidence of falsification of audit evidence is additional evidence of scienter. The FAC alleges that Defendants Peden and Martin provided a spreadsheet to the Company's auditors that they represented described 300 of the "most recent" maturities of life settlements in an effort to convince the auditor that the LEs were reasonable, while they deliberately excluded 1,230 policies from this analysis for which the insureds had already outlived their LEs as calculated by Dr. Cassidy. ¶ 299. The only reason to provide false and misleading analysis to the Company's auditor is to try and make the auditor believe false information.

**(6)**       **Defendants continued the Company's practice of systematically using underestimated LEs despite the presence of numerous "red flags" calling the practice into question.**

Time and time again, the Defendants were confronted with concerns about the Company's use of underestimated LEs. The glaring presence of numerous "red flags" throughout the Class Period suggesting that LPHI's LEs were systematically understated show that the Defendants not only knew about the illicit scheme, but that they were complicit in furthering it. Deliberately ignoring such red flags, when considered "[a]n egregious refusal to see the obvious, or to investigate the doubtful" can strengthen an inference of scienter. *In re ArthroCare*, 726 F. Supp. 2d at 732. During the Class Period, the Defendants ignored the following "red flags" demonstrating that LPHI's LEs were materially, systematically understated:

- The audit committee's February 2003 report to LPHI's board of directors (of which Defendants Pardo and Peden were both members) recommended an "independent review" of LE calculations. ¶ 70.

- In 2006, a due diligence consultant hired by a potential customer of LPHI recommended to Pardo and Peden that they "track, analyze and validate" Cassidy's LEs. ¶ 74.[30]

- Beginning in 2003, LPHI began including data in its annual filings with the Texas Department of Insurance revealing that approximately 80% of matured policies that LPHI had brokered had outlived the Company's LEs. ¶ 72. These reports were prepared by the legal department, which Peden oversaw. *Id.*; Defs' Appendix, Ex. C.

- A chart of data available from LPHI's own internal policy tracking system showed that between 88% and 91% of policyholders outlived their LEs calculated by the Company from 2006 through 2010. ¶¶ 69, 75.

- The 2007 enforcement action filed against LPHI, Pardo and Peden by the Colorado Securities Commission was based in part on the "high frequency rate" at which insureds were outliving their LEs. ¶ 76. Defs' Appendix, Ex. E, p. 13.

- A Citron Research report published on February 11, 2009, identifying numerous

---

[30] Defendants also object to this allegation on the misguided grounds that it does not satisfy Rule 9(b). Defs' Br. at 20. But this allegation identifies who made the recommendation (a consultant the Defendants permitted to conduct due diligence), who received it (Pardo and Peden) and when they received it (February 2006). ¶ 74. That is a sufficient level of detail. *Bailey v. Linsco/Private Ledger Corp.*, 136 F.R.D. at 13-14.

"red flags" including LPHI's higher commissions than its competitors, and Pardo's checkered history with the SEC. ¶ 150.

- Pardo's admission in a December 2010 Wall Street Journal article that Dr. Cassidy "often significantly" underestimated LEs. ¶ 79.

- A Wall Street Journal article dated December 10, 2010, that detailed problems with LPHI's LEs and business model. ¶ 209.

### (7) LPHI's weak internal controls and SOX certifications are probative of scienter.

Weak internal controls provide even more evidence of scienter. To infer scienter from Sarbanes-Oxley certifications there must be "facts establishing that the officer who signed the certification had a 'reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions.'" *Indiana Elec. Worker' Pension Trust Fund Ibew v. Shaw Group, Inc.*, 537 F.3d at 545; *In re ArthroCare*, 726 F. Supp. 2d at 724. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006).[31]

As described above, Plaintiffs allege that (1) LPHI had weak internal controls and (2) that Defendants Pardo and Martin were aware of the problems. *See, supra* at 21-22. These allegations were confirmed in E&Y's resignation letter (¶ 227) and admitted by LPHI's 2011 Form 10-K, when the company admitted "we do not maintain an effective control environment" and that "this control deficiency" resulted in the misstatement of revenue and other problems and led to the restatement of LPHI's financial statements. ¶ 233.

### (8) The small size of LPHI strengthens scienter allegations.

LPHI is a small company with few employees, which adds to the inference that executives were personally involved in important issues such as LE underestimation and revenue recognition. During the Class Period, LPHI only had from 37 to 62 "direct employees." ¶ 50.

---

[31] *See also Varghese China Shenghuo Pharm. Holdings*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) (*citing In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) ("[A] failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter….")).

Defendants Pardo and Peden adopted LPHI's fraudulent revenue recognition policies. ¶¶ 272-73. Particularly in such a small company without a huge accounting staff, Martin, as the CFO and Principal Financial and Accounting Officer, was responsible for implementing accounting policies, including LPHI's revenue-recognition policy. Likewise, as a small company CEO, Pardo was necessarily aware of LPHI's accounting policies and system of accounting internal control. *Cf.*, *Nathenson*, 267 F.3d at 425 (32-35 employees).

### (9) LPHI's Quick Settlement of Ancillary Litigation is Indicative of Scienter.

Defendants LPHI, Pardo and Peden were sued by the Securities Commissioner for the State of Colorado because, *inter alia*, these defendants committed securities fraud by failing to disclose "the high frequency rate in which viators outlived the life expectancies predicted by Defendant LP." ¶ 76; Defs' Appendix, Ex. E, p. 13, 15-16. The Defendants quickly settled this action for $12.8 million. ¶ 76. The existence of an ancillary lawsuit charging fraud by a company, and the company's quick settlement of that suit is an indicia of scienter. *In re ArthroCare Corp.*, 726 F. Supp. 2d at 721; *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001). *See also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999).[32]

### b. The complaint pleads motive and opportunity because Pardo pocketed more than $31 million from the scheme.

Appropriate allegations of motive and opportunity may "meaningfully enhance" the inference of scienter. *Nathenson*, 267 F.3d at 412 (quoted in *Goldstein*, 340 F.3d at 246). The *Nathenson* complaint did not sufficiently allege any motive to commit securities fraud, 267 F.3d at 420-21, and thus defendants' motive did not contribute to the cumulative weight of the scienter inference. But here, defendants Pardo and LPHI's motive and opportunity to deceive

---

[32] Defendants' confusion as to whether Colorado was complaining of Dr. Cassidy's LEs is belied by their own evidence. The Colorado complaint, as submitted by the Defendants, specifically alleges misconduct only from 2004 through 2007. Defs' Ex. E, p. 5. Dr. Cassidy is alleged to have prepared LPHI's LEs during this period. ¶¶ 57-80.

investors are evident.  A motive to defraud based on compensation incentives such as dividends and bonuses can strengthen an inference of scienter.  *See Shaw*, 537 F.3d at 544; *America West*, 320 F.3d at 944; *In re New Century*, 588 F. Supp. 2d 1206, 1232 (C.D. Cal. 2008).  The Fifth Circuit recognized in *Shaw* that "[i]ncentive compensation packages … in conjunction with other scienter allegations" could be probative of scienter in extraordinary circumstances.  *Shaw* approvingly cited *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249 (5th Cir. 2005), in which the defendants' bonuses augmented the inference of scienter.  *Shaw*, 537 F.3d at 544.  Consistent with the Fifth Circuit's approach, the Ninth Circuit decided in *America West* that allegations that company officers made material misrepresentations that inflated the company financial results, resulting in increased bonus awards to those officers, helped provide "specific, particularized allegations" of motive.  320 F.3d at 944.  Likewise, in *New Century*, allegations that defendants benefited from fraudulently inflated company earnings by receiving dividends of $50 million, plus inflated bonuses, lent weight to the inference of scienter.  588 F. Supp. 2d at 1232.  Further bolstering the strong inference of scienter in *America West* was that two defendant controlling investors that benefitted from the misrepresentations *controlled the company's compensation committee* that had authority to review all aspects of officer compensation.  320 F.3d at 944.  *See also In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 898 (W.D. Tex. 2008).

Here, as in *Goldstein*, *America West* and *New Century*, Pardo directly benefitted from LPHI's fraudulent practices, far more than any LPHI shareholder, and directly controlled the dividend policies of the Company by virtue of his 50.3% majority ownership.  Pardo did not want to incur the scrutiny of large insider sales of stock, nor did he want his ownership interest to drop below the magic 50% threshold for control of the Company.  Instead, Defendant Pardo decided to loot the company by:  (1) engaging in insider sales of approximately $11.2 million

dollars (the most he could sell without dropping his ownership below the magic 50% threshold); and (2) causing LPHI to pay abnormally large and unsustainable dividends – more than half of which would go to his Gibraltar trust and be unavailable for recovery by any potential creditors or judgment creditors. By keeping his slim majority stake rather than selling shares of stock, he kept control of the Company and could unilaterally set its dividend policies. ¶ 84.

### (1) The insider selling prong of the scheme.

The FAC alleges that Defendant Pardo sold 457,102 shares of LPHI stock at prices between $10.00 per share and $43.50 per share during the Class Period for total proceeds of approximately $11.2 million. ¶ 86. As of the close of trading on April 20, 2012, LPHI stock traded at $2.36 per share, making 457,102 shares worth $1,078,761.[33] Accordingly, <u>Pardo netted at least $10 million additional dollars for his offshore trust by selling his shares during the Class Period, while in possession of material adverse undisclosed information about the Company</u>.

The sale of 457,102 shares for approximately $11.2 million during the Class Period was in marked contrast to Pardo's selling either before or after the Class Period. As shown on the SEC's EDGAR system, Pardo Family Holdings, LTD has not sold any shares following the Class Period.[34] The offshore trust sold 75,000 shares on February 26, 2001, 93,000 shares on October 14, 2004, and 93,600 shares on January 18, 2005.

The FAC alleges that the scheme was underway "at least as early as 2003." ¶ 70. The Class Period is bounded by the start date of May 2006 only because of the five-year statute of limitations for Section 10(b) claims. Accordingly, the sales of 93,000 and 93,600 on October 14,

---

[33] *See* Defs' Br. at 8, n. 11 (Court may take judicial notice of stock prices).

[34] *See* App. 76 for all transactions by this Trust, which can also be obtained on the SEC's website at: http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001139598&type=&dateb=&owner=include&count=40. The Court may rely on "matters of which a Court may take judicial notice," including SEC filings. Defs' Br. at 2 n.2 (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996)). *See also* Defs' Br. at 8 n.12; Exhibit A to Defs' Appendix (attaching a copy of Defendant Peden's Form 4).

2004, and January 18, 2005, are more appropriately viewed as additional suspicious sales in the period of undisclosed fraud, leaving one lone sale of 75,000 shares in 2001 as the only untainted sale by the Pardo offshore trust.[35]

"Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts." *Central Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d at 552-553. "Suspicious" in this context generally means that the "sales are out of line with prior trading practices or at times calculated to maximize personal profit." *Id.* at 553; *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 435 (5th Cir. 2002). Defendant Pardo's stock sales were suspicious and opportunistically timed trades. In calendar year 2007, when the Colorado Securities Commission sued Defendants LPHI, Pardo and Peden for the "high frequency rate" at which insureds were outliving their LEs, Pardo sold 363,513 shares of LPHI stock for total proceeds of $7,731,757.80. ¶ 86(b). In fiscal 2008, when LPHI overstated its net income by 29%, Pardo sold 73,589 shares of LPHI stock for total proceeds of $2,601,799.37. *Id.*

Nor can Pardo or Peden escape liability simply because they did not sell *all* of their shares at peak prices. Defs' Br. at 9. *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 647 (E.D. Va. 2000). Further, Defendant Pardo had an important reason he could not sell any more shares – he needed to maintain his 50.3% majority in order to enact the second prong of his scheme to enrich himself personally at the expense of the Class. ¶ 84.

### (2) The dividend prong of the scheme.

Pardo controlled LPHI and affirmatively used that control to approve dividend payments that awarded him nearly $21 million. Pardo owns 9,377,605 shares of LPHI (approximately

---

[35] Additionally, Defendant Peden sold 10,000 shares during the Class Period on June 18, 2007, at $30.12 per share for total proceeds of $301,270. Defs' Appendix, Ex. A. He had not sold any shares between February 16, 2001, and the beginning of the Class Period on May 26, 2006. Defendants point to the "absence of any allegations that Defendant Martin engaged in any trading activity" as evidence refuting scienter. Defs' Br. at 9. This argument is not compelling because Martin owned only trivial amounts of LPHI stock during the Class Period. *See* Martin's February 8, 2008 Form 3 (300 shares) and September 18, 2009 Form 4 (2,000 shares). App. 102.

50.3% of the Company's outstanding shares), primarily through a trust (Pardo Family Holdings, Ltd.). ¶¶ 30, 83, 86, 297. No stranger to securities fraud,[36] Pardo established the trust on the island of Gibraltar, a well-known "asset protection" haven where it is extremely hard, if not impossible, for creditors to attach assets. ¶ 83. By reporting "record" earnings quarter after quarter from 2007 through 2010, the Company was able to continue this scam long enough for Pardo to pay his Gibraltar trust the nearly $21 million dollars in LPHI dividends. ¶¶ 12, 88.

Even as LPHI's stock price dropped when the market began to learn of LPHI's manipulated LE estimations and doubt that LPHI's earnings were legitimate, Pardo *accelerated* the frequency of dividends and the amount. ¶ 88 (seven dividend payments from May 2010 to May 2011, including two "special" dividends). Of the $21 million in dividend payments Pardo collected from LPHI during the Class Period, he received $11.6 million of it during the Class Period's final 13 months. ¶ 88. Further, he increased the dividend rate to 25¢ per share from $0.07 per share *just months after Citron Research first publicly questioned LPHI's operations*. ¶ 88. Plaintiffs thus allege that Pardo used his controlling interest in LPHI to manipulate dividend payments to snare $21 million during the Class Period. *Id*.[37]

Defendants challenge that the allegations regarding Pardo's control and receipt of dividends provide evidence of *motive*, but largely ignore the Fifth Circuit's *Shaw*, *Barrie* and *Goldstein* decisions, instead relying principally upon *In re Yukos Oil Co. Sec. Litig.*, 2006 U.S. Dist. LEXIS 78067 (S.D.N.Y. 2006). Defs' Br. at 10-12. In *In re Yukos Oil Co.*, the court rejected defendant's receipt of dividends as probative of motive because defendant did not

---

[36] In 1991, Pardo settled SEC charges against him for overstating revenue and profits in a prior company, making the company a "stock-market favorite in the 1980s" before filing for bankruptcy. ¶ 211. Upon settling, he founded LPHI. *Id*.

[37] Defendants thus incorrectly assert that the Complaint does not allege a "suspicious" record of dividend payments. Defs' Br. at 12. Far from showing that LPHI merely continued LPHI's "well-established dividend policy," the record demonstrates payments both in "suspicious amounts" and "suspicious times." *Cf., id*.

control the dividend stream.  *Id*. at \*5.  Rather, as the court emphasized, allegations of mere passive benefit from fraudulent conduct are insufficient:  "The Complaint alleges merely the *passive* maintenance of stock positions and the receipt of dividends in due course[.]"  *Id*. at \*59 (emphasis added).  Likewise, in Defendants' second authority, *Tamar v. Mind C.T.I., LTD.*, 723 F. Supp. 2d 546, 556 (S.D.N.Y. 2010), the defendant owned only 19% of the company's stock and obtained the same percentage of its dividend stream.  Pardo, by contrast, owned just over half of LPHI's shares and controlled LPHI's dividend stream.  ¶¶ 12, 30, 297.

Defendants also cite *Patel v. Patel*, 761 F. Supp. 2d 1375, 1381 (N.D. Ga. 2011), which is contrary to the Fifth Circuit's approach that dividend payments and other forms of incentive compensation can, under appropriate circumstances, strengthen an inference of scienter.  *Patel*'s cursory analysis, by contrast, seems to invoke a bright-line rule that dividend payments can never indicate motive to commit securities fraud.  To the extent *Patel* does so, it must be rejected in light of the *Shaw*, *Barrie* and *Goldstein* decisions.

**D.**   **The Complaint sufficiently states a primary violation and thus also states control-person liability against the Individual Defendants**

To establish "controlling person" liability under § 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78t(a)), a plaintiff must show that a primary violation was committed and that the defendant "directly or indirectly" controlled the violator.  *In re ArthroCare*, 726 F. Supp. 2d at 729.  Defendants seek to dismiss the § 20(a) claim solely because, they assert, the Complaint fails to plead any primary violation of the federal securities law.  Defs' Br. at 34.  Plaintiff establishes above that LPHI committed a primary violation of the Securities Exchange Act, so Defendants' challenge to the § 20(a) claim fails.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs' Complaint satisfies the pleading standards of Rules 12(b)(6) and 9(b), and the PSLRA.  The Court should deny Defendants' motion to dismiss.

DATED this 26th day of April, 2012.

Respectfully submitted,


By    /s/ Steve W. Berman
    Steve W. Berman
    Erin K. Flory
    Karl P. Barth
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594


Reed R. Kathrein
Peter E. Borkon
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001


*Interim Lead Counsel for the Proposed Class*

John D. Fraser
**SHIELDS, BRITTON & FRASER, P.C.**
5401 Village Creek Drive
Plano, TX 75093
Telephone:      (972) 788-4020
Facsimile:      (972) 788-4332


*Interim Liaison Counsel for the Proposed Class*

Marc I. Gross
Jeremy A. Lieberman
**POMERANTZ HAUDEK GROSSMAN
    & GROSS, LLP**
100 Park Ave.
26th Floor
New York, NY 10017-5516
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

Lionel Z. Glancy
Ex Kano S. Sams II
Robert V. Prongay
**GLANCY BINKOW & GOLDBERG LLP**
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone:   (310) 201-9150
Facsimile:   (310) 201-9160

Samuel K. Rosen
**HARWOOD FEFFER LLP**
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone : (212) 935-7400
Facsimile:    (212) 753-3630

*Additional Counsel for the Proposed Class*